1  Dean Gazzo Roistacher LLP
2  Lee H. Roistacher, Esq. (SBN 179619)
   Kimberly A. Sullivan, Esq. (SBN 317857)
   Aleries Lau, Esq. (SBN 340709)
3  440 Stevens Avenue, Suite 100
   Solana Beach, CA  92075
4  Telephone:  (858) 380-4683
   Facsimile:  (858) 492-0486
5  E-mail:     lroistacher@deangazzo.com
                ksullivan@deangazzo.com
6                alau@deangazzo.com

7  Attorneys for Defendant
   Sergeant Daniel Howard
8

9                **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11 | CHRISTOPHER URQUIJO, | Case No.: 5:22-cv-02133-AH-DTB
   individually; LORI MEEKS,
12 individually and as successor in | **JOINT MEMORANDUM OF**
   interest to Raymond Loftin, deceased; | **POINTS AND AUTHORITIES IN**
13 Y.L., B.L., and E.L., in each case by | **SUPPORT OF MOTION FOR**
   and through their guardian ad litem | **SUMMARY JUDGMENT BY**
14 Sebrina Lucky, individually and as | **DEFENDANTS STATE OF**
   7successor in interest to Raymond | **CALIFORNIA BY AND THROUGH**
15 Loftin,  deceased; TYLER VINSON- | **CALIFORNIA HIGHWAY PATROL**
   LOFTIN, individually and as successor | **AND SERGEANT DANIEL**
16 in interest to Raymond Loftin, | **HOWARD**
   deceased; and RAYMOND ALGARIN
17 TORRES, individually and as
   successor in interest to Raymond | Date:       January 21, 2026
18 Loftin, deceased. | Time:       1:30 p.m.
                    | Courtroom:  9C
19            Plaintiffs, | Judge:      Anne Hwang
                    | Magistrate:  David T. Bristow
20       v.
                    | Complaint Filed: 11/30/2022
21 STATE OF CALIFORNIA, | Trial Date: 05/26/2026
   CALIFORNIA HIGHWAY PATROL,
22 SERGEANT DANIEL HOWARD,
   DOES 4-10, Inclusive, and
23 DANIELLE LOFTIN, a nominal
   Defendant.
24
              Defendants.
25

26

27

28  ///

                            1

1

**TABLE OF CONTENTS**

2                                                                **Page No.**

3    DEFENDANTS' INTRODUCTION…………………………………...…13

4    PLAINTIFFS' INTRODUCTION……………………………………....…15

5    DEFENDANTS' SUMMARY JUDGMENT STANDARDS………………….17

6    PLAINTIFFS' SUMMARY JUDGMENT STANDARDS………………….17

7    DEFENDANTS' STATEMENT OF FACTS……………………………..19

8        A.    The Stolen Big Rig Initiates A Long And Dangerous
               Pursuit…………....................................................................................... 19

9        B.    Loftin Actively Avoids Apprehension During A Nearly
10             1 ½ Hour Dangerous Pursuit…………..…………………………..20

11            1.    First Law Enforcement Action Attempting to Stop the
                    Dangerous Pursuit…………………………………………….20

12            2.    Loftin Drives into an Active Construction Zone…………...20

13
              3.    Second Law Enforcement Action Attempting to Stop
14                  the Dangerous Pursuit………………………………………….21

15            4.    Third Law Enforcement Action Attempting to Stop the
                    Dangerous Pursuit…………………………………………….21

16
              5.    Fourth Law Enforcement Action Attempting to Stop the
17                  Dangerous Pursuit…………………………………………….22

18            6.    Fifth Law Enforcement Action Attempting to Stop the
                    Dangerous Pursuit…………………………………………….22

19
              7.    Sixth Law Enforcement Action Attempting to Stop the
20                  Dangerous Pursuit…………………………………………….22

21            8.    Seventh Law Enforcement Action Attempting to Stop the
                    Dangerous Pursuit…………………………………………….23

22
              9.    Eighth Law Enforcement Action Attempting to Stop the
23                  Dangerous Pursuit…………………………………………….23

24       C.    Loftin Was Given A Final Opportunity To Surrender And
               Stop The Dangerous Pursuit At The Roadblock But Chose To
25             Endanger Lives…………………………………………………24

26    PLAINTIFFS' STATEMENT OF FACTS…………………………………..29

27

28

2

1  PLAINTIFFS' STATEMENT OF FACTS ………………………………….29

2      A.    Background……………………………………………………..29

3      B.    The Shooting……………………………………………………30

4      C.    Police Training and Standards on the Use of Deadly Force………32

5  ARGUMENT………………………………………………………………...34

6      A.    Howard's Argument: Summary Judgment Is Proper on the § 1983
             Claims (Claims 1 and 2)…………………………………………..34

7
       1.    Doctrine of qualified immunity……………………………34
8
       2.    Qualified immunity protects Howard from liability on the
9            Fourth Amendment claims brought on Loftin's behalf and
             Urquijo (Claim 1)………………………………………….36
10
             a.    *Howard's use of deadly force didn't violate the Fourth*
11                 *Amendment. Deadly force to stop the lengthy and*
                   *dangerous pursuit is constitutional because of the*
12                 *imminent, on-going and potential future risk of death*
                   *or serious bodily injury to the public and officers if the*
13                 *pursuit continued and further was constitutional*
                   *because of the imminent risk of death or serious*
14                 *injury to Howard and the other officers at the*
                   *roadblock*…………………………………………………36
15
                   i.    Fourth Amendment standard…………………36
16
                   ii.   Howard's use of deadly force to terminate
17                       the pursuit was objectively reasonable.
                         Probable cause existed for Howard to believe
18                       Loftin posed an immediate threat of serious
                         injury or death to anyone and everyone on the
19                       roadways, including Howard, the officers at the
                         roadblock and, if the pursuit continued, scores
20                       of innocent motorists and the officers trying to
                         stop Loftin   …………………………….…38
21
             b.    *Absence of clearly established law. No controlling*
22                 *precedent held an officer violates the Fourth*
                   *Amendment when using deadly force to end a*
23                 *50-mile pursuit of a Big Rig when the driver*
                   *intentionally avoids apprehension for over an*
24                 *hour while driving against traffic on three major*
                   *highways with many near-miss collisions with*
25                 *motorists and officers and then presents an*
                   *imminent risk of death or serious injury to officers*
26                 *at a roadblock trying to stop the ongoing*
                   *pursuit*…..………………………………..……………43
27

28

3. Qualified immunity protects Howard from liability on the Fourteenth Amendment loss of familial association claim (claim 2)................................................................45

a. The predicate underlying Fourth Amendment violation didn't exist.....................................46

b. The purpose to harm standard applies and Howard acted with the legitimate law enforcement objective of self-protection or protection of others.............................................................46

c. No clearly established law demonstrates a Fourteenth Amendment violation.........................47

B. Plaintiffs' Argument On The § 1983 Claims.........................48

1. A Reasonable Jury Could Find That Howard's Use of Deadly Force Was Excessive and Unreasonable...............48

a) Loftin Did Not Injure Anyone or Cause Any Collisions...................................................49

b) Howard Failed to Give a Warning Prior to Using Deadly Force.............................................49

c) Loftin and the truck posed no immediate threat of death or serious bodily injury to any person at the time of the shots.............................50

d) A reasonable jury could find Howard's statement that he perceived the truck to be coming toward him when it was reversing away from him not credible; alternatively, a reasonable jury could find Howard's mistake of fact unreasonable............51

e) Reasonable Alternatives Available.....................52

f) The Fleeing Felon Theory Does Not Apply.............53

g) Defendants' Cited Cases Are Distinguishable..........54

2. Plaintiffs' Fourteenth Amendment Claims Survive...........58

C. Howard is Not Entitled to Qualified Immunity.........................60

D. Defendants' Arguments: Summary Judgment On The State Law Claims Is Proper..................................................65

1. The Bane Act claims fail because Howard's use of deadly force didn't violate the Fourth Amendment. Alternatively, Howard lacked a specific intent to violate the Fourth Amendment (claim 3)............................................65

4

2.    Battery claims fail because Howard's use of deadly force was objectively reasonable under the Fourth Amendment (claims 6 and 7)……………………………………………………….65

3.    Negligence claims fail because Howard's use of deadly force was objectively reasonable under the totality of circumstances (claims 4, 5, and 8)…………………………….66

E.    Plaintiffs' Arguments On State Law Claims……………………...67

    1.    *Battery*……………………………………………………...67

    2.    *Negligence*………………………………………………68

    3.    *Negligent Infliction of Emotional Distress*………………68

    4.    *Bane Act*…………………………………………………69

F.    Howard's Argument: Summary Judgment On The Punitive Damage Claim Is Proper……………………………………….69

G.    Plaintiffs' Argument On Punitive Damages…………………….70

DEFENDANTS' CONCLUSION…………………………………………….71

PLAINTIFFS' CONCLUSION………………………………………………71

# TABLE OF AUTHORITIES

Page No.

**Cases**

*Acosta v. City and Cnty. Of San Francisco*
    83 F.3d 1143 (9th Cir. 1996)…………………………………………..…61

*A.D. v. State of California Highway Patrol*
    712 F.3d 446 (9th Cir. 2013)……………………………..…47, 59, 60

*Adams v. Speers*
    473 F.3d 989 (9th Cir. 2007)………………………………...45, 62, 63

*Adickes v. S.H. Kress & Co.*
    398 U.S. 144 (1970)………………………………………………....18

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)………………………………………………18, 39

*Arpin v. Santa Clara Valley Transp. Agency*
    261 F.3d 912 (9th Cir. 2001)……………..……………………66

*Ashcroft v. al Kidd*
    563 U.S. 731 (2011)……………………………………...…35, 44

*Avina v. United States*
    681 F.3d 1127 (9th Cir. 2012)……………………………………66

*Bias v. Moynihan*
    508 F.3d 1212 (9th Cir. 2007)………………………………………17

*Bird v. Saenz*
    28 Cal. 4th 910 (2002)…………………………………………………68

*Brosseau v. Haugen*
    543 U.S. 194 (2004)………………………………………..…*Passim*

*Brown v. Ransweiler*
    171 Cal. App. 4th 516 (2009)……………………………………………65

*Bryan v. MacPherson*
    630 F.3d 805 & n.15 (9th Cir. 2010)……………………………………52

*Cass v. City of Dayton*
    770 F.3d 368 (6th Cir. 2014)………………………………………..…64

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)………………………………...……..17, 18

*Changing World Films LLC v. Parker*
    2023 U.S. Dist. LEXIS 163825 (C.D. Cal. Sep. 12, 2023)………………44

6

*Chew v. Gates*
    27 F.3d 1432 (9th Cir. 1994)……………………………………..…50

*City & County of San Francisco v. Sheehan*
    575 U.S. 600 (2015)………………………………………………35

*Cole v. Bone*
    993 F.2d 1328 (8th Cir. 1993)……………………………………43

*Coles v. Eagle*
    704 F.3d 624 (9th Cir. 2012)………………………………………..…60

*Cornell v. City and County of San Francisco*
    17 Cal. App. 5th 766 (2017)………………………………………69

*County of Sacramento v. Lewis*
    523 U.S. 833 (1998)………………………………………………58

*Cruz v. City of Anaheim*
    765 F.3d 1076 (9th Cir. 2014)……………………………………52

*Dang v. Cross*
    422 F.3d 800 (9th Cir. 2005)……………………………………..…70

*Deorle v. Rutherford*
    272 F.3d 1272 (9th Cir. 2001)……………………………………50

*Dereaux v. Abbey*
    263 F.3d 1070 (9th Cir. 2001)……………………………………17

*Devenpeck v. Alford*
    543 U.S. 146 (2004)………………………………………………38

*Diaz v. Cnty. of Ventura*
    512 F. Supp. 3d 1030 (C.D. Cal. 2021)………………………..…52

*District of Columbia v. Wesby*
    583 U.S. 48 (2018)……………………………………35, 36, 43

*Drummond v. City of Anaheim,*
    343 F.3d 1052, 1062 (9th Cir. 2003)……………………………..…64

*Ellins v. City of Sierra Madre*
    710 F.3d 1049 (9th Cir. 2013)……………………………………60

*Espinosa v. City & Cnty. of San Francisco*
    598 F.3d 528 (9th Cir. 2010)……………………………………50, 54

*Estate of Aguirre v. County of Riverside*
    29 F.4th 624 (9th Cir. 2022)……………………………………49

*Est. of Hernandez v. City of L.A.*
    139 F.4th 790 (9th Cir. 2025)………………………………….....37, 42

*Estate of Kosakoff v. City of San Diego*
        460 Fed. App'x 652 (9th Cir. 2011)…………………………………………63

*Estate of Najera Aguirre v. Cnty. Of Riverside*
        29 F.4th 624 (9th Cir. 2022)…………………………………………………65

*Estate of Strickland v. Nevada Cnty.*
        69 F.4th 614, 620 (9th Cir. 2023)………………………………………37

*Felarca v. Birgeneau*
        891 F.3d 809, 815 (9th Cir. 2018)……………………………………...35

*Figueroa v. Gates*
        207 F. Supp. 2d 1085 (C.D. Cal. 2002)……………………………………54

*Galindo v. City of S.F.*
        718 F. Supp. 3d 1121 (N.D. Cal. 2024)……………………………...46

*Gantt v. City of Los Angeles*
        717 F.3d 702 (9th Cir. 2013)………………………………………...58

*Gauslik v. Perez*
        392 F.3d 1006 (9th Cir. 2004)………………………………………46

*Glenn v. Washington Cnty.*
        673 F.3d 864 (9th Cir. 2011)………………………………………...48

*Godawa v. Byrd*
        798 F.3d 457 (6th Cir. 2015)……………………………………….....63, 64

*Gonzalez v. City of Anaheim*
        747 F.3d 789 (9th Cir. 2014)………………………………………47, 49

*Graham v. Connor*
        490 U.S. 386 (1989)……………………………………………..*Passim*

*Green v. City & Cnty. of S.F.*
        751 F.3d 1039 (9th Cir. 2014)………………………………………48

*Greer v. City of Hayward*
        229 F. Supp. 3d 1091 (N.D. Cal. Jan. 17, 2017)…………………...58

*Harris v. Roderick*
        126 F.3d 1189 (9th Cir. 1997)……………………………………..………48, 49

*Hart v. City of Redwood City*
        99 F.4th 543 (9th Cir. 2024)………………………………………36

*Hayes v. County of San Diego*
        736 F.3d 1223 (9th Cir. 2013)………………………………………*Passim*

*Headwaters Forest Def. v. Cnty. Of Humboldt*
        240 F.3d 1185 (9th Cir. 2000)………………………………………48

8

*Hernandez v. Town of Gilbert*
    989 F.3d 739 (9th Cir. 2021)………………………………………...…17

*Hope v. Pelzer*
    536 U.S. 730 (2002)………………………………………………...64

*Hopkins v. Andaya*
    958 F.2d 881 (9th Cir. 1992)…………………………………………18

*Hopson v. Alexander*
    71 F.4th 692 (9th Cir. 2023)…………………………………………17

*J.P. ex rel. Balderas v. City of Porterville*
    801 F.Supp.2d 965 (E.D. Cal. 2011)…………………………………46

*Kaffaga v. Estate of Steinbeck*
    938 F.3d 1006 (9th Cir. 2019)………………………………………70

*Kirby v. Duva*
    530 F.3d 475 (6th Cir. 2008)………………………………………...53

*Kisela v. Hughes*
    584 U.S. 100 (2018)……………………………………………...35, 43

*Kosakoff v. City of San Diego*
    No. 08-CV-1819-IEG (NLS), 2010 WL 1759455
    (S.D. Cal. Apr. 29, 2010)……………………………………………63

*Koussaya v. City of Stockton*
    54 Cal. App. 5th 909 (2021)…………………………………………66

*Lake Nacimiento Ranch Co. v. San Luis Obispo County*
    841 F.2d 872 (9th Cir. 1987)………………………………………18

*Larez v. City of Los Angeles*
    946 F.2d 630 (9th Cir. 1991)………………………………………...70

*Liston v. County of Riverside*
    120 F.3d 965 (9th Cir. 1997)………………………………………18

*Longoria v. Pinal County*
    873 F.3d 699 (9th Cir. 2017)………………………………………...60

*Lowry v. City of San Diego*
    858 F.3d 1248 (9th Cir. 2017)………………………………………49

*Lytle v. Bexar Cnty., Tex.*
    560 F.3d 404 (5th Cir. 2009)……………………………………53, 54

*Monzon v. City of Murrieta*
    978 F.3d 1150 (9th Cir. 2020)……………………………………*Passim*

*Mullenix v. Luna*
    136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)………………………38, 43, 57

*Munoz v. City of Union City*
120 Cal. App. 4th 1077 (2004)……………………………………67

*Murillo v. City of L.A.*
707 F. Supp. 3d 947 (C.D. Cal. 2023)…………………………..…65, 66

*Napouk v. L.V. Metro. Police Dep't*
123 F.4th 906 (9th Cir. 2024)……………………………………46

*Nehad v. Browder*
929 F.3d 1125 (9th Cir. 2019)……………………………………48, 52

*Nicholson v. City of L.A.*
935 F.3d 685 (9th Cir. 2019)……………………………………47

*N.S. v. Kan. City Bd. Of Police Comm'rs,*
143 S. Ct. 2422 (2023)……………………………………64

*Ochoa v. City of Mesa*
26 F.4th 1050 (9th Cir. 2022)……………………………………45, 47

*Orn v. City of Tacoma*
949 F.3d 1167 (9th Cir. 2020)…………………………….......…Passim

*Pearson v. Callahan*
555 U.S. 223 (2009)……………………………………34, 35

*Plumhoff v. Rickard*
572 U.S. 765 (2014)……………………………………Passim

*Porter v. Osborn*
546 F.3d 1131 (9th Cir. 2008)…………………………….…46, 58

*Puente v. City of Phx.*
123 F.4th 1035 (9th Cir. 2024)…………………………….…46, 47

*Reese v. County of Sacramento*
888 F.3d 1030 (9th Cir. 2018)…………………………….…65, 69

*Reyes v. City of Santa Ana*
832 F. App'x 487 (9th Cir. 2020)……………………………..65

*Rivas Villegas v. Cortesluna*
595 U.S. 1 (2021)...............................................36, 65

*Rosenbaum v. City of San Jose*
107 F.4th 919 (9th Cir. 2024).....................................60

*Sabbe v. Wash. Cty. Bd. Of Comm'rs,*
84 F.4th 807 (9th Cir. 2023)……………………………………38

*Santos v. Gates*
287 F.3d 846 (9th Cir. 2002)……………………………..…18

10

*Schwarz v. Lassen County*
  628 F. App'x 527 (9th Cir. 2016)……………………………………………46

*Scott v. Harris*
  550 U.S. 372 (2007)……………………………………………*Passim*

*Scott v. Smith*
  109 F.4th 1215 (9th Cir. 2024)…………………………………......45, 64

*Sharp v. County of Orange*
  871 F.3d 901 (9th Cir. 2017)…………………………………….36

*Singh v. City of Phoenix*
  124 F.4th 746 (9th Cir. 2024)……………………………………49

*Smith v. Adepa*
  81 F.4th 994 (9th Cir. 2023)……………………………………35

*Smith v. City of Hemet*
  394 F.3d 689 (9th Cir. 2005)……………………………………..50

*Smith v. Cupp*
  430 F.3d 766 (6th Cir. 2005)……………………………………......63

*Smith v. Wade*
  461 U.S. 30 (1983)……………………………………………..…69, 70

*Spencer v. Pew*
  117 F.4th 1130 (9th Cir. 2024)…………………………………….36

*Tabares v. City of Huntington Beach*
  988 F.3d 1119 (9th Cir. 2021)…………………………………..….66, 68

*Tennessee v. Garner*
  471 U.S. 1 (1985)……………………………………………..…*Passim*

*Tennison v. City and Cnty. of San Francisco*
  570 F.3d 1078 (9th Cir. 2009)……………………………………58

*Tolan v. Cotton*
  572 U.S. 650 (2014)…………………………………………...17

*Torres v. City of Madera*
  648 F.3d 1119 (9th Cir. 2011)…………………………………..….48, 52

*United States v. One Parcel of Real Prop.*
  904 F.2d 487 (9th Cir. 1990)……………………………………18

*Vasquez v. City of San Jose*
  2024 U.S. App. LEXIS 2663 (9th Cir. Feb. 6, 2024)………………....44

*Villanueva v. California*
  986 F.3d 1158 (9th Cir. 2021)……………………………………*Passim*

11

1    *Vos. v. City of Newport Beach*
2        892 F.3d 1024 (9th Cir. 2018)……………………………………………48

3    *Waller v. City of Nogales*
         2024 U.S. Dist. LEXIS 29259 (D. Ariz. Feb. 20, 2024)……………..*Passim*

4    *White v. Pauly*
         580 U.S. 73 (2017)………………………………………………………35
5
     *Wilkinson v. Torres*
6        610 F.3d 546 (9th Cir. 2010)………………………………..……*Passim*

7    *Williams v. City of Sparks*
         112 F.4th 635 (9th Cir. 2024)…………………………………….…*Passim*
8
     *Williamson v. City of Nat'l City*
9        23 F.4th 1146 (9th Cir. 2022)……………………………………..…65

10   *Ziglar v. Abbasi*
         582 U.S. 120 (2017)………………………………………………………64
11

12   **Statutes**

     42 U.S. C. § 1983……………………………………………..…..*Passim*
13
     Cal. Gov. Code § 815.2(a)……………………………………………67
14
     Cal. Penal Code § 835(a)…………………………………………………67
15
     Fed. R. Civ. P. 56……………………………………………...17, 18
16

17   **Secondary**

18   CACI 441………………………………………………………….…68

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' INTRODUCTION**

Around 10:30 p.m. on June 22, 2021, while high on "meth," Raymond Loftin and his brother Christopher Urquijo stole a 40-foot long, ten-wheel, 19,000-pound truck (Big Rig). With Loftin driving, the two led many officers from several law enforcement agencies on a nearly 1 ½ hour, 50-mile pursuit on surface streets and *three major Southern California highways, where Loftin consistently drove at highway speeds against traffic* during which he endangered the lives of thousands of innocent motorists and many officers trying to end Loftin's homicidal conduct.

Around 1:00 a.m. the next morning, Loftin – traveling *the wrong way* on westbound I-10 around 50 mph – approached a CHP roadblock. Because Loftin wasn't stopping or surrendering, Howard used deadly force to end the long and dangerous pursuit and, doing so, eliminated the imminent, ongoing, and continued threat of serious injury and death Loftin posed to the thousands of drivers on the roadways, the many officers involved in trying to stop him, and Howard and the other officers at the roadblock. Loftin was killed and Urquijo injured by shattering glass. The evidence conclusively establishes deadly force was objectively reasonable under the totality of the circumstances and needed to end the pursuit. Loftin hadn't and wasn't going to stop or surrender. Sheer luck spared injury or death to innocent motorists and officers during the pursuit and at its conclusion.

Plaintiffs are Urquijo, Loftin's mother (Lori Meeks), Loftin's three minor children (Y.L., B.L. and E.L), and Loftin's two adult children (Tyler Vinson-Loftin and Raymond Algarin Torres). *See generally* Doc. 134 (4AC); Doc. 142 (stipulation clarifying claims in 4AC); Doc. 143 (order on stipulation). Plaintiffs assert claims directly against Howard under 42 U.S.C. § 1983 and against Howard directly and CHP vicariously under California law. *Id.*

On Loftin's behalf, all plaintiffs but Urquijo assert a Fourth Amendment excessive force claim against Howard as Loftin's successors in interest and seek damages on Loftin's behalf (Claim 1). Doc. 134, ¶¶ 37-59; Docs. 142, 143. Urquijo

13

asserts his own Fourth Amendment excessive force claim against Howard (Claim 1). *Id.* On their own behalf, Meeks, E.L., Y.L., B.L assert a § 1983 Fourteenth Amendment loss of familial association claim against Howard (Claim 2). Doc. 134, ¶¶ 60-72; Docs. 142, 143.

On Loftin's behalf, Meeks, E.L., Y.L., and B.L allege a Bane Act claim directly against Howard and vicariously against CHP seeking damages on Loftin's behalf as his successors in interest (Claim 3). Doc. 134, ¶¶ 73-89. Urquijo alleges his own Bane Act claim against Howard and CHP. (Claim 3). *Id.*

Meeks, E.L., Y.L., and B.L allege negligence and battery claims (Claims 4 and 6 [erroneously identified as Claim 7]) against Howard directly and CHP vicariously for their own "wrongful death" damages and for damages on Loftin's behalf. Doc. 134, ¶¶ 90-100, 113-116. Urquijo alleges his own negligence and battery claims (Claims 5 and 7), and a negligent infliction of emotional distress claim (claim 8) based on witnessing Loftin being shot, against Howard directly and CHP vicariously. *Id.*, ¶¶ 101-112, 127-135, 136-141.

Howard is entitled to qualified immunity on the § 1983 claims. Binding precedent compels finding Howard's use of deadly force violated neither Loftin's nor Urquijo's Fourth Amendment rights, nor the Fourteenth Amendment rights of Meeks, E.L., Y.L. and B.L. Alternatively, no controlling precedent existing in June 2021 "clearly established" to *all reasonable officers* that Howard's use of deadly force to end the pursuit and to protect himself and other officers under the *specific facts of this case* violated either the Fourth or Fourteenth Amendments.

Howard's objectively reasonable use of deadly force renders meritless the state law battery, negligence and Bane Act claims. The Bane Act claim further fails for lack of a specific intent by Howard to violate Loftin's or Urquijo's Fourth Amendment rights. Because Howard is not directly liable, CHP is not vicariously liable.

///

14

# PLAINTIFFS' INTRODUCTION

This Court should deny Defendants' Motion in its entirety. Viewing the facts in the light most favorable to Plaintiffs, which this Court is required to do on a motion for summary judgment, the truck posed no immediate threat of death or serious bodily injury to any person at the time of Howard's twenty lethal shots, including because no person was about to be struck by the truck with no opportunity to get out of the way. Under police training and standards, officers can only use deadly force based on an objectively reasonably belief that the person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. That was not the case here, where the truck was reversing away from Howard and the other officers at the time of the shooting, which a reasonable officer would have recognized. Even if Howard's mistaken perception were genuine, which is a credibility question for the jury, it was not a reasonable mistake. The videos clearly show that the truck came to a stop and then reversed, with no person in its path of travel. The only time Howard was in front of the truck is when the truck was moving in reverse, and Howard left a position of cover to intentionally place himself in front of the truck. Further, a reasonable officer in Howard's position would have known that the truck was making another U-turn, as Howard knew it had made U-turns several times. Howard determined that if the truck made another U-turn, then he would reassess rather than shooting. Simultaneously, the helicopter broadcasted that it looked like the truck was going to try to make a U-turn, and when Howard saw the truck slow down and make a turning movement, he thought the truck was going to make a U-turn.

Additionally, as articulated by Plaintiffs' police practices expert, Scott DeFoe, in his declaration filed concurrently herewith, it would not have been appropriate for Howard to shoot Loftin for fleeing. Howard had no information that Loftin had injured anyone or caused any vehicle collisions during the pursuit

15

and no information that Loftin had a firearm. Howard agrees that if the truck was trying to turn around at the roadblock and go the right way on the freeway, then there would not be an immediate threat of death or serious bodily injury at that time, and it would be inappropriate to shoot. Although Plaintiffs concede that the truck could have posed a potential threat to motorists had it completed its U-turn and driven away, a potential threat is insufficient to justify the use of deadly force. Officers, including Howard, are trained that an imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm. That was not the case here, where no person was about to be struck by the truck at the time of Howard's shots. Therefore, the shooting violated Loftin's and Urquijo's rights to be free from unreasonable force under federal and state law.

Howard is not entitled to qualified immunity, which only applies to Plaintiffs' federal claims. Given the video contradicting Howard's account, it is the role of a jury to determine whether Howard's story is credible and whether a reasonable officer would have mistakenly perceived the truck to be moving forward towards him at the time of the shots, especially when it is undisputed that the truck was reversing at the time of the shots. Where the incident is captured on video, the Court cannot credit "visible fiction" when one version of events is "blatantly contradicted by the record"; it must instead "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). With respect to the second prong of qualified immunity, Howard was on notice at the time of this incident that shooting the driver of a vehicle reversing away from him with no person in the vehicle's path is a Fourth Amendment violation. Officers, including Howard, are trained to stay out of the path of a vehicle and get out of the path rather than shooting at the vehicle. In violation of this training, Howard left cover and ran in front of the truck. For each of these

///

1   reasons and the reasons set forth below, this Court should deny Defendants'

2   Motion.

3                    **DEFENDANTS' SUMMARY JUDGMENT STANDARDS**

4          A defendant meets its summary judgment burden under Federal Rule of

5   Civil Procedure 56 by: (1) showing the absence of a genuine issue of material

6   fact; or (2) arguing the absence of evidence to support the plaintiff's claims.

7   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Dereaux v. Abbey*, 263

8   F.3d 1070, 1076 (9th Cir. 2001). "To avoid summary judgment, [the plaintiff]

9   [is] required to present significant probative evidence tending to support her

10  allegations." *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007).

11         Facts are viewed in favor of the nonmoving party only if a genuine dispute

12  exists. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Williams v. City of Sparks*, 112

13  F.4th 635, 642 (9th Cir. 2024). Though the court "assumes that the version of

14  material facts asserted by the plaintiff is correct," it "may [also] consider facts

15  offered by the defendant that are uncontradicted by any evidence in the record."

16  *Williams*, 112 F.4th at 642 (simplified); *Hopson v. Alexander*, 71 F.4th 692, 697

17  (9th Cir. 2023). This includes what is depicted on video, and the Court doesn't

18  accept a plaintiff's version of the facts when contradicted by video. *Williams*,

19  112 F.4th at 642; *see also Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th

20  Cir. 2021) ("[W]e are not required to accept a non-movant's version of events

21  when it is clearly contradicted by a video in the record.") (simplified) (citing

22  *Scott*, 550 U.S. at 378-80).

23                    **PLAINTIFFS' SUMMARY JUDGMENT STANDARDS**

24         On a motion for summary judgment, the Court must view the evidence in

25  the light most favorable to the plaintiff as the non-moving party and make all

26  reasonable inferences in the plaintiff's favor. *Tolan v. Cotton*, 572 U.S. 650, 657

27  (2014); *Scott*, 550 U.S. at 380. A factual dispute is "genuine" where "the

28  evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Entirely circumstantial evidence may be sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). The court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *United States v. One Parcel of Real Prop.*, 904 F.2d 487, 491–92 (9th Cir. 1990). Even where key facts are undisputed, summary judgment should be denied if reasonable minds could differ on the inferences to be drawn from those facts. *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

Summary judgment is a drastic remedy and therefore trial courts should act "with caution" in granting summary judgment. *Anderson*, 477 U.S. at 255. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions," summary judgment "in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question … for the jury."). Federal Rules of Civil Procedure, Rule 56 must be construed "with due regard" for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried by a jury. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

///

///

///

///

///

///

///

**DEFENDANTS' STATEMENT OF FACTS**

**A.    The Stolen Big Rig Initiates A Long And Dangerous Pursuit**

On June 22, 2021, at 10:37 p.m., high on "meth," Loftin and Urquijo broke into CMC Rebar West and stole the Big Rig -- a 10-wheel, 40-foot long three-axle flatbed 2008 Peterbilt 340 weighting over 19,000 lbs. – and with Loftin driving smashed through a fence on the way out. Joint Appendix of Facts (JAF) 1-4.



Exh. 40. The break in and theft was reported at 11:20 p.m.  JAF 5.

At 11:44 p.m., after Loftin and Urquijo stopped at McDonalds for food in the stolen Big Rig, Colton PD officers saw Loftin and Urquijo in the Big Rig on Iowa Avenue, east of I-215. JAF 6-7. The officers followed while waiting for additional support. JAF 8. After seeing officers following them and deciding not to surrender, Loftin made a sharp right turn and *crossed over three lanes of traffic to enter I-215 in the wrong direction, against the flow of traffic*. JAF 9-10. The reason Loftin fled is clear. Loftin was on probation and mandatory supervision after an August 13, 2019 conviction for receiving stolen property; he was arrested

19

on March 21, 2021 for burglary, grand theft, resisting and *evading an officer,* and he had a court hearing in two days for those charges. JAF 11-13.

The officers didn't follow Loftin the wrong way on I-215 because of his dangerous maneuver but instead requested additional law enforcement support from: San Bernardino County Sheriff's Department and its Helicopter 40-K, Fontana Police Department, and CHP San Bernardino and Rancho Cucamonga area units. JAF 14-16.

**B.    Loftin Actively Avoids Apprehension During A Nearly 1 ½ Hour Dangerous Pursuit**

*1.    First Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 11:47 p.m. Helicopter 40-K saw the Big Rig traveling northbound on I-215 at Washington Street in the correct direction of travel. JAF 17. At 11:50 p.m. the Big Rig exited eastbound I-10 at Waterman Avenue followed by Colton PD officers (lights and sirens) instructed Loftin to stop and pull over.  JAF 18. Using dangerous evasive driving, Loftin didn't stop and a pursuit ensued on surface streets where *Loftin ran four red lights* while traveling northbound on Waterman Avenue. JAF 19-24.

At 11:51 p.m. the Big Rig entered westbound I-10 *traveling the wrong way at 60 mph.* JAF 25. A supervisor instructed the officers not to pursue the Big Rig given the dangers a wrong way pursuant on I-10 posed the public and officers. JAF 26-27. Multiple times Loftin *swerved into other lanes nearly causing head-on collisions* with multiple innocent motorists *traveling the right way* who had to swerve into other lanes to avoid head-on collisions with the Big Rig. JAF 28-29.

*2.    Loftin Drives into an Active Construction Zone*

At 11:55 p.m., Loftin entered eastbound SR-210 driving *the wrong way at 75 mph.* JAF 30. He continued *the wrong way* until he went through an *active construction zone* blocking the roadway, striking debris and almost hitting construction workers and vehicles. JAF 31-34. Loftin made a U-turn in the middle

20

of the freeway and struck a concrete K-rail barrier, which had no impact on the 19,000-pound Big Rig, Loftin continued eastbound on SR-210 before exiting at San Bernardino Avenue. JAF 35-37.

3.    *Second Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 12:00 a.m., the Big Rig was seen westbound on SR-210, east of 5th Street where a second enforcement stop was initiated with officers activating their lights and sirens. JAF 38-39. Loftin didn't stop and a pursuit ensued as Loftin exited the freeway at Baseline Street and immediately re-entered eastbound SR-210 *traveling in the wrong direction*.  JAF 40-42. While officers pursuing the Big Rig using westbound SR-210, Loftin continued *westbound against traffic at 60 mph* on eastbound SR-210 using the right shoulder and slow lane to avoid crashing into cars traveling in the right direction *who had to swerve into other lanes to avoid being struck head on by the Big Rig*. JAF 43-45.

At 12:01 a.m. CHP Rancho Cucamonga area units learned the pursuit was heading into their area. JAF 46. Howard was monitoring the radio, acknowledging the pursuit at 12:02 a.m. CHP Officers Vasquez and Garcia began responding. JAF 47-48.

4.    *Third Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 12:04 a.m. officers conducted a traffic break with their vehicles by weaving across all lanes of traffic with lights activated to stop all eastbound SR-210 traffic at Victoria Avenue. JAF 50. Still traveling *against traffic* on eastbound SR-210 at 45 mph, Loftin *used the shoulder to drive around the stopped traffic and officers* continuing Loftin continued the *wrong way* and causing several *near-miss traffic collisions*. JAF 51-52. Helicopter 40-K advised over the radio that *Loftin swerved at two different vehicles* while traveling at 60 mph. JAF 53.

///

5.      *Fourth Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 12:09 a.m. Howard and Mercado responded toward SR-210 to get into position should the pursuit continue west. JAF 54. At 12:10 a.m. a second traffic break stopped all SR-210 eastbound traffic. Loftin continued to drive the *wrong way* on SR-210 again *passing the traffic break on the right shoulder*. JAF 55-56 .

6.      *Fifth Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

With the Big Rig still heading westbound on SR-210 *against traffic*, officers stopped all eastbound traffic with a traffic break at 12:11 a.m. and spike strips were set up along the right shoulder. JAF 57-59. Helicopter 40-K reported Loftin*, driving against traffic, ran a vehicle off the roadway* and was headed toward the traffic break. JAF 60. At 12:19 a.m., Loftin *avoided the traffic break and spike strips by making a U-turn on the freeway* near Riverside Avenue. JAF 61.

7.      *Sixth Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

The pursuit continued eastbound on SR-210 from Riverside Avenue at *speeds reaching 70 mph*. JAF 62. After exiting, Loftin immediately re-entered, *against traffic*, westbound SR-210 from Baseline Street *striking two concrete K-rail barriers and one water-filled K-rail barrier*. JAF 63-64. Neither impacted the Big Rig which continued traveling *against traffic at speeds up to 75 mph* almost crashing into several vehicles. JAF 65-67.

Because Loftin's conduct so endangered the lives of innocent motorists and the pursuing officers, at 12:34 a.m. Helicopter 40-K advised over the radio that they were ready to use "aerial lethal force" to stop the Big Rig. JAF 68-69.

A CHP sergeant advised all units to discontinue the pursuit at 12:35 and 12:36 a.m to allow Helicopter 40-K to follow the Big Rig, hoping Loftin would voluntarily exit the freeway if not actively pursued. JAF 70-71.

Howard continued to monitor the pursuit and discussed setting up a roadblock with his officers if the Big Rig continued against traffic westbound on SR-210. JAF 72. At this point, Howard knew the Big Rig was reaching high speeds

22

while traveling against traffic on various freeways and that he made U-turns on the freeway, driven past and around traffic stops and stopped traffic, hit K-rail barriers, and had near misses with oncoming traffic. JAF 73.

8.    *Seventh Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 12:37 a.m., officers again deployed spike strips on westbound SR-210, east of San Bernardino Avenue. JAF 74. Loftin drove over the spike strips which deflated the Big Rig's left front tire. JAF 75. Loftin didn't stop but *continued to drive the wrong way on SR-210 at high speeds with a deflated front tire* until transitioning onto the *eastbound I-10 driving against traffic*. JAF 76-77.

At 12:42 a.m., Helicopter 40-K requested CHP conduct a traffic break and shut down eastbound I-10 at I-215. JAF 78. At 12:43 a.m., multiple citizens frantically called 911 as Loftin continued *against traffic on I-10*. JAF 79. The 911 callers reported swerving to avoid a head-on collision with the Big Rig; one caller said, "When I saw the truck coming at me – wow." JAF 80-81.

At 12:46 a.m., Howard directed CHP units meet on eastbound I-10 to create a roadblock. JAF 82. Howard decided a roadblock was needed because he knew the Big Rig was approaching their location traveling against traffic and if not stopped, drivers heading eastbound on I-10 would be in danger. JAF 83-84.

9.    *Eighth Law Enforcement Action Attempting to Stop the Dangerous Pursuit*

At 12:51 a.m., Sheriff's Deputy Andrei Tarankow conducted a fourth traffic break at Pepper Avenue to stop all eastbound I-10 traffic. JAF 85. Cars in all traffic lanes behind Tarankow's vehicle were completely stopped. JAF 86. Deputy Tarankow parked his patrol vehicle in front of the stopped cars and exited his vehicle (which was fortuitous). JAF 87. As Loftin approached the traffic break at *60 mph against traffic*, he didn't stop and nearly crashed into Deputy Tarankow's

///

///

23

1    vehicle. JAF 88-89. Straddling a lane of travel and the right shoulder, Loftin

2    *avoided the traffic stop and continued driving the wrong way on I-10.* JAF 90.

3    **C.    Loftin Was Given A Final Opportunity To Surrender And Stop The
         Dangerous Pursuit At The Roadblock But Chose To Endanger Lives**

4

5    Officers started a fifth traffic stop for I-10 eastbound traffic as the Big Rig

6    continued the *wrong way* in their direction. JAF 91. Garcia requested, and Howard

7    gave, permission to block the Big Rig if the opportunity arose. JAF 92.

8    At 12:53 a.m., officers stopped I-10 eastbound traffic just east of the Sierra

9    Avenue on-ramp and began setting up a roadblock with their patrol vehicles a

10   quarter mile east of the stopped traffic. JAF 93-94. Howard and Mercado arrived

11   and parked their patrol vehicles within the eastbound I-10 lanes. JAF 95.

12   The roadblock consisted of four marked patrol vehicles with overhead lights

13   and spotlights activated, which created a barrier between the *oncoming Big Rig*

14   *traveling the wrong way and the stopped traffic behind the roadblock*. JAF 96.

15   The officers took cover positions in a dirt area just south of the right

16   shoulder, behind a metal guardrail near a group of eucalyptus trees. JAF 97. But

17   this wouldn't have protected the officers if the Big Rig drove through the guardrail.

18   JAF 98.

19   Howard got a tactical rifle from his vehicle and took a cover position with

20   the other offices and told his officers it would be him to use deadly force if

21   necessary. JAF 99. Howard made this decision because he had only recently been

22   assigned to CHP Rancho Cucamonga and was unfamiliar with the other officers'

23   experience and tactical rifle skills. JAF 100-101. Howard was proficient with the

24   rifle, having served in the U.S. Navy for 4 years and had 12 years of patrol

25   experience as a CHP officer and, if deadly force needed to be used, he wanted to

26   prevent crossfire and also didn't want to risk the safety of the officers, the stopped

27   traffic, or the vehicles traveling on the opposite side of I-10. JAF 102-104.

28   ///

At 12:57 a.m., a traffic break stopped all westbound traffic on I-10 at Cedar Avenue. JAF 105. At this point, all I-10 traffic in both directions was stopped. JAF 106. At 1:00 a.m., the Big Rig *approached the roadblock traveling the wrong way on westbound 1-10*, straddling the shoulder and a traffic lane of eastbound I-10; the 50-mile pursuit had been ongoing for almost 1 ½ hours, with Loftin consistently traveling the wrong way on the several freeways at speeds of 40 to 75 mph. JAF 107-110. Loftin would have faced and passed approximately 1200 vehicles during the pursuit. JAF 111. The image below is a map of Loftin's travel.



Exh. 33, at p. 000459.

With the Big Rig approaching the roadblock at approximately 50 mph, Mercado was worried Loftin would drive through the guardrail and injure the officers behind the guardrail. JAF 112-113. When the Big Rig was about 500 feet from the roadblock, Howard stepped over the guardrail and walked northbound near the rear of the southmost patrol vehicle. JAF 114. This provided Howard with a tactical advantage and a better angle to respond to the Big Rig. JAF 115.

At this point, Howard knew the pursuit had been ongoing for more than an hour with Loftin consistently driving against traffic, making U-turns on the

25

freeway, avoiding multiple traffic breaks and stopped traffic, driven over spike strips and kept going, hit K-rail barriers, had near misses with oncoming traffic, and was approaching the roadblock, the officers, and the full eastbound freeway traffic stopped directly behind the roadblock. JAF 116-125.

The Big Rig entered lane and Loftin quickly drove across lanes 2, 3 and 4 toward the shoulder. JAF 126. Helicopter 40-K announced Loftin could be trying a U-turn, a report Howard did not hear. JAF 127-128. The Big Rig now faced south toward Howard and the other officers. JAF 129. Howard, in full uniform, walked forward with his tactical rifle pointed at the Big Rig hoping Loftin would stop upon this show of force. JAF 130-131. As the front of the Big Rig entered the number 4 lane, Howard proceeded along the right shoulder. JAF 132-133. The other officers left their positions near the trees and stepped over the guard rail. JAF 134. Many officers were now in the roadway near the still maneuvering Big Rig. Howard proceeded into the number 4 lane heading toward the Big Rig. JAF 135. Howard now believed the Big Rig was coming toward him and other officers and commanded Loftin to "Stop. Stop. Stop." JAF 136-137.

This image shows Howard on the right and the Big Rig facing the officers' position of cover:



Exh. 22, at 6:54.

Not stopping and now out of room, Loftin reversed and the Big Rig was again facing Howard, the other officers, patrol vehicles and stopped traffic behind the roadblock. JAF 138-139. As the Big Rig's headlights moved across Howard's body from his right to left, Howard believed Loftin was positioning the Big Rig to drive forward at him, other officers and the roadblock; Howard feared the Big Rig could hit him, other officers, or drive through the roadblock causing serious bodily injury or death to the motorists stopped behind the roadblock. JAF 140-144. Howard never believed Loftin was turning around and neither Howard nor the other officers believed Loftin had any intention of surrendering. JAF 146-148.

Howard heard the Big Rig's engine revving and he and the other officers believed Loftin would continue forward toward them, the roadblock and stopped traffic behind the roadblock. JAF 149-151.

With the Big Rig's engine revving, and believing the Big Rig was moving toward him, the other officers and the roadblock and cars behind it, Howard began firing his rifle at the Big Rig's cab. JAF 152-153. Likewise, Officer Mercado was on the verge of firing until hearing Howard fire.  JAF 154. These images show Howard and the Big Rig immediately before he began firing his rifle.



Exh. 22, at 6:56.

Howard walked forward toward the Big Rig firing 20 shots.  JAF 155-156.

///

///

27

Although the Big Rig had been slowly rolling backward, neither Howard nor the other officers perceived this until after Howard stopped firing given their focus on the threat posed by the Big Rig. JAF 157-158.

Howard made the decision to use deadly force based on what he knew and the threat posed by Loftin: a Big Rig had been driving the wrong way on the freeway for a long time consistently making radical maneuvers, making U-turns on and off freeways, running red lights on city streets, there were unsuccessful spike strip attempts, the Big Rig drove past traffic breaks and stopped traffic, drove into an active construction zone, and had near miss collisions causing vehicles to run off the roadway and up embankments; and when Howard saw the headlights of the Big Rig move across his body toward his location while simultaneously revving the engine, Howard believed the Big Rig was coming toward him, the officers behind him, and the civilian traffic stopped behind the roadblock. JAF 159.

This image shows the Big Rig pointed toward the roadblock when Howard stopped shooting.



Exh. 22, at 7:00.

///

1  The Big Rig rolled backward until it struck the left side of officer Garcia's vehicle
2  and stopped. JAF 160-161.

3      Urquijo and Loftin were eventually removed from the Big Rig, and officers
4  provided medical care, including CPR on Loftin, until EMS arrived at 1:11 a.m.;
5  Loftin was pronounced dead at 1:18 a.m. JAF 162-173.

6      Loftin's blood tested positive for a concentration of methamphetamine and
7  amphetamine (methamphetamine metabolite), and delta-9 THC (active component
8  of marijuana). JAF 174. The high methamphetamine/amphetamine establishes
9  with medical certainty that Loftin was under the influence of methamphetamine
10  during the incident. JAF 175-176.

11                    **PLAINTIFFS' STATEMENT OF FACTS**

12      **A. Background**

13      Prior to the shooting, Howard had no information that anyone had been
14  injured by the truck and no information that there were any collisions between
15  the truck and any other vehicles. JAF 177-178. According to Urquijo, the truck
16  did not come close to crashing into any vehicles. JAF 180. Howard did not have
17  any information that Loftin was intentionally trying to injure or kill anyone. JAF
18  179. At times during the pursuit, Loftin was driving 25-30 mph on the shoulder.
19  JAF 181. Prior to the shooting, Howard had no information that any occupant of
20  the truck had a firearm and Howard did not know whether there were passengers
21  in the truck, other than the driver, including whether there were men, women, or
22  juveniles in the truck. JAF 182-83. Howard had no information that Loftin was
23  under the influence of drugs or alcohol and no information as to whether any of
24  the occupants of the truck had any documented criminal history before the date
25  of the incident. JAF 184-185. Howard also did not have any of the details of the
26  circumstances under which the truck was stolen. JAF 186.

27      During the pursuit, the spike strip popped one of the truck's tires. JAF 187.
28  ///

After one of the truck's tires was affected by the spike strip, the truck slowed down to about 25-30 mph. JAF 188. Howard agrees that just because they used the spike strip and Loftin kept going, that doesn't mean they couldn't try the spike strip again. JAF 189. Prior to the shooting, Howard had information that the truck at various times would be going the wrong way on the freeway and then make a U-turn on the freeway and start going the right way on the freeway. JAF 190. Other officers involved in the roadblock also knew that the truck had previously made U-turns, prior to the truck approaching the roadblock. JAF 191. Officer Garcia told Howard that if the truck made a U-turn, he would try to box it in, and Howard approved this plan. JAF 196.

Howard did not have any conversations with his lieutenant about what tactics should be employed. JAF 192. Howard did not formulate any tactical plan involving a 40 mm launcher or beanbag shotgun. JAF 193. At no point did anyone tell Howard that when the truck approached his direction, he should shoot at the driver. JAF 194. Howard chose the rifle as opposed to the handgun because the rifle had the capability to penetrate a windshield. JAF 195. Howard considered driving head on into the truck to stop it, although the overall goal was to take Loftin safely into custody. JAF 197-98.

**B. The Shooting**

The San Bernardino Sheriff's Department airship was overhead at the time of the shooting, and Howard was receiving some information from the dispatch from the airship. JAF 199-200. The other officers involved in the roadblock were also listening to dispatches from the helicopter. JAF 201. Howard heard the airship put out radio traffic that the truck was approaching his location. JAF 202. Howard may have heard the airship say the truck was trying to make a U-turn, but he does not recall. JAF 203. Prior to the shooting, Howard considered the possibility that the truck would see the roadblock and make a U-turn, as it had done previously. JAF 204. Howard determined that if the truck saw the

30

1  roadblock and made another U-turn to go the right way on the freeway, and there

2  was no imminent threat, then he would reassess rather than shooting. JAF 205.

3      The truck slowed down as it approached the roadblock. JAF 206. There

4  was a center median dividing the eastbound lanes from the westbound lanes. JAF

5  207. Traffic was stopped on both sides, and there was no traffic in the lanes when

6  the truck approached the roadblock. JAF 208-09. When the truck approached the

7  roadblock, the officers were behind the guardrail. JAF 210. The safest place to be

8  as the truck approached was the right shoulder behind the wood and metal

9  guardrail, followed by trees. JAF 211. When Howard saw the truck approach,

10  slow down, and make a turning movement, he thought the truck was going to

11  make a U-turn. JAF 212. Officers Mercado, Vasquez, and Mark Garcia also

12  thought the truck might be making a U-turn. JAF 213-14. Howard believed that

13  the truck had enough room to make a U-turn or three-point turn. JAF 215.

14  Howard also thought Loftin might be coming to a stop and giving up. JAF 216.

15      The purpose of the roadblock is to get the vehicle to stop. JAF 217. The

16  truck came to a brief stop. JAF 218. If Howard had stayed behind the guardrail,

17  then he would not have been standing in front of the truck, with no barrier

18  between him and the truck. 219. Howard did not tell the officers he was leaving

19  cover. JAF 220. When Howard left cover and walked over the guardrail, he was

20  not providing any incident command or control to his officers. JAF 221. After

21  Howard stepped out from behind the guardrail, when Howard thought the truck

22  was possibly stopping and making a U-turn, Howard did not use the patrol cars

23  for cover. JAF 223. The truck did not strike any of the patrol vehicles in the

24  roadblock prior to the shooting. JAF 222.

25      After the truck came to a brief stop, it began moving in reverse. JAF 224.

26  When Officer Mercado went over the guardrail, he believed there was no reason

27  to be behind the guardrail because the truck had stopped. JAF 225. When the

28  truck reversed, it was moving slowly. JAF 226. When Howard began firing his

31

shots, the truck was moving in reverse. JAF 227. The truck continued to move in reverse during all of Howard's shots. JAF 228. Officers Mercado and Garcia observed the truck moving in reverse at the time of the incident. JAF 229-230.

At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way. JAF 231. No person was behind the truck when it was reversing. JAF 232. When the truck was backing up, it was moving away from Howard, away from the other officers, and away from the roadblock. JAF 233-235. The only time Howard was directly in front of the truck was when the truck was moving in reverse. JAF 237. Instead of retreating and taking cover so he could formulate a plan and give directive to his officers for a felony stop, Howard kept running at the truck. JAF 236.

In Howard's experience, to make a three-point turn, a vehicle has to back up. JAF 238. Based on Howard's training, if the truck was just trying to turn around at the roadblock and go the right way on the freeway, then there would not be an immediate threat of death or serious bodily injury at that time. JAF 238. Howard did not assess at all during the time he was shooting. JAF 239. Howard did not stop shooting until his magazine was empty. JAF 240. Howard fired some of his shots to the driver's side window area. JAF 241. Prior to firing his shots, Howard did not issue a verbal warning that deadly force would be used. JAF 242. No other officer fired any shots. JAF 244. Officer Mendez had his rifle out but never raised it to shoot Loftin. JAF 245.

## C. Police Training and Standards on the Use of Deadly Force

Officers, including Howard, are trained to give a verbal warning prior to using deadly force, where feasible, and are trained to reassess the situation when using deadly force. JAF 246-47. Basic police training and standards instruct that deadly force should only be used base on an "objectively reasonable" belief that the suspect poses an immediate or imminent threat of death or serious bodily injury. JAF 248. Howard understands that pursuant to police officer training and

CHP policy, a subjective fear is insufficient to justify a use of deadly force. JAF 249. Police officers, including Howard, are trained that a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. JAF 250. At the time of the incident, Howard had been trained that if those requirements are not met, he should not use deadly force. JAF 251. Police officers, including Howard, are trained that an imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. JAF 252. Police officers are trained that a threat or potential threat is insufficient to justify the use of deadly force. JAF 253. Howard has been trained that even though deadly force may be justified during one second, it may be different the next second. JAF 254.

Police officers are trained that they are responsible for justifying every shot they fire. JAF 255. Howard understands that CHP policy recognizes that the "use of force is a serious responsibility that shall be exercised judiciously with respect for human rights and dignity and for the sanctity of every human life." JAF 256. Howard understands that it's his job to protect and serve everybody on the road, even the suspect, and the safety of the suspect is part of the evaluation. JAF 257. Basic police officer training teaches that shooting at a moving vehicle is a poor tactic in most scenarios, and that if a driver is wounded or killed when operating a vehicle, it prevents their ability to effectively operate the vehicle. JAF 258-59. At the time of this incident, Howard had been trained to stay out of the path of a moving vehicle, if feasible and trained to position himself safely in relation to a vehicle so that if it does start moving, he would not be in its path. JAF 261. At the time of this incident, Howard had been trained that if he finds

///

1    himself in the path or potential path of a vehicle, he should try to get out of the

2    way safely. JAF 262.

3           Howard had also been trained that when practical, officers should utilize

4    cover until a vehicle is stopped, and a safe approach can be made. JAF 264.

5    Howard violated CHP policy when he left a safe area and ran at the truck with

6    his rifle rather than giving Loftin a chance to stop. JAF 265-66. Pursuant to CHP

7    policy, "the discharge of a firearm at a wrong-way, high-speed, or reckless driver

8    or vehicle solely on the assumption that other persons may be injured or killed

9    unless the driving act is terminated is not authorized." JAF 267. Under the facts

10   of this case and pursuant to police standards and training, it would have been

11   inappropriate for Howard to shoot at Loftin or the truck for fleeing or attempting

12   to flee. JAF 269. Howard agrees that he would not be justified in using deadly

13   force because the truck was fleeing or made a U-turn and was driving away from

14   him. JAF 270. Officers, including Howard, are trained to consider other

15   reasonable options before using deadly force, and trained to have situational

16   awareness. JAF 271-72. A reasonable officer under this set of facts would have

17   recognized that the truck was making another U-turn and was backing up in

18   order to make a three-point turn. JAF 273-74. At the time that the truck was

19   reversing, reasonable officer under this set of facts would have recognized that

20   the truck was reversing and not moving forward, and therefore there was no

21   immediate threat of death or serious bodily injury. JAF 275.

22                                   **ARGUMENT**

23   **A.    Howard's Argument: Summary Judgment Is Proper on the § 1983
         Claims (Claims 1 and 2)**

24

25   **1.    Doctrine of qualified immunity**

26          "[Q]ualified immunity protects government officials 'from liability for civil

27   damages insofar as their conduct does not violate clearly established statutory or

28   constitutional rights of which a reasonable person would have known.'" *Pearson*

34

1    *v. Callahan*, 555 U.S. 223, 231 (2009). "When properly applied, it protects all but

2    the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al*

3    *Kidd*, 563 U.S. 731, 743 (2011) (simplified).

4        "Under [Supreme Court] precedents, officers *are entitled to qualified*

5    *immunity* under §1983 *unless* (1) they violated a federal statutory or constitutional

6    right, and (2) the unlawfulness of their conduct was 'clearly established at the

7    time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (emphasis

8    added). A plaintiff must overcome both prongs of qualified immunity. *Felarca v.*

9    *Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018); *see also Smith v. Adepa*, 81 F.4th

10    994, 1004 n.4 (9th Cir. 2023) ("[T]he burden is not on the officers to prove they

11    fit perfectly within the facts of a case granting qualified immunity; the burden is

12    on the plaintiff to show a violation of a clearly established right in the specific

13    circumstances at issue.").

14        "Clearly established" law means precedent existing at the time of the

15    conduct "'squarely governs the specific facts' at issue," *Kisela v. Hughes*, 584 U.S.

16    100, 104 (2018), such that it "placed the [un]constitutionality of the officer's

17    conduct 'beyond debate,'" *Wesby*, 583 U.S. at 63, under the "'particularized' facts

18    of the case," *White v. Pauly*, 580 U.S. 73, 79 (2017). This is a "demanding,"

19    "exacting," and "high standard." *Wesby*, 583 U.S. at 63; *City & County of San*

20    *Francisco v. Sheehan*, 575 U.S. 600, 611 (2015); *Smith*, 81 F.4th at 1001-02.

21    "Clearly established means that, at the time of the officer's conduct, the law was

22    sufficiently clear that every reasonable official would understand that what he is

23    doing is unlawful." *Wesby*, 583 U.S. at 63 (simplified). It "must be settled law ….

24    It is not enough that the rule is suggested by then existing precedent." *Id.*

25    (simplified). "The rule's contours must be so well defined that it is clear to a

26    reasonable officer that his conduct was unlawful in the situation he confronted.

27    This requires a high degree of specificity." *Id.*

28    ///

"'[C]ourts must not define clearly established law at a high level of generality[.]'" *Id.* at 63. "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* at 64 (simplified).

"Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert the [officer] in this case that [his] particular conduct was unlawful." *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). "[P]rior precedent must be 'controlling' from the Ninth Circuit or Supreme Court or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.*

Importantly, existing precedent with "materially distinguishable" facts is insufficient to constitute "clearly established" law. *Rivas Villegas v. Cortesluna*, 595 U.S. 1, 6 7 (2021); *Spencer v. Pew*, 117 F.4th 1130, 1138 (9th Cir. 2024).

**2.    Qualified immunity protects Howard from liability on the Fourth Amendment claims brought on Loftin's behalf and Urquijo (Claim 1)**

*a.    Howard's use of deadly force didn't violate the Fourth Amendment. Deadly force to stop the lengthy and dangerous pursuit is constitutional because of the imminent, on-going and potential future risk of death or serious bodily injury to the public and officers if the pursuit continued and further was constitutional because of the imminent risk of death or serious injury to Howard and the other officers at the roadblock.*

i.    Fourth Amendment standard

The Fourth Amendment prohibits "unreasonable seizures" but not "objectively reasonable" force. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The excessive force claim brought on Loftin's behalf and by Urquijo are analyzed the same. *Villanueva v. California*, 986 F.3d 1158, 1165-69 (9th Cir. 2021).

"[T]he Supreme Court has instructed [courts] to inquire 'whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted.'" *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024). A court examines "the 'facts and

36

circumstances confronting the officers, without regard to their underlying intent or motivation.'" *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020). The court's evaluation is "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and it "must allow for an officer's need to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Est. of Hernandez v. City of L.A.*, 139 F.4th 790, 798 (9th Cir. 2025) (en banc) (simplified). Notably, "'the Fourth Amendment does not require omniscience,' and absolute certainty of harm need not precede an act of self-protection." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010). A court "carefully balances the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake, considering the totality of the circumstances," including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight[.]" *Est. of Hernandez*, 139 F.4th at 798 (simplified). However, the threat posed to the public and officers is the most important factor and it can outweigh all other *Graham* factors, *Hart*, 99 F.4th at 549, 552; *Estate of Strickland*, 69 F.4th at 620, and a court need not consider other factors where the immediacy of the perceived threat warranted deadly force, *see, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (only analyzing immediacy of the threat in pursuit case).

That later point is reflected in the Supreme Court's decisions "in cases involving use of deadly force against a fleeing suspect," where "'the Supreme Court has crafted a more definitive rule,' allowing an officer to use deadly force '[when] [ ] "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."'" *Villanueva*, 986 F.3d at 1169 (bracketed text added) (quoting *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see*

37

*also Brosseau*, 543 U.S. at 197-98 (stating rule); *Sabbe v. Wash. Cty. Bd. of Comm'rs*, 84 F.4th 807, 822 (9th Cir. 2023) (same); *see Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

ii.    <u>Howard's use of deadly force to terminate the pursuit was objectively reasonable. Probable cause existed for Howard to believe Loftin posed an immediate threat of serious injury or death to anyone and everyone on the roadways, including Howard, the officers at the roadblock and, if the pursuit continued, scores of innocent motorists and the officers trying to stop Loftin</u>

The Supreme Court has twice held "a 'police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment …. '" *Plumhoff*, 572 U.S. at 776 (quoting *Scott*, 550 U.S. at 386). The Supreme Court has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment[,]" *Mullenix*, 577 U.S. at 15; *accord Waller v. City of Nogales*, 2024 U.S. Dist. LEXIS 29259, at *47 (D. Ariz. Feb. 20, 2024), *aff'd*, 2025 U.S. App. LEXIS 9779 (9th Cir. Apr. 24, 2025) (unpub.); *see also Villanueva*, 986 F.3d at 1170 (observing same). The reason is obvious, as the Ninth Circuit explained in *Orn*:

> A fleeing suspect's escape can pose a threat to the public when police have probable cause to believe that the suspect … driven in a manner that puts the lives of pedestrians or other motorists at risk, as by leading officers on a high-speed chase. *See Mullenix v. Luna*, 136 S. Ct. 305, 306, 309, 193 L. Ed. 2d 255 (2015) (per curiam) (suspect drove at over 100 miles per hour and threatened to shoot police officers unless they abandoned the pursuit); *Plumhoff*, 572 U.S. at 776 (suspect swerved between congested traffic lanes at speeds exceeding 100 miles per hour); *Scott*, 550 U.S. at 380 (suspect engaged in 'a Hollywood-style car chase of the most frightening sort'). In such cases, officers have an interest in terminating the suspect's flight because the flight itself poses a threat of serious physical harm to others. [ ] [T]o warrant the use of deadly force, a motorist's prior interactions with police must have demonstrated that 'he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around.' [Citation].

949 F.3d at 1176-77.

1    Defendants' undisputed material facts, recited above, cannot be disputed.

2    *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (only disputes over

3    "*material* fact[s]" preclude summary judgment).

4    Two independent reasons demonstrate Howard's use of deadly force

5    objectively reasonable: (1) the threat to Howard and other officers at the

6    roadblock; and (2) the threat to innocent drivers and officers trying to stop him

7    should Loftin continue fleeing in the Big Rig. *See Orn*, 949 F.3d at 1176-77

8    (stating the rule). As the Supreme Court and Ninth Circuit recognize, "[o]fficers

9    may use deadly force to halt the flight (or continued flight) of a motorist who they

10    reasonably believe *will pose* a deadly threat to the lives of pedestrians or other

11    motorists." *Id.* at 1180 (emphasis added) (citing *Plumhoff,* 572 U.S. at 777); *Scott*,

12    550 U.S. at 379-80.

13    Loftin led officers from multiple jurisdictions on a harrowing 50-mile

14    pursuit lasting nearly 1 ½ hours on three major and heavily traveled freeways,

15    consistently driving the wrong way, repeatedly taking evasive action to escape and

16    several times narrowly avoiding catastrophic collisions with innocent motorists

17    and the officers trying to stop him. "It is beyond serious dispute that [Loftin's]

18    flight posed a grave public safety risk." *Plumhoff*, 572 U.S. at 777; *see also id.* At

19    776 ("During th[e] chase, Rickard passed more than two dozen other vehicles,

20    several of which were forced to alter course. Rickard's outrageously reckless

21    driving posed a grave public safety risk.").

22    And Loftin was not just driving a car, he was driving a large 19,000-pound

23    industrial truck capable of smashing another vehicle to bits and making little work

24    of a roadblock consisting of police cars, not to mention what it could do to a

25    person. That an ordinary car can constitute a deadly weapon, *Brosseau*, 543 U.S.

26    at 200; *Monzon*, 978 F.3d at 1160, speaks volumes about the risk Loftin posed in

27    the Big Rig, *Waller*, 2025 U.S. App. LEXIS 9779, at *2-3 ("Compounding the

28    ///

danger, Cockrum was operating a semitruck—a vehicle that, even at reduced speeds, presents significantly greater risk than an average-sized vehicle.").

By the time Howard used deadly force, Loftin "'had proved he would do almost anything to avoid capture." *Brosseau*, 543 U.S. at 200. "Under the circumstances at the moment when" Howard fired "all that a reasonable police officer could have concluded was that [Loftin] was intent on resuming his flight and that, if he were allowed to do so, he would once again pose a deadly threat for others on the road." *Plumhoff*, 572 U.S. at 777. Not just that, Loftin was making maneuvers in the Big Rig unknown to Howard without total control of the Big Rig given a blown tire and given what Loftin had done earlier during the pursuit, Howard reasonably interpreted Loftin's maneuver as one directing the Big Rig toward him, the other officers and the motoring public waiting behind the roadblock posing a serious threat to all of them. *Plumhoff*, 572 U.S. at 776 (deadly force reasonable where "the front bumper of [the suspect's] car was flush with that of one of the police cruisers, [the suspect] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [he] threw the car into reverse 'in an attempt to escape.'"); *Villanueva*, 986 F.3d at 1170 ("[W] have found use of deadly force against a stopped or slow-moving vehicle reasonable only when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle."); *Wilkinson*, 610 F.3d at 551-53 (deadly force reasonable where officer "was standing in a slippery yard with a minivan accelerating around him"); *see also Monzon*, 978 F.3d at 1159 ("An officer might reasonably question the ability of any driver in this situation -- much less one who has just driven erratically in a high-speed chase and run into a fence post while turning his car around -- to safely navigate his accelerating vehicle between five police officers and four closely parked cars.").

And it matters not whether Loftin was moving forward, backward or moving at all when Howard fired given Loftin was revving the engine and certainly

appeared to be continuing efforts to avoid apprehension. *See id.* at 1158 ("Even though it was no longer moving, just as in Wilkinson these officers 'could hear the engine revving' and they were now situated on all sides of a van containing 'a driver desperate to escape[.]'") (quoting *Wilkinson*, 610 F.3d at 552); *Williams*, 112 F.4th at 645 ("Based on the engine revving and the tires spinning, Williams appeared 'intent on resuming his flight' and would have 'once again pose[d] a deadly threat for others on the road.'") (quoting *Plumhoff*, 577 U.S. at 777).  Nor does it matter whether Loftin was heading directly at Howard or another officer. *Monzon*, 978 F.3d at 1159; *see also id.* ("[I]t is undeniable that Monzon drove his van amongst the officers and toward some of them, it does not matter whether Monzon drove the van toward all of the officers when the shooting began. In this chaotic situation spanning a mere 4.5 seconds, the officers that Monzon did not drive directly toward were justified in using deadly force to protect the lives of their fellow officers that Monzon was driving toward.").

Moreover, and importantly, it was Loftin's decision to flee despite all efforts to stop him over the course of 1 ½ hours and 50 miles and despite the obvious danger his conduct posed to the public and the officers charged with stopping him from killing an innocent citizen. *Scott*, 550 U.S. at 383-84 ("[I]n judging whether [the officer's actions were reasonable, we must consider the risk of bodily harm that [the officer's] actions posed to [the suspect] in light of the threat to the public [from the suspect] that [the officer] was trying to eliminate. … [I]t is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase."). In terms of "relative culpability," the scales are seriously uneven in an obvious way. "It was [Loftin], after all, who intentionally placed himself and the public [and the officers] in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [Howard] confronted." *Id.* At 384. "Multiple police

41

cars, with blue lights flashing and sirens blaring, had been chasing [Loftin] for nearly [50] miles, but he ignored their warning to stop. By contrast, those who might have been harmed had [Howard] not taken the action he did were entirely innocent." *Id.* ("We have little difficulty in concluding it was reasonable for [the officer] to take the action that he did" in using deadly force).

Instructive is the Ninth Circuit's decision in *Williams*, a case involving a fleeing suspect driving much like Loftin and, like Loftin, endangered the public and officers and where the court found deadly force objectively reasonable to eliminate the threat posed. 112 F.4th at 644; *see also id.* at 645 ("In line with the Supreme Court's reasoning in *Plumhoff*, [fn] we hold that Williams—taking into account the duration, speed, and other hazards of his flight, as well as his clear intent to flee – 'posed a grave public safety risk' and that 'the police acted reasonably in using deadly force to end that risk.' 572 U.S. at 777."). As the Ninth Circuit explained:

> Williams posed a similar threat to the officers on the scene and the public at large. He led officers on a chase that lasted forty-two minutes and reached speeds of around 70 miles per hour. During the chase, Williams ran several red lights, weaved between lanes, drove through a chain-link fence, drove in the wrong direction on the freeway, albeit briefly, and had, for a significant portion of the chase, his lights off and a blown tire. By the time his truck was pinned, he had struck three patrol vehicles. As in *Plumhoff*, Williams continued his attempt to flee. He was obviously pushing down on the accelerator because the car's wheels were spinning. It is reasonable that an officer, without the benefit of hindsight, might fear that Williams's truck would gain traction at any moment, maneuver out of the pin, and accelerate forward into traffic. Based on the engine revving and the tires spinn'ng, Williams appeared Intent on resuming his flight and would have once again posed a deadly threat for others on the road.

*Id.* at 644-45 (simplified).

Nor does it matter that Howard shot 20 times. *Est. of Hernandez*, 139 F.4th at 800 ("'[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.'") (quoting *Plumhoff*, 572 U.S. at 777). There is no evidence Howard

42

continued to fire after the threat Loftin posed was eliminated. Indeed, the evidence demonstrates Howard stopped firing before the Big Rig stopped moving.

Here, the unhesitating conclusion under the circumstances is Howard "acted reasonable in using deadly force to end [the] risk" Loftin posed to the motorists, himself and other officers. *Plumoff*, 572 U.S. at 777; *see also Scott*, 550 U.S. at 383-86; *Williams*, 112 F.4th at 643-45; *see, e.g. Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (deadly force to end pursuit of a tractor trailer objectively reasonable where "use [of] deadly force based on [driver's] demonstrated lack of concern for other travellers and for the officers themselves" and officer "had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves.").

b.    *Absence of clearly established law. No controlling precedent held an officer violates the Fourth Amendment when using deadly force to end a 50-mile pursuit of a Big Rig when the driver intentionally avoids apprehension for over an hour while driving against traffic on three major highways with many near-miss collisions with motorists and officers and then presents an imminent risk of death or serious injury to officers at a roadblock trying to stop the ongoing pursuit.*

"'[S]pecificity' … is 'especially important in the Fourth Amendment context,'" *Wesby*, 583 U.S. at 64, because of the "'hazy border between excessive and acceptable force,'" *Kisela*, 584 U.S. at 105, because "it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts," *Mullenix,* 577 U.S. at 12.

No controlling precedent existed in June 2021 telling all reasonable officers that Howard's use of deadly force *under the facts of this case* violated the Fourth Amendment. Certainly, no precedent from the Supreme Court exists. *See Waller*, 2024 U.S. Dist. LEXIS 29259, at *47 ("The [Supreme] Court has ... never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity.'") (quoting *Mullenix*, 577 U.S. at 13-15); *see also Plumhoff,* 572 U.S. 765 (no Fourth Amendment violation and no clearly established law); *Scott*, 550 U.S. 372 (no

43

Fourth Amendment violation); *Brosseau*, 543 U.S. 194 (no clearly established law).

And no factually similar precedent from the Ninth Circuit instructs officers that it violates the Fourth Amendment to use deadly force to terminate a pursuit *of the type here* or when presented with the threat Loftin posed to Howard and other officers at the roadblock such that it can be said Howard's use of deadly force was "plainly incompetent" or a "knowing[ ] violat[ion] [of] the law." *al Kidd*, 563 U.S. at 743 (simplified); *see Vasquez v. City of San Jose*, 2024 U.S. App. LEXIS 2663, at *3 (9th Cir. Feb. 6, 2024) (unpub) ("[T]he video evidence conclusively establishes that even if the signpost and the cruiser prevented Vasquez's immediate escape, 'a reasonable police officer could have concluded that [he] was intent on resuming [his] flight and that, if [he] was allowed to do so, [he] would once again pose a deadly threat for others on the road. Given the close similarities between *Plumhoff* and the instant case, the illegality of the officers' conduct here could not have been 'clearly established.'") (simplified).

Indeed, the precedent discussed earlier instructs the reasonable officer that deadly force *is constitutional* under the facts of this case. From a constitutional standpoint, that is what the reasonable officer would know.

Best demonstrating the absence of clearly established law is *Waller*, 2025 U.S. App. LEXIS 9779. *See Changing World Films LLC v. Parker*, 2023 U.S. Dist. LEXIS 163825, at *15 n.7 (C.D. Cal. Sep. 12, 2023) ("Although these cases are unpublished, they are relied upon for their persuasive value and to indicate how the Ninth Circuit applies binding authority."). Because *Waller* is so factually apt, it is quoted in full:

> This case is best resolved on the second prong of the qualified immunity analysis. [Citation]. Cockrum did not have a clearly established right against deadly force such that the officers knowingly violated the Fourth Amendment.
>
> A right is clearly established where existing precedent places the constitutional question beyond debate. [Citation]. This case is

44

different from our prior cases finding Fourth Amendment violations for excessive force. Previous cases predominantly concern fleeing vehicles that pose no threat to officers or third parties and those that are average-sized and fast-moving. *See, e.g.*, *Villanueva*, 986 F.3d at 1162-63; *Orn*, 949 F.3d at 1171-73. Further, a driver's speed is not our only consideration. *See, e.g., Wilkinson*, 610 F.3d at 552 (a minivan moving slowly as it slipped through mud 'could ... gain[] traction at any time, resulting in a sudden acceleration in speed').

Here, Cockrum engaged in likely felony assault; committed multiple traffic offenses on crowded city streets and within high-risk, highway-construction zones; intentionally struck other vehicles; disregarded orders to surrender; and triggered a pursuit lasting over an hour through highways and suburban roads. Compounding the danger, Cockrum was operating a semitruck -- a vehicle that, even at reduced speeds, presents significantly greater risk than an average-sized vehicle. The officers were aware that the situation posed an immediate and ongoing threat to law enforcement and to public safety, as details of Cockrum's flight and noncompliance had been reported through radio dispatch. [Citations]. The officers tried various methods to stop Cockrum, but none were successful before resorting to deadly force. *Cf. Adams v. Speers*, 473 F.3d 989, 991-94 (9th Cir. 2007) (officers violated a clearly established right where they did not warn or use alternative methods to stop a suspect who posed no threat to the public and had no opportunity to escape).

Our sister circuits do not provide guidance, either, as there is no broad consensus of cases clearly establishing a right against deadly force in like circumstances. [Citation]. The factual differences are simply too vast, and there is a lack of precedent involving chases with semitrucks. The officers are entitled to qualified immunity.

*Id.* at *1-3 (citations altered).

### 3. Qualified immunity protects Howard from liability on the Fourteenth Amendment loss of familial association claim (claim 2)

"Parents and children have a substantive due process right to a familial relationship free from unwarranted state interference," *Scott v. Smith*, 109 F.4th 1215, 1227 (9th Cir. 2024), but proving it "demands more of such a plaintiff than a Fourth Amendment claim by the victim of an officer's actions" because it requires proof that an officer's conduct "'shocks the conscience.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1055, 1056-57 (9th Cir. 2022).

///

///

///

*a.    The predicate underlying Fourth Amendment violation didn't exist*

Because Howard didn't violate the Fourth Amendment, the Fourteenth Amendment loss of familial association claim fails. *Gauslik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004); *Schwarz v. Lassen County*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation."); *Galindo v. City of S.F.*, 718 F. Supp. 3d 1121, 1143 (N.D. Cal. 2024); *J.P. ex rel. Balderas v. City of Porterville*, 801 F.Supp.2d 965, 988-89 (E.D. Cal. 2011).

*b.    The purpose to harm standard applies and Howard acted with the legitimate law enforcement objective of self-protection or protection of others*

"Where actual deliberation [by an officer] is practical, then an officer's deliberate indifference may suffice to shock the conscience. But where, as here, a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 922 (9th Cir. 2024) (simplified). But "deliberation' … should not be interpreted in a narrow, technical sense. Though a police officer may *literally* have 'time to deliberate' while, e.g., chasing a suspect, we nevertheless apply the purpose to harm standard whenever the circumstances force the officers to act quickly" and "actual deliberation is practical only when officials have time to make unhurried judgments, with the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Puente v. City of Phx.*, 123 F.4th 1035, 1055 (9th Cir. 2024) (simplified); *see also Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) ("[W]hen an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply."); *see e.g., Waller*, 2024 U.S. Dist. LEXIS 29259, at *68 ("The Ninth Circuit has twice found that in the context of a car chase, where officers were forced to make 'repeated split-second decisions' about

46

moving vehicles that had the potential to harm not only the defendant officers, but also the surrounding public, actual deliberation was not practicable. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014) (even where there was a question of fact as to whether the force was excessive, because the minivan was moving at the time the defendant officer, who was in the minivan, shot the decedent in the head; the decedent did not obey the defendant officer's commands to stop the minivan, actual deliberation was not practicable); *Wilkinson*, 610 F.3d at 554-55 (the minivan was accelerating in close proximity to other officers).").

"Legitimate objectives [ ] include arrest, self-protection, and protection of the public," and "[i]llegitimate objectives include 'whether the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." *Ochoa*, 26 F.4th at 1056 (simplified); *see A.D. v. State of California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (belief in need for self-protection a subjective inquiry).

The undisputed evidence recited earlier conclusively establishes Howard had no "deliberation" time in a situation with "competing obligations," *Puente*, 123 F.4th at 1055, and used deadly force in the fast-paced evolving situation for the singular and legitimate law enforcement objective of protection of himself, other officers and the public, *Ochoa*, 26 F.4th at 1056.

c.    *No clearly established law demonstrates a Fourteenth Amendment violation*

Plaintiffs cannot meet their burden to identify controlling precedent existing in June 2021 giving notice to all reasonable officers that Howard's use of deadly force under the circumstances here violated *their Fourteenth Amendment rights*. *See Nicholson v. City of L.A.,* 935 F.3d 685, 696 & n.5 (9th Cir. 2019) (Fourth Amendment cases don't satisfy the "clearly established" component of qualified immunity for a Fourteenth Amendment claim). It simply doesn't exist.

///

47

**B.    Plaintiffs' Argument On The § 1983 Claims**

###    1.  A Reasonable Jury Could Find That Howard's Use of Deadly Force Was Excessive and Unreasonable.

When evaluating a Fourth Amendment claim of excessive force claim of excessive force, the inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Scott*, 550 U.S. at 381). "This inquiry requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). Because the inquiry is "highly fact-intensive" and involves "no *per se* rules" (*Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)), the "determination of whether the force used to effect an arrest [or seizure] was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1205-06 (9th Cir. 2000)).

Factors to consider on balance include the seriousness of the crime at issue, whether the suspect posed an immediate threat of death or serious bodily injury to the officers or the public, the availability of alternative methods to effectuate an arrest or overcome resistance, and whether proper warnings were given. *Graham*, 490 U.S. at 396; *Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019); *Vos. v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) (finding that despite the short eight-second time frame, in light of the non-lethal, "less intrusive force options available" to the officers); *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) ("whenever practicable, a warning must be

48

1    given before deadly force is employed"). Courts do "recognize that 'police

2    officers are often forced to make split-second judgments . . ." *Id.* at 1124

3    (quoting *Graham*, 490 U.S. at 397). While courts "do not judge the

4    reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor

5    does the Constitution forgive an officer's every mistake." *Id.* (quoting *Graham*,

6    490 U.S. at 396).

7                    **a)  *Loftin Did Not Injure Anyone or Cause Any Collisions*.**

8           The "severity of the crime" factor relates to the initial crime prompting

9    police response. *See, e.g.*, *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58

10   (9th Cir. 2017). "Even when a suspect has … committed a serious crime prior to

11   an officer's arrival, … a jury could discount the severity of the suspect's

12   purported crimes when the suspect is … not engaged in felonious conduct when

13   the officer arrives." *Singh v. City of Phoenix*, 124 F.4th 746, 752 (9th Cir. 2024)).

14   Although Loftin caused drivers to swerve out of the way, the truck never actually

15   collided with another vehicle and never injured anyone. Howard also had no

16   information that Loftin was intentionally trying to kill or injure anyone with the

17   truck. To the contrary, during the pursuit, which lasted over one hour with Loftin

18   driving the wrong direction at times, Loftin did not strike a single person or

19   vehicle. If Loftin had the intent to cause serious bodily injury or death, then he

20   would have done so. Further, Howard had no information that any occupant of

21   the truck had a firearm or a criminal history and no information that Loftin or

22   Urquijo had verbally threatened to harm anyone or was under the influence of

23   drugs or alcohol.

24                **b)  *Howard Failed to Give a Warning Prior to Using Deadly Force*.**

25           "Before using deadly force," officers "must, 'where feasible,' issue a

26   warning." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir.

27   2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)); *Gonzalez v. City*

28   *of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) ("A rational jury may find . . . a

49

warning was practicable and the failure to give one might weigh against reasonableness"); DeFoe Decl. at ¶¶ 6(i), 10. It is undisputed that before Howard fired his twenty shots at Loftin, he failed to give Loftin a verbal warning that he was prepared to use deadly force. It would have been feasible for Howard to give a warning under the facts of this case, where the truck was slowing down and starting to make a U-turn when Howard ran toward the truck and yelled, "stop," and the truck was slowly reversing with no person in the truck's path of travel at the time of the shots.

### c) *Loftin and the truck posed no immediate threat of death or serious bodily injury to any person at the time of the shots.*

In conducting the balancing test, the most important *Graham* factor is "whether the suspect posed an *immediate* threat to the officers' or public's safety." *Espinosa*, 598 F.3d at 537 (emphasis added); *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005) (en banc); *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir. 1994)). "A simple statement by an officer that he fears for . . . the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Along these lines, an officer's "desire to resolve quickly a potentially dangerous situation" does not, on its own, justify the use of deadly force. *Id.* Police officers are trained that a threat or potential threat is insufficient to justify the use of deadly force. JAF 253.

A reasonable officer in Howard's position would have determined that the truck was making or attempting to make another U-turn or three-point turn. Before the truck approached the roadblock, Howard knew that the truck had previously made multiple U-turns on the freeway to turn around and start driving the right way. When the truck approached, the police helicopter broadcast that it looked like the truck was going to make a U-turn. The truck slowed down, made a sweeping turn from its right to its left, came to a brief stop, and then began

50

1  reversing. Howard understands that the truck would have to back up to make a

2  three-point turn. Howard agrees that if the truck made a U-turn to go in the right

3  direction on the freeway, and there were no person in the truck's immediate path

4  of travel, then there would be no reason to shoot. JAF 204, 238. Rather than

5  allowing the truck to stop so the officers could box it in, Howard left cover and

6  ran toward the truck with his rifle out. Howard admitted that the only time he

7  was directly in front of the truck is when the truck was reversing. It is undisputed

8  that when Howard fired all his shots, the truck was reversing away from him and

9  the other officers with no person in the truck's path of travel. Therefore, there

10  was no reason to shoot.

11         **d)  *A reasonable jury could find Howard's statement that he perceived the truck to be coming toward him when it was reversing away from him not credible; alternatively, a reasonable jury could find Howard's mistake of fact unreasonable.***

12

13

14         As seen in the videos, the truck is clearly reversing away from Howard,

15  the officers, and the roadblock during all of Howard's shots. This Court should

16  not "adopt [Defendants'] version of the facts for purposes of ruling on [their]

17  motion for summary judgment"; rather, it should view the facts in the light

18  depicted by the video, which shows that no person was in the truck's path of

19  travel when it reversed during Howard's shots. *Scott*, 550 U.S. at 380-81. Here, a

20  reasonable jury could find Howard's assertions that he thought the truck was

21  moving forward at the time of the shots to be not credible. During an interview

22  after the shooting, Howard stated that he did not stand directly in front of the

23  truck to impede its movement, because the only time he was directly in front of

24  the truck was when the truck was reversing. JAF 237. This is circumstantial

25  evidence that Howard knew the truck was reversing at the time of the shooting,

26  or he would not have placed himself in that position. Police officers are trained to

27  have situational awareness, and a reasonable officer in Howard's position would

28  not have believed that the truck was moving forward at the time that it was

1    reversing. JAF 275. Even if the jury believes Howard's testimony that he
2    mistakenly believed the truck was moving forward toward him, a reasonable jury
3    could still find his mistake to be entirely unreasonable.

4         Although "officers are often forced to make split-second judgments,"
5    "[n]ot all errors in perception or judgment . . . are reasonable," and an officer's
6    unreasonable factual mistake can lead to a constitutional violation. *Torres v*, 648
7    F.3d at 1124, 1127. When an officer's use of force is based on a mistake of fact,
8    the question of whether the mistake was reasonable is a triable factual issue. *Diaz*
9    *v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1042 (C.D. Cal. 2021); Ninth Cir.
10   Jury Instruction 9.25 (2024) (listing "whether a reasonable officer would have or
11   should have accurately perceived a mistaken fact" as a factor for the jury to
12   consider in excessive force cases). In *Cruz v. City of Anaheim*, 765 F.3d 1076
13   (9th Cir. 2014), the Ninth Circuit recognized that circumstantial evidence can
14   discredit an officer's claim that they perceived a deadly threat and denied
15   summary judgment because a jury "could [] reasonably conclude that the officers
16   lied" about what they had perceived. *Id.* at 1080. As in *Cruz*, a jury in this case
17   could reasonably infer from the evidence that Howard knew or should have
18   known that the truck was reversing away from him and find his assertions to the
19   contrary not credible and were said after the fact to try to justify an unjustified
20   shooting.

21         **e)  *Reasonable Alternatives Available***

22         Officers also must "consider what other tactics if any were available" to
23   effect an arrest, including "less intrusive methods." *Bryan*, 630 F.3d at 831 &
24   n.15; *see Nehad*, 929 F.3d at 1135. During the pursuit, a spike strip popped one
25   of the truck's tires. Howard agrees that spike strips could have been redeployed.
26   Howard also could have formulated a plan to deploy a 40mm sponge launcher or
27   beanbag shotgun at the truck. The officers also could have boxed the truck in
28   ///

1    after it came to a stop or reversed slowly. If the truck turned around at the

2    roadblock, then a further traffic break or roadblock could have been deployed.

3        **f)  *The Fleeing Felon Theory Does Not Apply.***

4        Under the facts of this case, Howard could not shoot under the fleeing felon

5    theory. Pursuant to CHP policy, "the discharge of a firearm at a wrong-way,

6    high-speed, or reckless driver or vehicle solely on the assumption that other

7    persons may be injured or killed unless the driving act is terminated is not

8    authorized." JAF 267. As set forth in Mr. DeFoe's declaration, police officers are

9    trained that they can only shoot a fleeing felon where all of the following factors

10   are present: (1) the person threatens the officer with a weapon or the officer has

11   information that the person has committed a felony involving the infliction of

12   serious bodily harm or death, (2) the officer has probable cause to believe that

13   that the person will cause death or serious bodily injury to another person unless

14   immediately apprehended, (3) the officer has probable cause to believe that the

15   use of deadly force is reasonably necessary, and (4) the officer gives some

16   warning that deadly force may be used, where feasible. JAF 268. These factors

17   were not met here. Loftin did not commit a felony involving serious bodily

18   injury or death, Howard had no information that Loftin had a firearm during this

19   incident, no person was in immediate danger of being run over by the truck at the

20   time of the shots, and Howard did not give Loftin a verbal warning before

21   shooting. Howard even admitted that he would not be justified in using deadly

22   force because the truck was fleeing or driving away from him or reversing or

23   making a U-turn. JAF 270.

24       Under the fleeing felon theory, the inquiry is still whether there was an

25   immediate threat of death or serious bodily injury. "This holds as both a general

26   matter and in the more specific context of shooting a suspect fleeing in a motor

27   vehicle." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 417-18 (5th Cir. 2009) (citing

28   *Kirby v. Duva*, 530 F.3d 475, 484 (6th Cir. 2008); *see also Brosseau v. Haugen*,

53

543 U.S. 194, 199-200 (2004) (focusing the inquiry on whether persons *in the
immediate area* were at risk from the felon's flight) (emphasis added); *Figueroa v.
Gates*, 207 F. Supp. 2d 1085, 1093 (C.D. Cal. 2002) ("[t]he primary focus of [the]
inquiry . . . remains on whether the officer was in danger at the exact moment of
the threat of force"). "Where the suspect poses no immediate threat to the officer
and no threat to others, the harm resulting from failing to apprehend him does not
justify the use of deadly force to do so." *Espinosa*, 598 F.3d 547 (*quoting
Garner*, 471 U.S. at 11-12). "The use of deadly force to prevent the escape of all
felony suspects, whatever the circumstances, is constitutionally unreasonable.  It
is not better that all felony suspects die than that they escape." *Tennessee v.
Garner*, 471 U.S. 1, 11 (1985). "The Court's decision in *Scott* [*v. Harris*] did not
declare open season on suspects fleeing in motor vehicles. . . *Scott* did not
'articulat[e] a mechanical, *per se* rule.'"  *Lytle*, 560 F.3d at 414. "Nearly any
suspect fleeing in a motor vehicle poses some threat of harm to the public. . . the
real inquiry is whether the fleeing suspect posed such a threat that the use of
deadly force was justifiable." *Id.* at 415.

### g) *Defendants' Cited Cases Are Distinguishable*

The chaotic situation in *Waller v. City of Nogales*, 2024 WL 706976 (D.
Ariz. Feb. 20, 2024) is inapposite. Whereas Loftin never verbally threatened
anyone, never intentionally targeted anyone, and never caused any collisions, the
suspect in *Waller* (Cockrum) threatened a civilian and an officer with a knife and
brass knuckles and attempted to strike a Border Patrol agent. *Id*. at *4-6. Before
using deadly force against Cockrum, officers attempted numerous reasonable
alternatives, including firing shots at the truck's tires, cutting the brakes to the
trailer, placing a spike strip in front of the trailer tires, breaking out one of the
rear windows of the truck cab, and attempting to deploy a non-lethal stun
grenade. *Id.* a *5. When officers finally fired at Cockrum, they believed he was
shooting back. *Id*. Cockrum persisted, ramming two patrol vehicles to escape and

turning onto a road where other motorists were expected to be at that time. *Id*. a *6, *15. By contrast, here, other than the one spike strip, officers did not explore less-lethal alternatives to stop Loftin's truck. Unlike Cockrum, Loftin did not attempt to barrel through the roadblock; rather, he briefly stopped at the roadblock and began executing a U-turn or three-point turn and was reversing away from the officers at the time of the shooting. Further, at the time of Howard's shots, traffic was stopped, and there were no bystanders or civilian vehicles in the immediate vicinity.

Nor does *Plumhoff v. Rickard*, 572 U.S. 765 (2014) defeat Plaintiffs' claims. *Plumhoff* holds only that where a fleeing suspect "indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby," an officer's use of deadly force is not clearly established as unreasonable. *Id.* at 780. This holding does not undermine the clearly established law that an officer may not use deadly force against a fleeing suspect absent an *immediate* risk to officers or bystanders. In *Plumhoff*, after an unsuccessful roadblock, the suspect (Rickard) struck three police cruisers and then accelerated his vehicle while it was in contact with a police cruiser. *Id.* at 769. Only then did an officer fire shots into Rickard's vehicle. *Id.* at 770. Even after shots were fired, Rickard sped away in an officer's direction. *Id.* In holding that the law as of 2014 did not clearly establish Rickard's constitutional right to be free from excessive force under the facts of *Plumhoff*, the Court emphasized Rickard's conduct after the initial shots were fired, including pressing down on the accelerator and then speeding away. *Id.* at 766. By contrast, here, Loftin never struck any police vehicles in any roadblock, and Loftin was slowly reversing away from the officers with no person in the truck's path when Howard fired his shots.

The instant case is also distinguishable from *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), where the shots occurred when the suspect vehicle was

Case No. 5:22-cv-02133-AH-DTB

"accelerating, its tires were spinning, mud was flying up," an officer (Key) had fallen to the ground, and the shooting officer believed Key had been run over and feared Key, who was lying fallen on the ground or standing disoriented, would be run over again. *Id.* at 549-51. Important to the *Wilkinson* analysis was the shooting officer's belief that "Key had been run over, and [his fear] that the van would back around toward Key, [which] is uncontradicted by any evidence in the record." *Id*. at 551. Whereas the *Wilkinson* court found that the plaintiffs' "version of the incident could not control on summary judgment when the record as a whole did not support that version," here, the video evidence clearly supports Plaintiffs' version of the events. It is undisputed that the truck driven by Loftin was slowly reversing away from Howard and the officers with no person in the truck's path and no officers lying on the ground.

*Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020) is also inapposite. In *Monzon*, Monzon accelerated *toward* the officers and crashed into a police cruiser, pushing it into one of the officers and injuring him. 978 F.3d 1153. Officers fired at Monzon when the van moved in their direction. *Id*. By contrast, as clearly seen on the videos, Howard fired when the truck was moving *away* from him and the other officers. Whereas multiple officers found it necessary to fire upon Monzon, only Howard left cover to run in front of the truck and fire shots. *Monzon*'s holding turned on the immediate risk that Monzon posed to officers near the van, and did not reach the issue of whether Monzon's conduct during the pursuit justified the use of deadly force. *Id*. at 1161.

In *Scott v. Harris*, an officer terminated an ongoing pursuit by ramming the suspect's car off a two-lane road after the officers unsuccessfully attempted to box in the suspect's car and after the suspect's vehicle collided with his police vehicle and then sped away. 550 U.S. 372, 384 (2007). The *Scott* court considered that the plaintiff's version of the events were contradicted by the video. *Id*. at 379-80. The facts of the instant case are starkly different. Howard

56

did not attempt to push the truck off the freeway, away from motorists, when Loftin was speeding away during the pursuit. Rather, Howard shot Loftin when Loftin was slowly reversing away from him and the other officers, when no bystanders or motorists were in the vicinity. Instead of allowing the truck to come to a stop to attempt to box in the truck—a plan that Howard had approved, and the alternative measure attempted in *Scott*—Howard ran toward the truck in violation of police training and CHP policy. Further, Plaintiffs' version of the events is supported by the video evidence in the instant case, and Defendants do not dispute that the truck was reversing at the time of the shots.

Nor are the facts of *Mullenix v. Luna*, 577 U.S. 7 (2015) analogous to the instant case. In *Mullenix*, the suspect (Leija) called the police dispatcher during the pursuit, "claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit. The dispatcher relayed Leija's threats, together with a report that Leija might be intoxicated, to all concerned officers." *Id*. at 306. An officer fired six shots at Leija's vehicle with the intent to disable the vehicle. *Id*. at 306-07. It is undisputed that here, the officers had no information that Loftin had verbally threatened anyone, had a gun, or was intoxicated. Howard's shots struck the front windshield and passenger side window of the truck (JAF 242), indicating that he intended to strike the driver (Loftin), as opposed to disabling the truck. Further, the Court reversed the appellate court's decision on the second prong of qualified immunity only—not whether there was a Fourth Amendment violation—finding that the law was not clearly established as of the 2010 shooting. *Id*. at 308. As described in detail below, subsequent case law, including *Villanueva v. State of California*, 986 F.3d 1158 (9th Cir. Jan. 2021) and *Orn v. City of Tacoma*, 949 F.3d 1167 (2020) clearly establish Loftin's and Urquijo's rights to be free from excessive force under the Fourth Amendment at the time of the June 2021 shooting.

///

### 2. Plaintiffs' Fourteenth Amendment Claims Survive

Parents and children have a Fourteenth Amendment liberty interest in the companionship and society of one another. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Due process violations occur when official conduct "shocks the conscience," but what that means "depends on the context." *Id.* In *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009), the Ninth Circuit made clear that acting with "deliberate indifference to or reckless disregard for [a person's] rights" was "consistent with the standard imposed in the substantive due process context." 570 F.3d at 1089; *see also Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013) ("Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm.").

The higher "purpose to harm" standard only applies in situations "that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137–40 (9th Cir. 2008). In *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), the Ninth Circuit Court held, consistent with *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), that the "snap judgment" to use deadly force must be a reaction to an *unforeseen* escalation by the subject. 736 F.3d at 1230. The Ninth Circuit has only applied *Lewis* to scenarios where deliberation was impractical due to unforeseen escalations such as where the subject suddenly brandished a weapon. Where the facts regarding practical deliberation are disputed, only the jury can determine which of the two "shocks the conscience" standards apply. *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. Jan. 17, 2017).

Here, there was no "unforeseen" escalation. Howard had information that Loftin had previously made U-turns on the freeway. When the truck approached the roadblock, it appeared to be making another U-turn, as broadcast by the

helicopter. A reasonable jury could find that Howard had time to deliberate. The truck slowed down and stopped before reversing away from Howard and the other officers. Howard escalated the situation when he left cover and ran toward the truck. When Howard started firing his shots without warning, the truck was reversing away from Howard, and there was no person behind the truck. A reasonable inference that this Court can make is that Howard was intent on shooting the driver of the truck no matter what—he chose the rifle because it could penetrate windows, he considered driving head-on into the truck to stop it before he even saw the truck, and he told the other officers that he would be the one to shoot. JAF 100, 197. This would explain why he left cover, jumped over the guardrail, and fired twenty shots until his magazine was empty, even though the truck was reversing away from him with no person in its path. Howard's subsequent claims that he thought the truck was moving toward him are clearly discredited by the videos and other evidence in the case, including that the airship announced that it looked like the truck was making a U-turn. The reasonable inference is that Howard subsequently made these claims in an effort to justify an unjustified shooting.

*A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) is clearly established law on the Fourteenth Amendment claim. In that case, officers pursued the driver of a stolen vehicle who traveled without headlights on the freeway at speeds over 100 miles per hour. *Id.* at 450. Just as Loftin slowed and stopped at the roadblock, in *A.D.*, the suspect stopped at a dead end. Then the suspect then verbally threatened officers, struck a fence, backed into a police vehicle, moved forward, used profanity, and then backed into the police vehicle two more times before an officer fired into the suspect's vehicle. *Id.* at 450. Despite these facts, the *A.D.* court affirmed denial of qualified immunity because there was evidence that the suspect's vehicle was stopped or driving away from

///

1    officers at the time of the shooting, meaning there was no immediate defense of

2    life situation. *Id* at 455-59.

3                    **C. Howard is Not Entitled to Qualified Immunity**

4           Howard is not entitled to qualified immunity for three reasons.  First,

5    disputed issues of material fact preclude granting qualified immunity on

6    summary judgment. *See, e.g.*, *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924

7    (9th Cir. 2024) ("Where factual disputes exist as to the objective reasonableness

8    of an officer's conduct, the case cannot be resolved at summary judgment on

9    qualified immunity grounds."); *Villanueva*, 986 F.3d at 1173; *Longoria v. Pinal*

10   *County*, 873 F.3d 699, 710 (9th Cir. 2017) ("Where the facts are disputed, their

11   resolution and determinations of credibility 'are manifestly the province of a

12   jury."). Where genuine issues of material fact exist, a court must address a claim

13   of qualified immunity by resolving all factual disputes in the non-moving party's

14   favor. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013); *Coles*

15   *v. Eagle*, 704 F.3d 624, 629 (9th Cir. 2012). Here, that means that this Court

16   must assume the following facts: the truck slowed down considerably as it

17   approached the roadblock; Howard heard the helicopter announce that it looked

18   like the truck was going to make a U-turn; Howard observed the truck start to

19   make a U-turn; Howard knew the truck was reversing away from him; Howard

20   knew no person was in the truck's path; Howard knew it would be inappropriate

21   to shoot the truck for fleeing or making a U-turn; it would have been feasible for

22   Howard to give a verbal warning before using deadly force; no person was in

23   immediate danger of being struck by the truck at the time of the shots; reasonable

24   alternatives were available, including remaining behind cover, boxing in the

25   truck after it stopped, or redeploying the spike strip.

26          Second, Loftin's and Urquijo's constitutional rights to be free from

27   excessive force under this set of facts was clearly established at the time of the

28   shooting.

                                        60

Prior to the June 2021 shooting of Loftin, the Ninth Circuit in *Villanueva* stated, "[i]n light of [the 1996 case] *Acosta*, all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could 'simply step[] to the side' to avoid danger." 986 F.3d at 1172 (quoting *Acosta v. City and Cnty. of San Francisco*, 83 F.3d 1143, 1146 (9th Cir. 1996)). In *Villanueva*, the decedent led officers on a high-speed chase and then slowly attempted to execute a three-point turn when the shooting occurred. Despite the pursuit at speeds up to 70 miles per hour, the key question was "whether Villanueva accelerated or attempted to accelerate toward the officers before the officers shot at the Silverado and its occupants." 986 F.3d at 1170. The Ninth Circuit found that "a reasonable jury could conclude that the officers used excessive force, because they 'lacked an objectively reasonable basis to fear for [their] own safety, as [they] could simply have stepped back [or to the side] to avoid being injured.'" *Id*. at 1171 (quoting *Orn*, 949 F.3d at 1179).

In denying qualified immunity, the Ninth Circuit distinguished *Villanueva* from *Mullenix* and *Scott v. Harris*, stating, "this case does not involve a shooting *during* a high-speed chase. It is undisputed that Villanueva slowed to below the speed limit . . . and came to a stop . . . before performing the three-point turn." 986 F.3d at 1170 (emphasis added). This Court should reach the same conclusion here, where Loftin was not shot during a high-speed chase; rather, he slowed at a roadblock, stopped, and started to make a U-turn or three-point turn. The instant case is even stronger—whereas the suspect vehicle in *Villanueva* and *Acosta* was moving forward at the time of the shots, generally in the direction of officers, here, in this case, the undisputed video evidence shows that the truck was moving backwards, away from Howard and the officers, at the time of the shots, and no person was behind the truck when it was reversing. *Villanueva*, 986 F.3d at 1170; *Acosta*, 83 F.3d at 1146.

///

61

In *Orn*, the Ninth Circuit appropriately viewed the facts in the light most favorable to the plaintiff and affirmed the denial of qualified immunity. As in the instant case, in *Orn*, the plaintiff presented evidence that the officers were never at risk of being struck by Orn's vehicle because they were never in the vehicle's path of travel. 949 F.3d at 1174-76. According to the plaintiff's version of the events, the shooting officer "could not reasonably have feared for his own safety because he was on the side of Orn's vehicle as it was traveling away from him." *Id*. at 1175. The Ninth Circuit found that "Orn's vehicle was moving at just five miles per hour [and the shooting officer] could therefore have avoided any risk of being struck by simply taking a step back, a common-sense conclusion." *Id*. Despite Orn having struck police vehicles prior to the shooting, the *Orn* court properly rejected the defendants' argument that the shooting officer reasonably feared for the safety of his partner officer when he mistakenly believed that the officer "may have been standing in the area where Orn's vehicle was headed." *Id*. at 1176. This Court should likewise reject Howard's argument that he reasonably believed the truck posed an immediate threat to him or other officers when he mistakenly perceived the truck to be moving forward, when it was in fact slowly reversing away from him and the officers. This Court should also consider that Howard chose to leave a position of safety to place himself in front of the truck, and Howard knew that Loftin might be trying to make a U-turn. The reasonable inference is that Loftin was not intentionally trying to run anyone over, and Howard ran onto the freeway with the intent to shoot the driver.

In *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007), is also instructive. In that case, Adams led officers on a vehicle pursuit, during which Adams' Expedition dragged a patrol car. Adams' Expedition came to a stop, and then Adams slowly reversed the Expedition while turning to the left. *Id*. Officer Speers exited his patrol vehicle and stood behind the Expedition as it rolled backwards away from him, and fired shots at Adams without warning. *Id*. At

62

992. The *Adams* court held that the law was clearly established that shooting under these facts would be a constitutional violation. *Id*. At 993-94.

In *Estate of Kosakoff v. City of San Diego*, 460 Fed. App'x 652 (9th Cir. 2011), the Ninth Circuit affirmed the district court's denial of qualified immunity. In *Kosakoff*, the subject ran a red light, crossed six lanes of traffic, nearly collided with a patrol vehicle, and fled from officers at 120 miles per hour. *Kosakoff v. City of San Diego*, No. 08-CV-1819-IEG (NLS), 2010 WL 1759455, at *1 (S.D. Cal. Apr. 29, 2010). After the subject's vehicle stopped, officers approached the vehicle, and then the subject began reversing the vehicle. *Id*. At *2. Officers opened fire, later contending that they perceived a fellow officer to be in danger of being run over. *Id.* In holding that the use of deadly force was not objectively reasonable, the court considered that the shots were fired after the vehicle "was moving *away* from the officers, and after [the officer] extricated himself from the 'V' created by the car door." *Id.* At *6. Similarly, Howard fired his shots when the truck was moving in reverse, away from the officers.

Other circuits have reached the same conclusion. In *Smith v. Cupp*, 430 F.3d 766, 768 (6th Cir. 2005), the Sixth Circuit held "Smith's right not to be seized by deadly force when fleeing arrest was clearly established." In *Smith*, Smith took control of a police cruiser. The parties disputed whether Smith accelerated toward officers and whether the shots were fired when the officers were to the side of the vehicle, out of its path of travel. *Id.* At 770. In affirming the denial of qualified immunity, the *Smith* court reasoned that although the suspect driver "could have used the police cruiser to injure or kill [the officer], under the plaintiffs' version of the facts, he was not doing so" at the time of the shots. *Id*. At 775. *See also Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015) (holding that even if it appears a vehicle is coming toward a person, officers "may not use deadly force once the car moves away, leaving the officer and

///

bystanders in a position of safety.'" 798 F.3d at 464 (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)).

The above-cited cases are sufficient to put Howard on notice that shooting Loftin under this set of facts would violate his constitutional right to be free from excessive force. "[A] decision with identical facts is not required to clearly establish" a constitutional right. *Scott v. Smith*, 109 F.4th 1215, 1227 (9th Cir. 2024); *see also N.S. v. Kan. City Bd. Of Police Comm'rs*, 143 S. Ct. 2422, 2423 (2023); *Ziglar v. Abbasi,* 582 U.S. 120, 151-52 (2017). There can be "notable factual distinctions" so long as the prior decisions give "reasonable warning" that the conduct is unconstitutional. *Scott*, 109 F.4th at 1227 (citing *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002)).

Third, it is well established that an officer's violation of police training weighs against granting qualified immunity. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("training materials are relevant not only to whether the force employed in this case was objectively unreasonable . . . but also to whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable"). An officer who makes a conscious decision to violate basic training guidelines should not be heard subsequently to claim to have made a reasonable mistake or to have reasonably believed their decision to be lawful. *See id*. Basic police training discourages shooting at vehicles or their drivers. See JAF 258-268. Pursuant to CHP policy, "Officers shall not stand and/or step directly in front of a vehicle in attempt to impede its movement, prevent escape, intentionally creating circumstances where use of deadly force appears to be necessary." JAF 263. Howard denies he violated the policy and says he was only in front of the truck when it was going backwards. JAF 237. A reasonable jury could find that Howard violated his training when he left cover to run in front of a moving vehicle and then used deadly force even

///

1   though Loftin was slowly reversing away from him, with no person in the truck's

2   path of travel.

3           Fourth, a reasonable jury could find that Howard's use of deadly force

4   under Plaintiffs' facts was "obviously" a constitutional violation. *See, e.g.*, *Estate*

5   *of Najera Aguirre v. Cnty. Of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) ("no

6   'body of relevant case law' is necessary in an 'obvious case' like this one")

7   (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)).

8   **D.    Defendants' Arguments: Summary Judgment On The State Law
        Claims Is Proper**

9

10  **1.    The Bane Act claims fail because Howard's use of deadly force didn't
        violate the Fourth Amendment. Alternatively, Howard lacked a specific
        intent to violate the Fourth Amendment (claim 3).**

11

12          Plaintiffs' Bane Act claims fail because Howard didn't violate Loftin's or

13  Urquijo's Fourth Amendment rights. *Williamson v. City of Nat'l City*, 23 F.4th

14  1146, 1155 (9th Cir. 2022) ("California's Bane Act requires proof of an underlying

15  constitutional violation.").

16          Assuming a Fourth Amendment violation, plaintiffs can't establish Howard

17  had a "specific intent" to violate Loftin's or Urquijo's Fourth Amendment rights.

18  *Reese v. County of Sacramento,* 888 F.3d 1030, 1043 (9th Cir. 2018). The evidence

19  establishes neither Howard's specific intent to violate nor a reckless disregard for

20  their Fourth Amendment rights when using deadly force. *Id.* at 1045.

21  **2.    Battery claims fail because Howard's use of deadly force was
        objectively reasonable under the Fourth Amendment (claims 6 and 7).**

22

23          A state law battery claim based on excessive force is "a counterpart to a

24  federal claim of excessive use of force." *Brown v. Ransweiler*, 171 Cal. App. 4th

25  516, 527 (2009); *Murillo v. City of L.A.*, 707 F. Supp. 3d 947, 960 (C.D. Cal. 2023).

26  "[T]he reasonableness standard applied to state law battery by a peace officer

27  matches the reasonableness standard used for Fourth Amendment excessive force

28  claims." *Reyes v. City of Santa Ana*, 832 F. App'x 487, 491 (9th Cir. 2020); *Hayes*

1    v. Cty. of San Diego, 736 F.3d 1223, 1232 (9th Cir. 2013) ("Claims of excessive

2    force under California law are analyzed under the same standard of objective

3    reasonableness used in Fourth Amendment claims."); accord Avina v. United

4    States, 681 F.3d 1127, 1131 (9th Cir. 2012); Murillo, 707 F. Supp. 3d at 960.

5        Because Howard's use of deadly force didn't violate the Fourth

6    Amendment, the battery claims fail. Reyes, 832 F. App'x at 491; Arpin, 261 F.3d

7    at 922); Murillo, 707 F. Supp. 3d at 960-61.

**3.    Negligence claims fail because Howard's use of deadly force was objectively reasonable under the totality of circumstances (claims 4, 5, and 8).**

10    "[O]fficers have a duty to act reasonably when using deadly force." Hayes

11    v. County of San Diego, 57 Cal. 4th 622, 629 (2013). Except for the reasonableness

12    of pre-shooting tactical conduct in assessing the "totality of circumstances," the

13    reasonableness standard mirrors the Fourth Amendment standard. Id. at 629, 632,

14    637-39; Tabares v. City of Huntington Beach, 988 F.3d 1119, 1125-26 (9th Cir.

15    2021); Koussaya v. City of Stockton, 54 Cal. App. 5th 909, 932-37 (2021).

16        As explained, Howard's use of deadly force was objectively reasonable. The

17    question is thus whether any "preshooting circumstances might show that an

18    otherwise reasonable use of deadly force was in fact unreasonable." Hayes, 57 Cal.

19    4th at 630. When "an officer's conduct falls within the range of conduct that is

20    reasonable under the circumstances, there is no requirement that he or she choose

21    the 'most reasonable' action or the conduct that is the least likely to cause harm

22    and at the same time the most likely to result in the successful apprehension of a

23    violent suspect, in order to avoid liability for negligence." Id. at 632.

24        No evidence establishes anything Howard did or didn't do before using

25    deadly force transformed his objectively reasonable use of force into an

26    unreasonable one under the totality of the circumstances in this case. See id. at 632

27    ("Although preshooting conduct is included in the totality of circumstances, we do

28    not want to suggest that a particular preshooting protocol ... is always required.

1    Law enforcement personnel have a degree of discretion as to how they choose to

2    address a particular situation. Summary judgment is appropriate when the trial

3    court determines that, viewing the facts most favorably to the plaintiff, no

4    reasonable juror could find negligence.").

5    **E.    Plaintiffs' Arguments On State Law Claims**

6        Plaintiffs are entitled to a jury trial on their state law claims because a

7    reasonable jury could conclude that Howard's use of deadly force was

8    objectively unreasonable as discussed above in connection with Plaintiffs' Fourth

9    Amendment excessive force claim. Qualified immunity does not apply to state

10   law claims. The State of California is vicariously liable on Plaintiffs' state law

11   claims. Cal. Gov. Code § 815.2(a).

12       **1.  *Battery***

13       "Federal civil rights claims of excessive force are the federal counterpart

14   to state battery and wrongful death claims; in both, the plaintiff must prove the

15   unreasonableness of the officer's conduct. Accordingly, federal cases are

16   instructive." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121 n.6

17   (2004). Police training and standards instruct that deadly force can only be used

18   based on an objectively reasonably belief that the person has the present ability,

19   opportunity, and apparent intent to immediately cause death or serious bodily

20   injury to the peace officer or another person. JAF 250; CACI 1305B; Cal. Penal

21   Code § 835(a). An imminent harm is not merely a fear of future harm, no matter

22   how great the fear and no matter how great the likelihood of the harm, but is one

23   that from appearances must be instantly confronted and addressed. *Id*.; JAF 252.

24   Applying this standard, a reasonable jury could find that Loftin did not have the

25   ability, opportunity, or apparent intent when he was backing up to turn around

26   and no person was in the path of the truck, as he was moving away from Howard

27   and the other officers. As described in detail above, at the time of the shooting, it

28   was not the case that any person was about to be struck by the truck with no

67

opportunity to get out of the way, and Howard would not be justified in shooting at Loftin or the truck for fleeing.

### 2. *Negligence*

The negligence analysis is even broader. In addition to the shooting itself being a negligent use of deadly force, pre-shooting tactics "are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability. Such liability can arise where the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639 (2013); *see also Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021); CACI 441 (instructing the jury to consider the officers' pre-shooting tactical conduct). Howard's pre-shooting negligent tactics include: failing to stay in a safe area to see if the truck stopped at the roadblock before approaching the truck; failing to exercise situational awareness and recognize that the truck was reversing away from him, and failing to listen to the helicopter broadcast that Loftin looked like he was going to try to make a U-turn (assuming the jury finds Howard's testimony credible); failing to issue a verbal warning before using deadly force; failing to provide incident command or control to his officers when he left cover and ran at the truck; failing to explore less-lethal alternatives.

### 3. *Negligent Infliction of Emotional Distress*

Plaintiff Urquijo satisfies his Negligent Infliction of Emotional Distress claim, which arises from Urquijo witnessing Howard's negligent use of deadly force against Loftin. To prove this claim, he must satisfy a three-part test: the "plaintiff (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested

68

witness and which is not an abnormal response to the circumstances." *Bird v. Saenz*, 28 Cal. 4th 910, 915 (2002). Urquijo and Loftin are half-brothers, and they shared a close relationship. JAF 276-77. After the shooting, Urquijo looked at Loftin and knew he was deceased. JAF 278. Urquijo suffered severe emotional distress as a result of witnessing his brother's death. JAF 280.

### 4. *Bane Act*

Howard's use of deadly force also support Plaintiffs' Bane Act claim. The Ninth Circuit in *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018), held that reckless disregard for constitutional rights demonstrates specific intent to deprive those rights. *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017), confirmed that the Bane Act does not require a separate "threat, intimidation, or coercion" beyond the constitutional violation itself. Whether Howard knew his actions were unlawful is irrelevant; reckless disregard for Loftin's right to be free from excessive force is sufficient. As described in detail above in connection with Plaintiffs' Fourteenth Amendment claim a reasonable jury could find that Howard acted with reckless disregard for Loftin's and Urquijo's rights to be free from excessive force. Given the facts of this case, where Howard fired twenty shots at Loftin without warning when the truck was reversing away from Howard and the officers, with no person in the truck's path of travel, summary judgment must be denied on this claim under any applicable standard.

### F. Howard's Argument: Summary Judgment On The Punitive Damage Claim Is Proper

Plaintiffs seek punitive damages from Howard. Doc. 134, p. 34. Punitive damages are available under § 1983 when a defendant demonstrates "reckless or callous disregard for the plaintiff's rights" or "intentional violations of federal law." *Smith v. Wade*, 461 U.S. 30, 51 (1983). "California law provides for punitive damages where the defendant has acted with fraud, or malice, express or implied,

which must be proven with clear and convincing evidence. … The requisite intent to support punitive damages is malice, and it may be proved either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences)." *Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 1015-16 (9th Cir. 2019) (simplified).

There is no evidence sufficient to support an award of punitive damages against Howard under § 1983 and certainly not to the level of "clear and convincing" required for punitive damages under California law.

**G.    Plaintiffs' Argument On Punitive Damages**

Punitive damages awards are permitted on "various[] standards of negligence, recklessness, carelessness, or other culpable conduct short of actual malicious intent." *Smith v. Wade*, 461 U.S. 30, 45 (1983); *see Larez v. City of Los Angeles*, 946 F.2d 630, 639 (9th Cir. 1991) (a jury may assess punitive damages under §1983 when the defendant's conduct involves "reckless or callous indifference to the federally protected rights of others"; actual intent or malice not required). "[O]ppressive conduct is [also] a proper predicate for punitive damages under §1983." *Dang v. Cross*, 422 F.3d 800, 809, 815 (9th Cir. 2005) (reiterating that various standards exist as separate and distinct bases for punitive damages and holding that the "district court prejudicially erred in refusing to instruct the jury that punitive damages could be awarded if it found that [the officer's] acts that caused [the plaintiff's] injuries were oppressively done."). Here, a reasonable jury could find that shooting under these circumstances satisfies one or more of the various standards for awarding punitive damages, as described in detail above in connection with Plaintiffs' Fourteenth Amendment claim.

///

///

///

1

## DEFENDANTS' CONCLUSION

2    Loftin left Howard with no choice other than to use deadly force to put an

3    end to Loftin's reign of highway terror endangering the lives of thousands of

4    innocent motorists. Other less intrusive means to get Loftin to stop had proved

5    totally ineffective. Even when confronted with the significant show of force at the

6    roadblock, Loftin persisted and exposed Howard and the other officers to an

7    imminent risk of death or serious injury while demonstrating he was not going to

8    surrender. And no force options other than deadly force could have possibly

9    stopped the 19,000-pound Big Rig. Sliced either way, Howard's use of deadly

10   force was objectively reasonable under the totality of the circumstances. Summary

11   judgment on all plaintiffs' claims is proper.

12

## PLAINTIFFS' CONCLUSION

13   For each of these reasons, Plaintiffs respectfully request that this Court

14   deny Defendants' motion for summary judgment in its entirety. The law is clear

15   that there must be an immediate threat of death or serious bodily injury at the

16   time of the shots to justify a use of deadly force. Despite Defendants' efforts to

17   focus this court's attention on the details of the pursuit preceding the shooting—

18   most of which was unknown to Howard at the time of the shooting—it is clear

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

71

1    that there was no immediate threat of death or serious bodily injury to Howard,

2    the officers, or anyone else at the time of the shooting.

3

4    Dated: December 12, 2025                    Dean Gazzo Roistacher LLP

5

6

7    By: */s/ Lee H. Roistacher*

8            Lee H. Roistacher
            Kimberly A. Sullivan
9            Aleries Lau
            Attorneys for Defendant
10            Sergeant Daniel Howard

11

12    Dated: December 12, 2025                    Law Offices of Dale Galipo

13

14

15    By: */s/ Dale K. Galipo*

16            Dale K Galipo, Esq.
            Renee V. Masongsong
17            Attorneys for Plaintiffs

18

19

20    Dated: December 12, 2025            ROB BONTA
                                    Attorney General of California
21                                    ELIZABETH S. ANGRES
                                    Supervising Deputy Attorney General
22

23

24    By: */s/ Haiyang Allen Li*
            HAIYANG A. LI
25            Deputy Attorney General
            Attorneys for Defendant
26            State of California by and through the
            California Highway Patrol
27

28

72

**SIGNATURE CERTIFICATION**

Pursuant to Local Rule 5-4.3.4, I hereby certify that the content of this document is acceptable to counsel for all parties and that I have obtained counsels' authorization to affix his/her electronic signature to this document.

Dated: December 12, 2025                    /s/ Lee H. Roistacher
                                            Lee H. Roistacher, declarant

**CERTIFICATION OF COMPLIANCE**

The undersigned, counsel of record for Defendant(s) State of California by and Through California Highway Patrol and Sergeant Daniel Howard, certify that this Motion for Summary Judgment contains 19,894 words, which:

   _X_  complies with the word limit of L.R. 11-6.1.

   _____ complies with the word limit set by court order dated [date].

Dated: December 12, 2025                    /s/ Lee H. Roistacher
                                            Lee H. Roistacher, declarant

73