**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

**LAW OFFICE OF SHARON J. BRUNNER**
Sharon J. Brunner, Esq. (SBN 229931)
sharonjbrunner@yahoo.com
14393 Park Ave., Suite 101
Victorville, CA 92392
Tel: (760) 243-9997
Fax: (760) 843-8155

**LAW OFFICE OF JAMES S. TERRELL**
James S. Terrell, Esq. (SBN 170409)
15411 Anacapa Road
Victorville, CA 92392
Tel: (760) 951-5850
Fax: (760) 952-1085

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER URQUIJO, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA, et al., <br><br> Defendants. | Case No. 5:22-cv-02133-AH-DTB <br><br> **DECLARATION OF JUSTIN ROSANDER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: January 7, 2026 <br> Time: 1:30 p.m. <br> Courtroom: 9C <br> Judge: Anne Hwang <br><br> Complaint Filed: 11/30/2022 <br> Trial Date: 05/26/2026 |

**DECLARATION OF JUSTIN ROSANDER**

I, Justin Rosander, declare as follows:

1. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so. I make this declaration in support of Plaintiffs' opposition to Defendants' motion for summary judgment to lay the foundation for the videos I prepared, which I understand are being lodged with the Court as "Exhibit 52" and "Exhibit 53" in the Joint Appendix of Evidence. "Exhibit 52" is the body-worn camera video of CHP Officer Jesus Garcia, synchronized with the MVARS video. "Exhibit 53" is the body-worn camera video of CHP Officer Jesus Garcia, synchronized with the MVARS video, with annotations.

2. A true and correct copy of my curriculum vitae is attached to the Joint Appendix of Evidence as "Exhibit 54."

3. I reviewed and used the following evidence: CHP Jesus Garcia 191183_01918320210622235615_0419.mp4; MVARS 1540337.

4. My purpose in this case was to clarify, synchronize, and analyze a body-worn camera and a dash camera video file. Additionally, stabilization was requested to view the officer more clearly, along with an analysis in order to determine when the vehicle stops, when it begins to reverse, when the shots begin, when the shots discontinue, and when the vehicle was reversing.

5. In order to maintain the integrity of the evidence file , only forensic software that is fit for purpose was utilized while conducting the analysis and clarification. A non-destructive workflow was created, and all results are reproducible within Axon Investigate PRO version 4.4.1, Amped FIVE version 37757, Magnet Verify version 2.349 with reference library version 2. 2.17 9, and iZotope RX 11 Advanced version 11.2.0.4231. To ensure the visual accuracy of the imagery, a calibrated Apple Pro Display 6 K monitor was used during the analysis. To ensure auditory accuracy and a natural frequency response, Yamaha HPH- MT7

studio monitoring headphones were utilized during the analysis.

  6. <u>Technical Analysis</u>

  Prior to the initiation of the forensic video clarification and analysis, working copies of the evidence files were created in order to ensure that the provided files were protected. After the working copies were created, the analysis began in Axon Investigate to obtain relevant metadata. While working in the program, hash values were calculated from the file in its entirety, along with all video and audio streams within evidence files. All hash values of the original files and working copies are in continuous agreement and identical sequence, supporting the proposition that the working files are an identical copy to that of the original evidence files.

  **CHP Jesus Garcia 19183_01918320210622235615 _0419.MP4:** After analyzing the evidence file, it was determined that a date and time stamp, along with GPS coordinates, were located at the binary fame level of the video. Subsequent date and time stamps, as well as GPS coordinates, were embedded within the imagery of the video files. The binary frame level data was verified against the embedded imagery data; however, a slight drift was observed in the embedded date and time stamp and GPS data, depending on where the video was being played. The drift is an expected result as it is a characteristic of most surveillance systems or body-worn cameras during the encoding process. It should be noted that the binary frame level data is generally the most reliable and should be utilized over the embedded data when possible; however, in this instance, it was not relevant to the task at hand. Additionally, it should be noted that the binary frame level date and time stamp, as well as GPS data, were not present until approximately one minute, fifty-nine seconds, and six hundred and nineteen milliseconds into the video file. Lastly, the binary frame level date and time stamps were cross verified with the encoded/create, tagged/modified, and duration time metadata within Amped FIVE. After review, the encoded/create date and time stamp metadata was approximately two frames after the first frame's embedded date and time stamp. This is

additionally an expected result from bodyworn cameras, for the reasons as mentioned above. Lastly, the tagged/modified date and time stamp was identical to the encoded/create date and time stamp and could not be verified against the total duration time of the evidence file. A hexadecimal analysis was also conducted to verify the analyzed metadata, with no discrepancies detected.

Upon completion of a global non-content-based analysis, it can be determined that the evidence file contains original metadata, file structure, and hexadecimal data from a surveillance system. The evidence file did not contain evidence that would suggest alteration with an editing application or software. The video file appears to be an accurate representation of a native body-worn camera video file and is fit for the purpose of a forensic video clarification and analysis.

**MVARS 1540337.VOB:** After analyzing the evidence file, no date and time stamp or GPS coordinates were found at the binary frame level of the video file or embedded within the imagery. Additionally, no encoded/create or tagged/modified date and time stamps were located within the evidence file's metadata. Upon further review of the metadata, the evidence file contained original delay data that suggests the evidence file is a region of interest that starts approximately three hours and thirty-one minutes into a larger file. Furthermore, delayed data is common in surveillance system region of interest exports. Subsequently, interlaced top-field first data was observed within the metadata; however, no interlacing artifacts were observed in the imagery of the video file. The surveillance system likely deinterlaced the video file during export. Lastly, the evidence file contained an older mpeg2video codec and is in DVD VOB format. Further analysis of the audit trail or audit report would be required to determine whether the evidence file is in its native format or if it has been exported from a surveillance system.

After a frame analysis and observation of the PTS duration time within the evidence file, it can be determined that the FFMS framerate was incorrect and that the actual frame rate as seen in the Axon Investigate Metadata, Amped FIVE

MediaInfo, and EXIF metadata was 29.970 frames per second, which equates to a frame duration of ~.033 seconds per frame, or 33 milliseconds per frame. The PTS (Presentation Time Stamp) data is the most reliable within a video file and should always be utilized for frame duration and frame rate data. A brief visual check was conducted, revealing no visual variability within the video file, which suggests that a transcode or conversion that would have altered the timing data likely did not occur.

Upon completion of a global non-content-based analysis, it can be determined that the evidence file contains original metadata, file structure, and hexadecimal data from a surveillance system or a surveillance system export. The evidence file did not contain evidence that would suggest alteration with an editing application or software. The video file appears to be an accurate representation of a native dash camera video file or an exported dash camera video file from the surveillance system. Due to CHP Jesus Garcia 19183_01918320210622235615_0419.MP4 and the evidence file containing little to no frame duration variability, the evidence file is fit for the purpose of a forensic video clarification, synchronization, and analysis.

7. <u>Clarification Workflow</u>

After completing the global non-content-based analysis, as seen above, both evidence files were brought into Amped FIVE for synchronization and then placed into a Multiview canvas. Before synchronizing the evidence files, the aspect ratio was reviewed to verify that the relationship between the width and height of the evidence file were being view accurately. After reviewing the aspect ratio metadata, the display aspect ratio was incorrect in both of the video files and was corrected for as seen in the "Aspect Ratio" correction hyperlink within the Amped FIVE workflow reports. Upon further review of the evidence files, lens distortion was detected; however, it was not corrected to avoid unnecessary interpolation. It was also not corrected, considering the perceived distance was not an issue, and that the files were not utilized for an image comparison or metrology analysis. Additionally,

little lens distortion was observed within evidence file MVARS 1540337.VOB, which was the main video file for analysis. Other technical aspects such as interlacing artifacts were considered while conducting the review of the evidence file, however, no further correction needed to be performed as previously discussed under the technical analysis above.

After reviewing both evidence files, a luminance adjustment was conducted due to the dark imagery within the video files. Several filters were analyzed within Amped FIVE; however, the Smart Adjust filter produced the best luminance clarification within the region of interest. The evidence files contained bright and dark pixel data, resulting in the Smart Adjust filter providing the best result. The filter adjusts the luminance values of each frame in its entirety, ensuring that each frame maintains a similar brightness and contrast throughout the video files. While conducting the luminance adjustment, pixel saturation analysis, and histogram analysis were performed to verify that no saturation occurred. It should be noted, however, that the Smart Adjust filter operates so that pixel saturation cannot occur from any of the settings within the filter.

Upon reviewing the body-worn camera evidence file, CHP Jesus Garcia 19183_01918320210622235615_0419.MP4, stabilization was required due to the significant camera movement. A Global Stabilization filter was applied using Amped FIVE, as it corrects instability and maintains the general imagery in the same approximate location. It should be noted that the Global Stabilization filter does not alter the camera's perspective, nor does it add or remove pixel values through interpolation; rather, it shifts the frame's X and Y coordinates to maintain an object or region of interest in the same position. A frame-size canvas was applied to maintain the edges as the stabilization filter shifts the imagery.

Once the luminance clarification was conducted to assist the visualization of the evidence files, a Multiview synchronization of the video files was conducted to view both files simultaneously. A fast synchronization point was identified in both

evidence files at the point where the emergency lights of a squad car turned off. Both officers' body-worn cameras captured the light turning off, and it was a strong and fast synchronization point at the time frames listed in the Amped FIVE Workflow Report PDF. It should be noted, however, that at the point of synchronization, the potential rate of error would be approximately no more than plus or minus one frame.

After a synchronization point was obtained, the original PTS (Presentation Time Stamp) duration time and the original frame numbers were placed onto the corresponding video files. They were displayed at the bottom of the video files where no relevant imagery was located. The synchronization point was set to timestamp 00:00:00.000, representing the time and frame of the synchronization point. The evidence file's original PTS timing information was then used for the interpolation of the synchronization timestamp, as it is the most reliable frame time data within a video file. The timestamp will allow anyone viewing the Multiview video file to determine how far off the two videos are from the synchronization point at any point in time. Additionally, the synchronization timestamp can act as a potential rate of error. As longer durations elapse from the synchronization point and frame duration variability is introduced, the higher the drift value will be. The drift in time is due to the variable timing information being converted to a constant average over time within the Multiview, as the encoder requires a constant frame rate to export a Multiview file. The PTS duration displayed is the duration of time in which the frame was intended to be shown before the Multiview re-encoding process. Original frame rate information and variability within the frame durations must be observed within the original evidence files; however, minimal to no frame time variability was observed in both files. It is imperative that no timing calculations be derived from the displayed time without further verification and metrology analysis. Spot checks were conducted to verify the synchronization point with no gross visual dissimilarities or unexplained differences within the Multiview.

While working in the Multiview, it was observed that the dash camera evidence file, MVARS 1540337.VOB, contained a lower pixel density compared to the bodyworn camera CHP Jesus Garcia 19183_01918320210622235615_0419.MP4. To make the video more accessible to view and to match a relative pixel density within the Multiview, a resize was performed within Amped FIVE. Area interpolation was utilized during the resizing process to maintain a majority of the original pixel data, and due to the hard edges seen in the evidence file. Bilinear resizing was also conducted within the non-stabilized body-worn camera synchronized video file to reduce pixelation and create an enhanced, natural looking demonstrative imagery by averaging pixel values from four neighboring pixels in a linear fashion. Both interpolation mythologies were utilized during the analysis below, along with the original pixel values. Both interpolation methodologies can be cross-referenced to the original evidence file for verification purposes. Additionally, it was observed that the audio stream from evidence file CHP Jesus Garcia 19183_01918320210622235615_0419.MP4 contained an approximate five-frame offset from the video stream within evidence file MVARS 1540337.VOB. An audio stream offset is an expected result due to video encoding, as well as acoustical factors of the environment in which it was captured. The Audio Sync filter was utilized to position the audio stream correctly between the two frames where the shot occurred for subsequent analysis. Refer to the video analysis below for more details and timing information.

Lastly, an annotated video file was created to visually demonstrate the requested areas of interest within the video files. The annotations will further be used to visually assist the Video Analysis portion of the report, as shown below. A text overlay was utilized along with arrows and the magnification tool for the last two frames, which contained a small area of interest. All solid annotations were applied to areas of the video file where no relevant imagery was located. Subsequent video files without annotations were also created for verification purposes. Lastly,

the Freeze Frame filter was used to display the eight video frames with various annotations. The frames were held for approximately five seconds in the regular playback video files and ten seconds in the reduced frame rate video files.

Upon completing the synchronization and annotation video files, five different deliverable video files were created with various settings. Due to the relatively short region of interest, a Range Selection tool was utilized to ensure that only the applicable regions were clarified and exported. All deliverable video files originated from the working files or working copies with the workflows listed within the reports. The deliverable video files were exported to a visually lossless MP4 format within Amped FIVE, which has a Constant Rate Factor of 1 for quality and compatibility purposes. All video files exported contain audio from evidence file CHP Jesus Garcia 19183_01918320210622235615_0419.MP4, considering it was the only video file with an audio stream. While resizing, the appropriate interpolation was utilized, and the aspect ratio was maintained. Reduced frame-rate video files were also included to view the deliverable video files at a slower frame-by-frame level. Additionally, a lossless frame extraction PDF was created for the relevant video files to facilitate viewability at a frame-by-frame level. All deliverable video files are an accurate representation of the original evidence files, and all clarification processes conducted did not alter the informative content of the evidence files. Furthermore, all clarifications conducted, including resizing and interpolation, follow the best practices within the forensic image and video scientific community and are non-destructive, reproducible, and verifiable, as demonstrated in the workflow reports. Each deliverable multimedia file can have the integrity verified with the hash values seen in the Amped FIVE Workflow PDF.

8. <u>Video Analysis</u>

Overview: Following the video clarification, a forensic video analysis was conducted to determine the time when the vehicle stops, begins to reverse, when the first shots are fired, and when the shots discontinue. While working on the

analysis, the original working files were used to obtain the best-quality imagery. All frame numbers within the analysis will be referenced from the dash camera evidence file titled MVARS 1540337.VOB. Before conducting the analysis, a complete PTS duration time analysis was performed on both of the evidence files. Upon review, little to no variability was detected, and both video files contained PTS frame durations of 0.033367 and 0.033366, which equate to 29.970 FPS (Frames Per Second). For the duration of the analysis, the Sync Point timestamp will be used for frame duration analysis, considering it was interpolated from the original PTS duration data. The potential rate of error was calculated from the synchronization process, as mentioned above, which was plus or minus one frame interval, or ± 0.033 seconds. It should also be noted that due to pixel saturation, motion blur, and low pixel density within the region of interest, body-worn camera evidence file titled CHP Jesus Garcia 19183_019183202106222235615_0419.MP4 was not utilized for visual analysis. It was used, however, for a general overview of the scene and for the audio stream as discussed in the clarification overview above.

**Frame 12389-12390:**



The vehicle that the Decedent operated came to a stop approximately between frame numbers 12389 and 12390. Considering sampled and unsampled duration times of digital cameras, any action that is captured by a digital camera cannot be deduced to one frame, rather in-between two frames. It should also be noted that due to heavy compression artifacts and low pixel density within the region of interest, some motion was observed after the vehicle discontinued forward motion; however, the motion was due to compression artifacts that moved throughout the imagery. The center of the front wheel of the vehicle and several parts of the vehicle that were closest to the camera were used to determine when the vehicle discontinued movement, along with when it started to reverse and continue movement.

**Frame 12404-12405:**





The vehicle that the Decedent operated started to reverse and continue movement at approximately between frame numbers 12389 and 12390. It can be determined that there is an approximate sixteen frame interval between the point when the vehicle stopped and discontinued movement and the point when the vehicle reversed and resumed movement. The time between the two events has an approximate duration of 0.534 seconds, with a minimum value of 0.501 seconds and a maximum duration of 0.567 seconds.

**Frame 12488-12489:**





The first shot that the Officer fired was between frame numbers 12488 and 12489. Muzzle flash was observed, which is a fast and reliable event for determining a shot fired. Considering the rapid appearance of muzzle smoke, determining an exact location and precise timing of the first shot fired is possible. It can be determined that there is an eighty-five frame interval between the point when the vehicle reversed and resumed movement and the time when the first shot was fired. The time between the two events has a duration of 2.837 seconds, with a minimum value of 2.804 seconds and a maximum value of 2.870 seconds.

DECLARATION OF JUSTIN ROSANDER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Frame 12645-12646:**





The last shot that the Officer fired was between frame numbers 12645 and 12646. Considering the limited pixel density of where the Officer was located during the last shot fired, muzzle flash or smoke could not be captured from the dash camera. The audio stream was used to determine the location of the last shot fired. Unlike video, audio captures samples linearly and does not have variable time issues, as it is continuously sampling at 48 kHz, which is 48,000 samples per second. Due to this reason, it is utilized whenever possible, provided that the video and audio offsets are corrected and accounted for, as seen in the technical analysis above. A frame-by-frame analysis of the video and audio stream was performed, and it was verified that each frame, along with subsequent shots and muzzle smoke, matched the crest of the waveform until the dash camera no longer captured the smoke. It can be determined that there is a one hundred and fifty-eight frame interval between the point when the first shot was fired and when the last shot was fired. The time between the two events has a duration of 5.239 seconds, with a minimum value of 5.206 seconds and

DECLARATION OF JUSTIN ROSANDER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

a maximum value of 5.272 seconds. A Spectrogram and Waveform Analysis was also conducted to verify the time values.



The original working copy was utilized in order to maintain the best video and audio stream for analysis. After analysis, the first shot was fired at 00:04:02.522, and the last shot was fired at 00:04:07.755, resulting in a duration of 5.233 seconds. It should be noted that there are no minimum or maximum values required for audio, considering it has a continuous sampling as mentioned above. After the last shot was fired, the analysis was discontinued. It should be noted that during the last shot fired, the vehicle was still reversing and did not discontinue movement.

9. There is strong support for the following propositions:

  a. The evidence files depict that the vehicle came to a stop and then reversed before shots were fired.

  b. The evidence files depict that the vehicle was reversing while all shots were fired.

  c. The evidence files depict that the vehicle was still reversing after the last shot was fired.

  d. The evidence files contain a duration time of 5.233 seconds between when the first shot and the last shot was fired.

10. There is support for the following propositions:

  a. The evidence files contain an eighty-five frame interval between the point when the vehicle reversed and resumed movement and the time when the first shot was fired. The time between the two events has a duration of 2.837 seconds, with a minimum value of 2.804 seconds and a maximum value of 2.870 seconds.

  b. The evidence files contain a two hundred and fifty-seven frame interval between the point when the vehicle stopped and discontinued movement and the time when the last shot was fired. The time between the two events has a duration of 8.575 seconds, with a minimum value of 8.542 seconds and a maximum value of 8.608 seconds.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this November 20, 2025, at JSM Forensics in San Luis Obispo California.

_____
Justin Rosander