# EXHIBIT 71

On-Scene Consulting

October 30, 2025

Ms. Renee Masongsong, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

## <u>Federal Rules of Civil Procedure 26 (a) (2) (B) Report</u>

**CHRISTOPHER URQUIJO, et al, Plaintiffs,**
**vs.**
**STATE OF CALIFORNIA, et al., Defendants.**
<u>**Case No. 5:22-cv-01233-SSS-DTB.**</u>

Dear Ms. Masongsong,

Thank-you for retaining me to analyze and render opinions regarding the June 22, 2021, Officer-Involved Shooting of Mr. Raymond Loftin by California Highway Patrol Sergeant Daniel Howard.  Pursuant to the requirements of Rule 26, I have studied reports, videos, photographs, San Bernardino County Sheriff's Department documents, California Highway Patrol documents and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.  It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Third Amended Complaint for Damages, <u>Case No. 5:22-cv-01233-SSS-DTB.</u>

2. California Highway Patrol, Division Review, <u>Pursuit No. 20215876/20215881</u>.

3. AMR, Patient Name: Chris Urquijo, 6/23/21.

4. California Highway Patrol, Inland Division Critical Incident, Investigation Team, <u>Case No. 21-03274</u>.

5. Colton Police Department, Case No. 21-03271, by Sergeant G. Castillo, CL No. 4147.

6. Colton Police Department, Case No. 21-03271, by Officer I. Jaramillo, CL No. 4973.

7. Colton Police Department, Case No. 21-03271, by Officer N. Campos, CL No. 5029.

8. Fontana Police Department, Confidential Incident Report, Case No. 210008613.

9. Detailed History for <u>Police Event No. 210610619</u>, 6/23/21.

10. San Bernardino County Sheriff-Coroner Division, Homicide, <u>Case No. 702107343</u>.

11. State of California, Department of Highway Patrol, Vehicle Report, CHP 180, <u>File No. 71257</u>.

12. West Covina Police Department, Original Report, <u>Case No. CR-21-1596</u>.

13. Incident Detail Report, <u>No. 210622IN01503</u>, 6/22/21.

14. Colton Police Department, Call Detail Report, <u>Call No. 787547</u>.

15. San Bernardino County Sheriff's Division for Police <u>Incident No. AV211730001</u>.

16. California Highway Patrol, ATS Scans, Officer D. Howard, 6/22/21.

17. California Highway Patrol, Beat Schedule, Rancho Cucamonga, <u>6/1/21-6/30/21</u>.

On-Scene Consulting

18. California Highway Patrol, Critical Incident, <u>A-H23</u>.

19. Photographs.

20. California Highway Patrol, <u>T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</u>, OIS No Time Stamps, (<u>1:57:13</u>).

21. Deposition Transcript and Exhibits of Mark Garcia taken on June 6, 2025.

22. Deposition Transcript and Exhibits of Nicholas Mercado taken on June 13, 2025.

23. Deposition Transcript and Exhibits of Jesus Garcia taken on June 17, 2025.

24. Deposition Transcript and Exhibit of Sergio Vasquez taken on May 15, 2025.

25. Deposition Transcript and Exhibits of Daniel Howard taken on May 6, 2025.

26. Deposition Transcript and Exhibits of Gabriel Mendez, taken on June 27, 2025.

27. San Bernardino County Sheriff's Department, Case File, Lethal Force Encounter/PC 245(c), <u>DR No. 602100131</u>.

28. Video, (<u>10:02</u>).

29. CAD Video, (<u>1:00</u>).

30. CAD Video, EWD94198, (<u>0:12</u>).

31. CAD Video, EWD94204, (<u>0:12</u>).

32. CAD Video, EWDW94211, (<u>0:12</u>).

33. CAD Video, 9532, (<u>0:12</u>).

34. CHP, Jesus Garcia (<u>10:12</u>).

35. CHP MVARS, (<u>1:51</u>).

36. CHP MVARS, (<u>35:03</u>).

On-Scene Consulting

37. CHP MVARS, (27:41).

38. Fontana Police Department, BWC, Goodland, (7:49).

39. Fontana Police Department, BWC, Diaz, (5:05).

40. Fontana Police Department, BWC, Pisani, (6:12).

41. Colton Police Department, Case No. 21-03274, (AGO 000895-900).

42. Screen_AERO006186_202162, (58:03), (AGO 960-1).

43. Screen_AERO006186_202162, (58:03), (AGO 960-2).

44. Fire Photo Girl, San Bernardino Pursuit, (36:22), (AGO 961).

45. California Highway Patrol, Chapter 5, Pursuit Policy and Emergency Vehicle Operations, Revised 12/2020, HPM 70.6.

46. California Highway Patrol, Chapter 16, Roadblocks, Revised May 2020, HPM 70.6.

47. California Highway Patrol, Basic Course, Intensive, Course Control Number 1270-00100.

48. California Highway Patrol, Emergency Response Driving and Pursuit Policy.

49. California Highway Patrol, Chapter 1, Use of Force, Revised 12/2020.

50. California Highway Patrol, Expanded Course Outline, Regular Basic Course, Learning Domain #20, Use of Force/De-Escalation.

51. California Highway Patrol, Start Module 3 Training.

52. California Highway Patrol Training, Nicholas D. Mercado, Badge No. 021941.

53. Audio-Recorded Interviews:
   - Corporal Ryan Peppler, (43:16).

On-Scene Consulting

- Officer Jesus Garcia, (1:29:44).
- Officer Mark Garcia, (1:40:02).
- Officer Mendez, (1:31:58).
- Officer Mercado, (1:38:55).
- Officer Vasquez, (1:39:46).
- Sergeant Daniel Howard, (2:45:28).

54. Transcript of Recorded Administrative Interview of Daniel Howard taken on 5/10/23, (HOWARD 001-321).

55. Protective Order.

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."
9. #33: "Arrest and Control."
10. #35: "Firearms/Chemical Agents."

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**BRIEFING, SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT, CRIME REPORT, CASE SUMMARY, DR#602100131/H#2021-083:**

*"On Wednesday, June 23, 2021, at approximately 0048 hours, CHP Officers Mark Garcia, Gabriel Mendez, Sergio Vasquez, and Jesus Garcia, from Rancho Cucamonga Station stopped all eastbound vehicle traffic on I 10, west of Sierra Avenue, with two marked CHP patrol vehicles. CHP Sergeant Daniel Howard and CHP Officer Nicholas*

On-Scene Consulting

*Mercado arrived at I 10 and Sierra Avenue shortly after, each in their own parked patrol vehicle. Once civilian vehicles were stopped, the CHP Officers set up a roadblock with four marked patrol vehicles, with their overhead red and blue emergency lights activated and blocked all four eastbound lanes."*

*"Howard instructed the CHP Officers to equip themselves with their AR-15 rifles from their patrol vehicles. The CHP Officers moved from their marked patrol vehicles and positioned themselves behind a metal guardrail on the south side of the eastbound lanes of the I 10. Howard told the CHP Officers, if a lethal force situation presented itself, he would be the one to fire his rifle. According to Howard, Loftin needed to be stopped because he would kill someone in a head-on-collision if he continued to drive the wrong way on the freeway. Approximately 10 minutes later, Loftin drove westbound on the I 10 and straddled the number four lane and asphalt shoulder. Loftin approached the CHP roadblock at approximately 50 miles per hour."*

*"As the big rig was approximately 100 feet east of the roadblock, Loftin slowed down and made a sweeping right turn, then turned left toward the CHP Officer's positions behind the metal guardrail. Howard hopped off the metal guardrail, walked onto the freeway toward the front of the big rig, with his AR-15 patrol rifle positioned on his right shoulder. Howard yelled at Loftin to stop the big rig. Howard fired 20 rounds from his AR-15 patrol rifle at the front of the big rig and Loftin and Loftin was struck by gunfire."*

*"Loftin was pronounced deceased at approximately 0118 hours."*

On-Scene Consulting

**<u>Opinions:</u>**

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not
stated as ultimate issues. I hold the opinions below a reasonable degree of professional
certainty. The basis and reasons for my opinions are premised upon my education,
training and experience in law enforcement, my knowledge of law enforcement
standards, analysis and study; my familiarity with generally accepted police practices and
the professional and academic literature in the field; my review of relevant actions,
policies and procedures; and my understanding of the facts of this case based on my
comprehensive materials listed on <u>Pages 2-5</u> of this report. My opinions and testimony
regarding police procedure are relevant topics concerning issues of which lay jurors are
unaware or frequently have misconceptions. My testimony on these topics is relevant
and would assist a jury in understanding the evidence presented to them.

## <u>Opinion Number 1</u>

It is my opinion based on my review of the facts, testimony, videos, totality of the
circumstances and videos in this matter, a reasonable California Highway Patrol Sergeant
Daniel Howard <u>failed</u> to remain at a position of cover at a Road Block and formulate a
tactical plan and contingencies with California Highway Patrol Officers Mark Garcia,
Gabriel Mendez, Sergio Vasquez, Jesus Garcia and Nicholas Mercado at the I 10 and
Sierra Avenue. The Road Block was effectively deployed utilizing four marked police
vehicles with their overhead red and blue emergency lights activated. The four police
vehicles blocked all four eastbound lanes of the I 10 Freeway. San Bernardino County
Sheriff's Department 40K, (<u>Police Helicopter</u>), was providing overwatch of the stolen
Peterbilt Flatbed Big Rig Truck, California License No. 99346J1, that was being driven
by Mr. Raymond Loftin. Mr. Christopher Urquijo was seated in the passenger
compartment of the truck.

In the event Mr. Raymond Loftin did not flee in his vehicle or fled on foot, Sergeant
Daniel Howard could have established a perimeter with California Highway Patrol
Officers Mark Garcia, Gabriel Mendez, Sergio Vasquez, Jesus Garcia, and Nicholas
Mercado. In the event Mr. Raymond Loftin conducted a U-Turn, they could have
resumed the pursuit with the assistance of San Bernardino County Sheriff's Department
40K, (<u>Police Helicopter</u>), that have continued to provide overwatch of the Peterbilt
Flatbed Big Rig Truck, California License No. 99346J1, that was being driven by
Raymond Loftin, until the decision was made to either discontinue the pursuit or
implement Pursuit Intervention Techniques.

On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-8)</u>:

**<u>First Unit at the Scene</u>:** The first unit to arrive at the scene should take on the role of the primary unit.  That officer should take the leadership responsibility to gather as much information as is reasonably possible regarding the current status of the crime scene.  It is the primary officer who must take charge and initiate the appropriate steps toward controlling the situation.

<u>The first officer to arrive should</u>:

- Take a position to best observe and control the scene.
- Advise dispatch and responding units of the arrival and location.
- Identification and location of reporting person.
- Interview of reporting person to determine if a crime occurred.
- Number of suspects and suspect(<u>s</u>) description.
- The type of weapon(<u>s</u>) involved.
- The number of persons injured by the suspect.
- Actions (<u>propensity toward violence</u>).
- Suspects current and prior mental health issues.
- Suspects current and prior medical issues.
- Other emergency vehicles responding to the scene.
- ***Communicate and coordinate with the other officers to establish perimeters to contain the suspect and prevent escape.***
- ***Request additional resources if necessary and available, (<u>e.g., supervisor, additional units, canine unit, police helicopter</u>).***

The Aviation Unit is one of the most technologically advanced and efficient law enforcement tools.  The aircraft and their equipment are a "force multiplier" for law enforcement.  One helicopter in the air can cover as much territory (<u>more quickly</u>) as <u>12 officers</u> in patrol cars on the ground.  The primary function continues to be that of support for ground units.

On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-10)</u>:


**<u>Establishment of a Perimeter:</u>**

It is the responsibility of the primary officer to initiate the coordination of the security and containment of the crime scene. This can be done by establishing a boundary or perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.

<u>Establishing a perimeter</u>:
- Contains and isolates the crime scene.
- Prevents the suspect(<u>s</u>) from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(<u>s</u>).


<u>There are two types of perimeters at a crime scene</u>: **<u>inner perimeter</u>** and **<u>outer perimeter</u>**:


**<u>Inner Perimeter</u>**:
- Immediate area around the incident (<u>e.g., private residence, commercial establishment, vehicle, etc</u>.)
- Varying size depending on the purpose of the perimeter.

**<u>Outer Perimeter</u>**:
- Area surrounding the inner perimeter.
- May aid in apprehension if the suspect manages to breech the inner perimeter.


In addition, I base my opinion on my twenty-eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(<u>s</u>).


In addition, it is my opinion based on my review of the facts, totality of the circumstances, testimony and videos in this matter, Sergeant Daniel Howard made a poor

On-Scene Consulting

tactical decision and unnecessarily escalated the situation when he hopped over the metal guardrail and walked on the freeway without any cover or concealment towards the front of the Peterbilt truck with his AR-15 semi-automatic rifle positioned on his right shoulder.  Sergeant Daniel Howard <u>failed</u> to use <u>Time and Distance</u>.

De-Escalation is a concept that involves an officer's use of time, distance, and relative positioning in combination with Professional Communication Skills to attempt to stabilize a situation and reduce the immediacy of threat posed by an individual.

The tactical plan should have outlined verbal skills (<u>defusing and de-escalation techniques</u>) and <u>Less Lethal Force options such as</u>: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Conducted Energy Weapon, (<u>CEW</u>), Taser with an effective range of <u>7-15 feet</u> and maximum range of <u>21-25 feet</u>, Ballistic Shield, K9, Pepper Ball Round, 40MM Foam Baton Round and or Direct Impact CS Round,  ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of <u>10-15 feet</u>., or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round.  The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot.  The design utilizes four stabilizing tails and smokeless powder as the propellant.  The round has a velocity of 270 feet per second (<u>FPS</u>) with a maximum effective range of <u>75 feet</u> which could have effectively been deployed from a position of cover.

In addition, I base my opinion on <u>POST Learning Domain 21</u>, "Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach</u>: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**<u>Cover</u>**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (<u>firearm, shotgun, rifle</u>).

On-Scene Consulting

**Examples of Cover:**
- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific Crimes in Progress, 3-5:</u>

**Establish a Contact Officer and Cover Officers:**

**Contact Officer:**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover must be clear.  The **Contact Officer:**
- Conducts the business of the pullover,
- Directs the driver and occupants(<u>s</u>) of the target vehicle,
- Takes necessary actions related to the investigation.

**Cover Officers:**
<u>It is general responsibility of any cover officers to assist the primary officer at the scene of a high-risk vehicle pullover to:</u>
- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

**Communications Between Officers:**
In order to ensure officer safety and help ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

On-Scene Consulting

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 2**

It is my opinion that a reasonable Police Officer acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Raymond Loftin that he was going to fire his AR-15 semi-automatic rifle.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts in this matter, California Highway Patrol Sergeant Daniel Howard, did not give a verbal warning to Mr. Raymond Loftin and give Mr. Raymond Loftin a reasonable opportunity to comply prior to firing his AR-15 semi-automatic rifle unnecessarily shooting twenty times and killing Mr. Raymond Loftin.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

On-Scene Consulting

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

### **Opinion Number 3**

It is my opinion that a reasonable Police Officer acting consistent with standard police practices would not have used lethal force in this situation.  This was not an immediate defense of life situation, and, as explained further below, under the facts of this case, California Highway Patrol Sergeant Daniel Howard could not shoot Mr. Raymond Loftin for fleeing.  In addition, it is my opinion that "Shooting at or from Moving Vehicles," which are shots fired at or from a moving vehicle, are rarely effective.  Police Officers should not position themselves in the path of a vehicle and should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.  A Police Officer should only discharge a firearm at a motor vehicle or its occupants when the Police Officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.  Police Officers should not shoot at any part of the vehicle in an attempt to disable the vehicle.  "Shooting at or From Moving Vehicles" has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.

In addition, it is my opinion that even if the vehicle did in fact move, the use of deadly force would still not be appropriate in this incident as the movement would not have created an Immediate Defense of Life (IDOL) situation.

In addition, based on my review of the facts in this matter, at no time did Sergeant Daniel Howard or any citizen observe Mr. Raymond Loftin in possession of a firearm or any other weapon at the time of the shooting.

Lastly, I base my opinion on my twenty- eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

### **Opinion Number 4**

It is my opinion that California Highway Patrol Sergeant Daniel Howard's use of lethal force <u>violated</u> his training and caused the unnecessary death of Mr. Raymond Loftin.

In addition to the California Highway Patrol Department Manual, basic police officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in most scenarios. If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle. Additionally, an assaultive motor vehicle does not presumptively justify the use of deadly force.

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Sergeant Daniel Howard to shoot at Mr. Raymond Loftin for fleeing or attempting to flee. Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (<u>1</u>) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (<u>2</u>) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (<u>3</u>) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (<u>4</u>) the officer gives some warning that deadly force may be used, where feasible. (<u>*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a*</u>).

<u>**These four factors were not met in this case**</u>. Mr. Raymond Loftin did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident Mr. Raymond Loftin did not have a firearm, and Mr. Raymond Loftin posed no immediate threat of death or serious bodily injury necessitating deadly force.

Sergeant Daniel Howard violated basic police officer training and standards with respect to the use of deadly force when he shot Mr. Raymond Loftin while Mr. Raymond Loftin occupied the driver seat of a vehicle. A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. Mr. Raymond Loftin did not pose an immediate threat of death or serious bodily injury to Sergeant Daniel Howard or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity

On-Scene Consulting

to get out of the way.

<u>The Shooting was Excessive and Unreasonable</u>

From the standpoint of police practices, including basic police training, POST standards, and the California Highway Patrol's own policies, Sergeant Daniel Howard's use of deadly force was improper, inappropriate, excessive and unreasonable, including (<u>but not limited to</u>) <u>for the following reasons</u>:

a) <u>No Immediate Defense of Life Situation</u>.  Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.  A fear of future harm is not enough.  There was no immediate defense of life situation when Sergeant Daniel Howard fired his shots.  Nobody was about to be run over by Sergeant Daniel Howard's vehicle at the time of the shots.

b) <u>Subjective fear is insufficient</u>.  Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." In this case, the record does not support any objectively reasonable explanation that Mr. Raymond Loftin posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired.  Mr. Raymond Loftin was unarmed, and no person was about to be struck by Mr. Raymond Loftin's vehicle.

c) <u>Violation of basic Police Training.</u>  Sergeant Daniel Howard violated police training and standards surrounding shooting at vehicles and their driver when he shot Mr. Raymond Loftin while Mr. Raymond Loftin occupied the driver seat of a vehicle.  There was no person about to be struck by Mr. Raymond Loftin's vehicle when Sergeant Daniel Howard fired his shots. Therefore, there was no reason for Sergeant Daniel Howard to shoot.

d) <u>No crime involving the infliction of serious injury or death.</u>  Sergeant Daniel Howard was not responding to a crime involving the infliction of death or serious bodily injury.  Sergeant Daniel Howard had no information that Mr. Raymond Loftin was armed and no information that anyone had been injured.

e) <u>Unarmed</u>.  Mr. Raymond Loftin did not have a firearm or other weapon during this incident.

f) <u>No verbal threats</u>.  Mr. Raymond Loftin never verbally threatened to harm anyone.

On-Scene Consulting

g)  <u>Reasonable alternative measures available</u>.  Officers are trained that they can only use deadly force in a "last resort" situation. Sergeant Daniel Howard had other reasonable measures available, including moving out of the way, waiting for backup, giving further commands, and setting up a perimeter for later apprehension.

h)  <u>No reverence for human life</u>.  Police officers are trained that they must show a reverence for human life.  Sergeant Daniel Howard showed no reverence for human life when he fired at Mr. Raymond Loftin.

i)  <u>Police officers are responsible for justifying every shot</u>.  Police officers are trained that they must justify every shot they fire. Sergeant Daniel Howard is responsible for every shot that he fired in this case, and all twenty of his shots were unjustified.

In addition, it is my opinion that at the time of the shooting and killing of Mr. Raymond Loftin, he was not an Imminent Threat to anyone including California Highway Patrol Sergeant Daniel Howard.

<u>Imminent</u>: <u>California Penal Code Section 835a(e)(2) states per HPM 70.6:</u> "A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."

In addition, according to <u>HPM 70.6, 1-9</u>, (<u>1</u>) <u>Shooting at a Vehicle</u>. Firearms, when discharged at a vehicle, moving or stationary, shall be done in accordance with this chapter. (<u>a</u>). The discharge of a firearm at a wrong-way, high-speed, or reckless driver or vehicle solely on the assumption that other persons may be injured or killed unless the driving act is terminated is not authorized.

In addition, according to <u>HPM, 70.6 pg. 1-8</u>: To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

<u>In addition, I base my opinion on the following facts and testimony</u>:
• According to CHP Officer Nicholas Mercado, he did not hear anyone giving

commands or a verbal warning before he heard shots being fired, (<u>Deposition Transcript of Nicholas Mercado, Page 9</u>).

- According to CHP Officer Nicholas Mercado, when he watched the video, he noticed the truck was going backwards before the shots were fired, (<u>Deposition Transcript of Nicholas Mercado, Page 28</u>).

- According to CHP Officer Jesus Garcia, he did not hear any commands or a verbal warning to the driver of the truck before he heard shots being fired, (<u>Deposition Transcript of Jesus Garcia, Page 23</u>).

- According to CHP Officer Jesus Garcia, he observed the truck slow down as it approached the blockade, (<u>Deposition Transcript of Jesus Garcia, Page 27</u>).

- According to Sergeant Daniel Howard, he was promoted to Sergeant in May of 2021, less than two months before this incident, (<u>Deposition Transcript of Daniel Howard, Pages 12-13</u>).

- According to Sergeant Daniel Howard, he did not have any information that anyone in the big rig was under the influence of drugs or alcohol at the time of the shooting, (<u>Deposition Transcript of Daniel Howard, Page 26</u>).

- According to Sergeant Daniel Howard, he agrees the big rig slowed down before he started firing, (<u>Deposition Transcript of Daniel Howard, Page 49</u>).

- According to Sergeant Daniel Howard, while watching the video, it appeared that the truck was reversing when he fired the shots, (<u>Deposition Transcript of Daniel Howard, Page 63</u>).

- According to Sergeant Daniel Howard, he could not see inside the cab of the truck at the point that he fired and does not know how many rounds he fired into the passenger compartment of the vehicle, (<u>Deposition Transcript of Daniel Howard, Pages 75 & 78</u>).

- According to Sergeant Daniel Howard, he did not give a verbal warning that he was going to use deadly force, (<u>Deposition Transcript of Daniel Howard, Page 81</u>).

- According to CHP Officer Sergio Vasquez, he had no specific information if the driver of the big rig had a criminal history, if he was under the influence of drugs or alcohol or if the big rig collided with any vehicles before the shooting, (<u>Deposition Transcript of Sergio Vasquez, Page 7</u>).

- According to CHP Officer Sergio Vasquez, he does not recall a tactical plan before the shooting, (<u>Deposition Transcript of Sergio Vasquez, Page 8</u>).

- According to CHP Officer Sergio Vasquez, the truck appeared to be going in reverse when the shooting happened, (<u>Deposition Transcript of Sergio Vasquez, Page 11</u>).

- According to CHP Officer Sergio Vasquez, he did not see any pedestrians as the truck was approaching their location, (<u>Deposition Transcript of Sergio Vasquez, Page 15</u>).

On-Scene Consulting

- According to CHP Officer Sergio Vasquez, he did not unholster his duty weapon before hearing the shots, (Deposition Transcript of Sergio Vasquez, Page 37).
- According to CHP Officer Sergio Vasquez, there was no tactical discussion if the truck tried to go through the barricade, (Deposition Transcript of Sergio Vasquez, Page 42).
- Sergeant Daniel Howard stated that the CHP Policy dictates that you shall not stand directly in front or behind a vehicle, (Transcription of Daniel Howard's Administrative Interview, Page 78).
- Sergeant Daniel Howard stated he believes the CHP is incompetent how they train Officers regarding the use of firearms, (Transcription of Daniel Howard's Administrative Interview, Page 101).
- Sergeant Daniel Howard stated that he does not recall if he discussed tactical contingencies with the involved CHP Officers at the Road Block, (Transcription of Daniel Howard's Administrative Interview, Pages 131-132).
- Sergeant Daniel Howard stated that they could have used additional spike strips, (Transcription of Daniel Howard's Administrative Interview, Page 168).
- Sergeant Daniel Howard stated that after the shooting, the CHP Officers boxed the truck in, (Transcription of Daniel Howard's Administrative Interview, Page 196).
- Sergeant Daniel Howard stated that prior to the shooting, he did not know if an ADW with a Vehicle occurred, (Transcription of Daniel Howard's Administrative Interview, Page 211).
- Sergeant Daniel Howard stated that he agrees that truck had not collided with a vehicle before the shooting, (Transcription of Daniel Howard's Administrative Interview, Page 221).
- CHP Lieutenant Joshua Buffum stated, "when were you ever taught to run a vehicle during a felony stop?"  Buffum further stated he has never heard anyone ever do that, (Transcription of Daniel Howard's Administrative Interview, Pages 268-269).
- Sergeant Daniel Howard stated that he agrees that 40 King was overhead, (Transcription of Daniel Howard's Administrative Interview, Page 274).
- CHP Lieutenant Joshua Buffum stated, "leaving a position of cover and to stand in front of a Road Block was a very poor decision," (Transcription of Daniel Howard's Administrative Interview, Pages 291-292).
- CHP Lieutenant Joshua Buffum stated, "time was on their side," (Transcription of Daniel Howard's Administrative Interview, Page 293).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

## Opinion Number 5

It is my opinion that under the facts of this case, California Highway Patrol Sergeant Daniel Howard could not shoot Mr. Raymond Loftin under the Fleeing Felon theory, especially because Mr. Raymond Loftin never inflicted death or serious bodily injury on anyone prior to the shooting.

## Considerations Regarding the Use of Deadly Force

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an "*Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added):*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner,"(Learning Domain #20; "Introduction to the Use of Force, " Pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.*  This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer "police powers" on themselves*.  These powers come to the criminal justice system from the

people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 6

It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a departure of from POST Standards Use of Force and Use of Deadly Force Training. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013

On-Scene Consulting

Cal LEXIS 6652.  In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly us of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.

It is my expert opinion that a similarly trained California Highway Patrol Officer/Sergeant would not have considered Mr. Raymond Loftin to be a lethal threat in this set of facts.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 7**

It is my opinion based on my review of the facts, videos and totality of the circumstances, the California Highway Patrol failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used by California Highway Patrol Sergeant Daniel Howard in this matter was inappropriate, unreasonable, and excessive.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a failure by the California Highway Patrol to properly train Sergeant Daniel Howard on following subject matters: Verbal Strategies, Defusing and De-Escalation Techniques, Use of Cover and Contact Officers, Situational Awareness and the use of Less Lethal/Lethal/Deadly Force to include Shooting Into Moving Vehicles.  In addition, the California Highway Patrol ratified the conduct of Sergeant Daniel Howard by determining that his conduct was within policy and for failing to properly train him prior to this incident.  These types of decisions tend to have a ripple effect in the Department because other Officers believe that they can engage in similar conduct without consequences.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

**<u>My Qualifications for Reviewing this Case:</u>**

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked on a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working at Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

## On-Scene Consulting

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and edit the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates,

On-Scene Consulting

Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics
Training, Undercover Operations training, Surveillance training, and any other training
deemed necessary by my Area Commanding Officer.  I conducted audits, personnel
investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart
Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central
and South Bureaus.  I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant
II+1.  I directly supervised (18) K9 Handlers.  Metro K9 conducted K9 Operations for the
entire Department covering all Patrol Divisions and Specialized Units.  I provided all
facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant
services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force
Options, Department Directives, Training Bulletins, and other training dictated by the
Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-
service training, Watch Commander School, Field Training Officer (FTO) School, and
Basic Detective School.  While at K9, I investigated and completed K9 contacts,
personnel complaints, and Use of Force Investigations.  In addition, I directed and was
directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and
LAPD Police Star for two lethal uses of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT).  I
directly supervised sixty SWAT Officers.  I conducted and facilitated all facets of SWAT
training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun,
Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In
addition, I facilitated and conducted training in the following training Cadres: Breacher
(Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention,
Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support
Training (Fast rope, Aerial Platform Shooting).  I directly supervised SWAT missions
and High-Risk Search Warrant Services to include all facets (preparation, briefing,
deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation
Team.  I provided on-going crisis negotiation training, mental health training,
de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I
worked in conjunctional with the mental health community to provide and facilitate
training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science
Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I

On-Scene Consulting

assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of

investigations. Provided information to gang details. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.

# On-Scene Consulting

Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe