# EXHIBIT 58

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                           --oOo--

4

5    CHRISTOPHER URQUIJO, et al,

6            Plaintiffs,

7    v.                        Case No.  5:22-cv-02133-SSS-DTB

8    STATE OF CALIFORNIA, et al.,

9            Defendants.
     _____/
10

11

12            STENOGRAPHIC REPORTER'S TRANSCRIPT OF

13               REMOTE DEPOSITION OF DANIEL HOWARD

14                    TUESDAY, MAY 6, 2025

15

16

17   Reported Stenographically by:

18   KIMBERLY D'URSO, CSR 11372, RPR

19   Job No.  J12832745

20

21

22

23

24

25



```
1                    APPEARANCES (Remote)

2

3    FOR THE PLAINTIFFS:

4              LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO, ESQ.
5              21800 Burbank Boulevard, Suite 310
               Woodland Hills, California 91367
6              818.347.3333
               dalekgalipo@yahoo.com
7

8    FOR THE DEFENDANT DANIEL HOWARD:

9              DEAN GAZZO ROISTACHER LLP
               BY:  LEE ROISTACHER, ESQ.
10             440 Stevens Ave., Suite 100
               Solana Beach, CA 92075
11             858.380.4683
               lroistacher@deangazzo.com
12
     FOR THE DEFENDANTS STATE OF CALIFORNIA, NICHOLAS MERCADO
13   and SERGIO VASQUEZ:

14             OFFICE OF THE ATTORNEY GENERAL
               BY:  HAIYANG ALLEN LI, ESQ.
15             300 S. Spring Street, Suite 1702
               Los Angeles, CA 90013
16             213.269.6000
               allen.li@doj.ca.gov
17
     ALSO PRESENT:  Donald Stamper, Videographer
18

19                    --oOo--

20

21

22

23

24

25
```



1  some range?

2      A.   No, sir.

3      Q.   But you believe there's been multiple?

4      A.   Yes, sir.

5      Q.   More than one?                              10:24:58

6      A.   Yes, sir.

7      Q.   Have there -- again, this all goes to before

8  the date of our incident.  Have there been occasions

9  where you were on patrol and suspects' vehicles were

10  coming in your direction, apart from wrong-way vehicles?  10:25:14

11  In other words, it could be on a parking lot, a street

12  where they're actually going with traffic, but still

13  coming in your direction, such that you felt at risk.

14      A.   I mean, potentially.  Every single day making

15  stops on the freeway, you have vehicles coming at you,   10:25:35

16  so they're all viewed as dangerous, you know,

17  situations.

18      Q.   Were you generally trained to stay out of the

19  path of a moving vehicle, if you can?

20      A.   Yes.                                        10:25:49

21      Q.   And were you trained to try to position

22  yourself safely in relation to a vehicle so that if it

23  does start moving, you won't be in the path?

24      A.   Yes, sir.

25      Q.   Were you also trained that if you, for some   10:26:03



1   reason, find yourself in the path or potential path, you

2   should try to get out of the way safely, if you can?

3       A.   Yes, sir.

4       Q.   And were you generally trained that you should

5   try to safely get out of the path of the way of a moving          10:26:21

6   vehicle, rather than shooting at it, if you can?

7           MR. ROISTACHER:  Incomplete hypothetical.

8           You can answer.

9           THE WITNESS:  So, I've been trained to get

10  safely out of the way of the vehicle.  However, I have            10:26:41

11  been trained in shooting at moving vehicles as well,

12  while also trying to avoid their paths of travel.

13  BY MR. GALIPO:

14      Q.   I understand that, but I guess I'm asking

15  something slightly different.  Were you trained that if           10:26:59

16  you can get out of the path of the vehicle, that that

17  should be done rather than just shooting at the vehicle?

18          MR. ROISTACHER:  It's still an incomplete

19  hypothetical.

20          But you can answer the question.                          10:27:13

21          THE WITNESS:  So I've been trained, obviously,

22  my safety of getting out of the way of the vehicle is

23  priority.  However, that still doesn't absolve the fact

24  that I'm still potent- -- able to fire my weapon at the

25  vehicle if it is a perceived threat.                              10:27:32



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                    17

```
 1   BY MR. GALIPO:

 2       Q.   Well, the threat would have to be based on your

 3   training of imminent or immediate threat of death or

 4   serious bodily injury; correct?

 5       A.   Yes.                                        10:27:41

 6       Q.   Were you trained to shoot at a vehicle if it's

 7   not an imminent or immediate threat of death or serious

 8   bodily injury?

 9       A.   No.

10       Q.   And with respect to the training on the        10:27:58

11   imminent or immediate threat of death or serious bodily

12   injury, did you have some training with respect to the

13   suspect having the opportunity, ability, and apparent

14   intent to immediately cause death or serious bodily

15   injury as a requirement?                              10:28:25

16       A.   I'm sorry.  That was a little long-winded

17   answer -- or question.  Can you rephrase it or restate

18   it again, please?

19   BY MR. GALIPO:

20       Q.   Sure.  Sure.  And again, you may have had this  10:28:37

21   knowledge and maybe not, that's fine, or maybe you don't

22   recall.  There's a Penal Code Section 835(a) that was

23   enacted some years back that modified the language with

24   respect to when an officer can use deadly force.  And

25   the language defines "imminent" as "someone having the"  10:28:56
```



DANIEL HOWARD                                           May 06, 2025
URQUIJO vs STATE OF CA                                          18

1    present ability, opportunity, and apparent intent to

2    immediately cause death or serious bodily injury."

3              Are you familiar with that language in your

4    training?

5         A.   Yes, sir.                                    10:29:14

6         Q.   Are you aware that that specific language in

7    POST Learning Domain 20 that covers deadly force for

8    police officers?

9         A.   I don't know about the POST Learning Domains.

10   I just know that it's encompassed in the use of force   10:29:29

11   policy.

12        Q.   For the CHP?

13        A.   Correct.

14        Q.   Okay.  And was that your understanding at the

15   time of this incident we're here to talk about?  That   10:29:40

16   the threat level would have to be, as we've been

17   discussing, a suspect having the opportunity, present

18   ability, and apparent intent to immediately cause death

19   or serious bodily injury?

20        A.   Yes, sir.                                     10:30:00

21        Q.   And so was your training essentially if those

22   requirements are met, you can use deadly force?

23        A.   Correct.

24        Q.   And was your training also that if those

25   requirements are not met, you should not use deadly     10:30:13



 1   force?

 2       A.    Correct.

 3       Q.    Were you trained to consider other reasonable

 4   options before using deadly force?

 5       A.    Yes, sir.                                    10:30:32

 6       Q.    Were you trained to give a verbal warning

 7   before using deadly force when feasible?

 8       A.    When feasible, yes.

 9       Q.    Were you trained that you have to consider your

10   background or backdrop when using deadly force?    10:30:50

11       A.    Depending on the circumstances and situations,

12   it does vary.

13       Q.    In this case -- and we'll get to the facts in a

14   moment -- were you considering your background or

15   backdrop when you used deadly force?               10:31:08

16       A.    Yes, sir.

17       Q.    Were you trained about the importance of

18   assessing the situation before using deadly force?

19       A.    Yes, sir.

20       Q.    Were you trained that you should assess during  10:31:21

21   the shooting sequence, if you can?

22           MR. ROISTACHER:  Objection.  Vague and

23   ambiguous as to "shooting sequence."

24   BY MR. GALIPO:

25       Q.    Do you understand my --                      10:31:33



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                      25

1    A.   Correct.

2    Q.   Would that normally be by cell phone?

3    A.   Yes.

4    Q.   Can you generally tell me what information you

5  had related to the call before you initially left the                10:40:21

6  police station with Officer Mercado?

7    A.   Yes.  So, the initial call was from my CHP

8  dispatcher via telephone at the office, and I was

9  informed there was a stolen big rig being pursued wrong

10  way on the freeway by San Bernardino units.  That was              10:40:48

11  all the information I had at the time.

12    Q.   At any time -- strike that.

13         At some point, you actually saw the big rig;

14  correct?

15    A.   Yes.                                                        10:41:08

16    Q.   And when you saw it, was that shortly before

17  the shots were fired?

18    A.   Yes, it was.

19    Q.   How much time would you say passed between you

20  first seeing the big rig and you firing your first shot?          10:41:21

21    A.   I don't recall the exact time frames.

22    Q.   Can you give me any estimate?

23    A.   No.  I would be speculating if I gave you any

24  numbers.

25    Q.   Prior to seeing the big rig for the first time,            10:41:37



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                           26

1   did you have any information as to the names of the

2   occupant or occupants?

3        A.   No, sir.

4        Q.   Did you know how many people were in the big

5   rig?                                            10:42:05

6        A.   No, sir.

7        Q.   For example, did you know if there were

8   passengers in the vehicle, other than the driver?

9        A.   No, sir.

10       Q.   Did you know if any of the occupants of the big   10:42:21

11  rig had any documented criminal history before that day?

12       A.   No, sir.

13       Q.   Did you know if the driver or any occupants in

14  the big rig were under the influence of drugs or

15  alcohol?                                         10:42:43

16       A.   No, sir.

17       Q.   Did you have any of the details of the

18  circumstances under which the big rig was stolen?

19            MR. ROISTACHER:  At what point in time?

20            MR. GALIPO:  At any time prior to seeing it.   10:43:10

21            THE WITNESS:  I don't believe I did at that

22  time, no.

23  BY MR. GALIPO:

24       Q.   Did you have an understanding as to whether

25   there had been any actual collisions -- and I don't mean   10:43:30



DANIEL HOWARD                                        May 06, 2025
URQUIJO vs STATE OF CA                                        27

1    near accidents, but actual collisions -- between the big

2    rig and any other vehicles, before you saw it for the

3    first time?

4         A.   I -- I don't recall that information.

5         Q.   Well, just so I'm clear, as you sit here today,    10:43:54

6    do you have any recollection of having such information

7    that there had been a specific collision?

8         A.   I -- I don't recall, no.

9         Q.   Did you have any specific information that

10   anyone had been injured, actually physically or    10:44:17

11   medically injured, by the big rig, before you saw it for

12   the first time?

13        A.   I don't -- don't recall having any of that

14   information prior to seeing the big rig.

15        Q.   Did you have any information that anyone in the    10:44:41

16   big rig had a firearm, for example?

17        A.   I did not have any of that information, no.

18        Q.   There was an airship overhead at some point?

19        A.   Yes, sir.

20        Q.   And I've reviewed your statement, and it sounds    10:45:07

21   like there were different frequencies, radio channels,

22   that you were patching into at different times?

23        A.   Yes, sir.

24        Q.   So with the CHP channels, were there two

25   different channels, based on the two different stations?    10:45:29



DANIEL HOWARD                                May 06, 2025
URQUIJO vs STATE OF CA                              28

1    A.   Yes, sir.

2    Q.   Can you briefly explain that to me?

3    A.   Yes.  So depending on how the dispatch

4  communications center is set up, there -- normally

5  there's a separate dispatcher who is tending to the          10:45:44

6  different frequencies.  So the Rancho Cucamonga area was

7  on its own frequency, which was separate from the -- our

8  adjoining office, which was the San Bernardino area CHP

9  office.  The San Bernardino area CHP office was on a

10  separate frequency, and that is the frequency in which       10:46:05

11  the majority of this incident took place.

12    Q.   On the San Bernardino office frequency?

13    A.   Correct.

14    Q.   And then the airship overhead, did you have an

15  understanding as to whether that was a CHP helicopter or     10:46:23

16  some other agency?

17    A.   It was the San Bernardino County Sheriff's

18  Department helicopter.

19    Q.   And at times, were you getting some information

20  from listening to the dispatch or broadcast from the         10:46:39

21  helicopter?

22    A.   Yes.  The -- the San Bernardino Sheriff was

23  talking directly with the dispatchers on the CHP

24  frequencies.

25    Q.   Did you have some information that there were          10:47:00



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                          29

1    various times where the big rig would, for example, be

2    going the wrong way on the freeway and then make a

3    U-turn on the freeway and start going, I guess,

4    technically, at least with the direction of travel?

5         A.   Yes.                                          10:47:27

6         Q.   And then, did you have information that there

7    may have been multiple U-turns that the big rig made on

8    the freeway?

9         A.   Yes.

10        Q.   Now, at some point, it's my understanding that    10:47:47

11   after leaving the station with Mercado, you ended up

12   going back to the station with him at some point; is

13   that correct?

14        A.   Yes.

15        Q.   And you wanted Mercado to have a -- his -- a      10:48:02

16   separate vehicle?

17        A.   Correct.

18        Q.   And then, at some point, you ended up setting

19   up, I guess, what you referred to as "some kind of a

20   roadblock"?                                            10:48:22

21        A.   Yes, sir.

22        Q.   And were there four vehicles in total that were

23   set up for that, if you know?

24        A.   Yes.

25        Q.   And you -- did you place your vehicle in -- as     10:48:33



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                      31

1   vehicles there were -- what officers' vehicles?

2        A.   I don't remember any specifics as to whose

3   vehicles were what at that point in time.

4        Q.   Do you recall where you placed your vehicle?

5        A.   My vehicle was the second from the left.     10:50:25

6        Q.   And when you say "from the left," are -- like,

7   somewhere, like, between the 1 and 3 lanes?

8        A.   Somewhere in that vicinity, yes.

9        Q.   And for some time, were you and some of the

10  other officers, after setting up the roadblock, on the   10:50:56

11  other side of the guardrail?

12       A.   The guardrail on the right shoulder, yes.

13       Q.   And just so I have my directions correct, if

14  you're on the side of that guardrail on the right

15  shoulder away from the roadway, which direction would   10:51:21

16  that be?

17       A.   That would be on the -- the south edge of the

18  highway.

19       Q.   So if someone was south of the guardrail, they

20  would have the guardrail between themselves and -- and   10:51:37

21  the highway?

22       A.   Correct.

23       Q.   At any time before you saw the big rig, did you

24  have any conversations with your lieutenant about the

25  situation or what tactics should be employed?          10:51:59



DANIEL HOWARD                                        May 06, 2025
URQUIJO vs STATE OF CA                                      32

1      A.    No, sir.

2      Q.    Were you able to call him if you needed to?

3      A.    At that point in time, no.

4      Q.    Why were you unable to call your lieutenant?

5      A.    Because it was a very kinetic action that was       10:52:15

6  going on, so we were more focused on our response to the

7  incident at that point in time and trying to formulate

8  our best plan of action.  So calling just wasn't

9  feasible at that moment in time.

10     Q.    How much time would you estimate passed that       10:52:39

11 you were aware that the big rig was on the roadways,

12 prior to seeing it?

13     A.    I -- I don't have specifics.  I just recall it

14 was somewhere in the vicinity of an hour from my initial

15 notifications.                                                10:53:02

16     Q.    So you're saying during that hour, you did not

17 feel you had time to call the lieutenant?

18     A.    Correct.

19     Q.    Did you have at least your cell phone with you?

20     A.    Yes, I did.                                         10:53:14

21     Q.    And were you aware of his number at least, at

22 the time?

23     A.    Yes.

24     Q.    Did the lieutenant ever communicate to you that

25 he did not want you to call him after hours or anything     10:53:25



```
 1   like that?

 2        A.   No.

 3        Q.   Did anyone tell you that when the big rig

 4   approaches your direction, you should shoot at the

 5   driver?                                           10:54:10

 6        A.   Did anyone tell me?

 7        Q.   Correct.

 8        A.   No.

 9        Q.   Did you tell any of your deputies that you were

10   going to shoot at the driver if the big rig approached  10:54:21

11   in your direction?

12        A.   I informed my officers that if someone were to

13   shoot, then I would do it.

14        Q.   Did you tell them whether they should shoot or

15   not?                                              10:54:44

16        A.   I told them that if the situation arises and

17   they need to defend themselves or others, then I wanted

18   them to have the best opportunity available, so that was

19   discussed.

20        Q.   And when you say "best opportunity available,"  10:54:58

21   did you want them to have access to rifles?

22        A.   Correct, yes.

23        Q.   And if you know, did they have access to

24   rifles?

25        A.   Some of them did.  I don't recall how many.  10:55:12
```



DANIEL HOWARD                                           May 06, 2025
URQUIJO vs STATE OF CA                                          38

```
 1        Q.   Do you recall any tactical plan you
 2   communicated to them?
 3        A.   I remember the communications in regards to
 4   situating our patrol vehicles, setting up, creating a
 5   roadblock.  Outside of those things, I just don't        11:01:44
 6   recall.
 7        Q.   Well, in reviewing the body-worn camera footage
 8   and reviewing your statement recently, did that refresh
 9   your recollection at all as to any tactical plan you
10   had?                                                     11:02:02
11        A.   No.
12        Q.   Other than what we've already discussed?
13        A.   No.
14        Q.   Were you aware at some point that a spike strip
15   had been deployed?                                       11:02:19
16        A.   Yes.
17        Q.   Did you observe at any point before you fired
18   your shots that the left front tire of the big rig was
19   missing?
20        A.   No.                                            11:02:34
21        Q.   Did the big rig ever strike any of the patrol
22   vehicles that you had set up in this roadblock?
23        A.   Eventually, yes.
24        Q.   Before you fired your shots, did it strike any
25   of them?                                                 11:03:09
```



1      A.   No.

2      Q.   Did it try to, from your point of view,

3  accelerate and break through the roadblock before the

4  shots?

5      A.   Yes.                                              11:03:20

6      Q.   You believe the big rig was trying to break

7  through the -- the roadblock of the four vehicles?

8      A.   I don't want to speculate as to the actions of

9  the vehicle.  I just know that it was coming back

10 towards my direction.                                      11:03:39

11     Q.   I don't know if you're a movie person or not,

12 but have you seen movies where there's roadblocks set up

13 by law enforcements and the vehicle they're trying to

14 block in just kind of barrels right through and knocks

15 the vehicles out of the way?  Have you seen that before?  11:04:02

16     A.   I'm sure I have, yeah.

17     Q.   I was wondering if anything like that happened

18 in this case?

19     A.   No.

20     Q.   Did -- if -- and we're going to take a break    11:04:19

21 here in a minute because we've been going about an hour.

22          You considered the possibility that the big rig

23 may see the patrol vehicles and the roadblock and make

24 another U-turn, similar to the U-turns it had done

25 previously?  Did you consider that as a possibility?      11:04:41



DANIEL HOWARD                                            May 06, 2025
URQUIJO vs STATE OF CA                                          40

1          A.    Yes, I did.

2          Q.    And in your mind, tactically, were you thinking

3    that if the vehicle tries to make another U-turn and go

4    back on the freeway the direction it came, that you were

5    going to shoot at the driver?                          11:05:00

6          A.    No.

7          Q.    And why not?  Why, tactically, did you not

8    think you would shoot at the driver if it made another

9    U-turn to go the other way?

10         A.    Because at that point in time there wasn't --   11:05:15

11   again, depending on what the circumstance that

12   prevailed, I didn't feel it was -- would have been a

13   good idea to shoot at the truck if I didn't view any

14   imminent threat to anybody at that point in time.  So if

15   it turned around and was going the opposite way, then     11:05:38

16   unless there was a threat directly in front of it, I

17   wouldn't rise to the use of deadly force.

18         Q.    So in your mind, you were thinking if the truck

19   sees the blockade and makes a U-turn to go the other

20   way, you would have been okay with letting that happen    11:05:57

21   and then reassess your tactical decisions?

22         A.    Yes, sir.

23         Q.    Without shooting at the truck?  Do I have that

24   right?

25         A.    Unless there was some other circumstance that  11:06:09



DANIEL HOWARD                                         May 06, 2025
URQUIJO vs STATE OF CA                                          41

1    arrived that there was that threat.  But if there was no

2    threat immediately in front of the vehicle after it

3    turned around, then I would have reassessed.

4        Q.   Okay.  And that's, in part, based on what we

5    talked about earlier that there has to be that immediate    11:06:26

6    threat of death or serious bodily injury to use deadly

7    force?

8        A.   Yes, sir.

9        Q.   And if the vehicle was just trying to turn

10   around and go the other way, then under that scenario,      11:06:39

11   at least based on your training, you would not have that

12   immediate threat of death or serious body injury; is

13   that fair?

14       A.   Yes.

15           MR. GALIPO:  Okay.  Is this a good time for         11:06:50

16   everyone?  We've been going a little under an hour, but

17   I started late.  We'll take a ten-minute break.  Does

18   that sound good?

19           Let's make sure our videographer can do his

20   magic.                                                      11:07:05

21           THE VIDEOGRAPHER:  This is the videographer.

22   This marks the end of Media 1.  The time is 11:07 a.m.

23   Pacific Time.  We're off the record.

24           (Break taken.)

25           THE VIDEOGRAPHER:  This marks the beginning of      11:20:22



1          MR. GALIPO:  Don't try to confuse us now, Lee.

2   We finally got it right.

3          MR. ROISTACHER:  I confused myself.  Sorry.

4   BY MR. GALIPO:

5      Q.   So I want to talk to you a little bit about          11:27:10

6   this time frame when the truck approached leading up to

7   your shots.  Do you have in mind the time frame I'm

8   referring to?

9      A.   Yes, sir.

10     Q.   Were you south of the guardrail with the other      11:27:22

11  officers before you actually saw the truck?

12     A.   Yes.

13     Q.   Did you have some information that the truck

14  was approaching before you saw it?

15     A.   Yes, I did.                                          11:27:42

16     Q.   And what information did you have?

17     A.   At that point in time, I could hear the San

18  Bernardino County Sheriff's helicopter overhead putting

19  out radio traffic that it was approaching us and various

20  over-crossings and distances.                               11:28:04

21     Q.   Do you recall what that last distance was that

22  was broadcast?

23     A.   I do not, no.

24     Q.   Have you had an opportunity to listen to that

25  radio dispatch from the helicopter at any time since       11:28:18



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                        49

1        A.    Yes.

2        Q.    Did the truck appear to slow down at some

3   point, before you started firing?

4        A.    At some point, it did.  It was going slower at

5   other points.  I just don't recall exact speeds or                11:36:02

6   anything.

7        Q.    Well, I don't expect any exact speeds.  I'm

8   just wondering -- when I ask speeds -- just so you

9   know -- whether you can give any estimate or any range.

10        Do you understand that?                                      11:36:21

11        A.    Yes, sir.

12        Q.    At some point, did -- when you saw the truck in

13   the Number 4 lane area, it would have been traveling

14   westbound; is that correct?

15        A.    Yes.                                                    11:36:49

16        Q.    And you're saying at that point, you don't have

17   any estimate as to its distance from you or its speed?

18        A.    No, sir.

19        Q.    Is that correct?

20        A.    That's correct.                                        11:37:03

21        Q.    At some point, did you see the truck move, I

22   guess, to its right, towards the Number 1 lane?

23        A.    Yes.

24        Q.    Do you have an estimate as to the distance the

25   truck was from you when it did that?                              11:37:26



1      A.   No, sir.

2      Q.   Any estimate as to the speed of the truck when

3  it moved towards the Number 1 lane, which would be to

4  the truck's right?

5      A.   No, sir.                                          11:37:43

6      Q.   Did you think that the truck had enough room to

7  do a U-turn?

8      A.   I believe that if it wanted to make a U-turn,

9  it would have had enough room to do so.

10     Q.   And to make a U-turn, it essentially would have   11:38:01

11 had to go to the right initially, and then turn within

12 the roadway to go back the way it came?  Does that sound

13 correct?

14     A.   From the maneuvers it was making, it could have

15 turned to its right and come back, but there were        11:38:25

16 multiple different ways in which it could have made a

17 U-turn.

18     Q.   Okay.  Are you also familiar with -- you've

19 heard before of someone making a "three-point turn"?

20     A.   Yes, sir.                                         11:38:44

21     Q.   What does that essentially mean to you, a

22 three-point turn?

23     A.   Essentially, if somebody's trying to make a

24 U-turn, say a narrower street or if there's something

25 blocking its way from completing a full U-turn in one    11:38:56



DANIEL HOWARD                                      May 06, 2025
URQUIJO vs STATE OF CA                                      51

1   fell sweep, that they would essentially begin that

2   U-turn, stop, reverse, and then put it back in drive and

3   continue on with the its U-turn.  So three different

4   points of action to turn around.

5       Q.   And you indicated before the break that had the     11:39:15

6   truck made a U-turn and go back the other way, your

7   thinking is, tactically, you would not have fired at it;

8   you would have just reassessed and come up with a

9   further tactical plan?  Is that fair?

10      A.   Yeah.  Depending on the circumstances in front     11:39:34

11  of the truck at the time.  If there was no imminent

12  threat, then, yes.

13      Q.   And if the truck had made a three-point turn

14  instead of a U-turn to go back the other way, would your

15  tactical thinking have been the same:  Let it turn and     11:39:50

16  go the other way and then tactically reassess?

17          MR. ROISTACHER:  Incomplete hypothetical.

18          MR. GALIPO:  You may answer.

19          THE WITNESS:  Okay.  Yeah.  It just depends on

20  what that ultimate end maneuver would be; right?  So if     11:40:08

21  it -- again, whether -- regardless of how it made the

22  U-turn, if there was a U-turn that was made, and there

23  was no imminent threat at that point in time in which it

24  turned around, then, yes, we would essentially reassess.

25  BY MR. GALIPO:                                             11:40:28



1    Q.   I mean, I guess what I'm getting at, in your

2    mind, if the truck was trying to turn around to go the

3    other way, would it make a difference in your mind it

4    was a U-turn, as opposed to a three-point turn?

5    A.   No.  A U-turn is a U-turn.                      11:40:44

6    Q.   And so, at some point, you do observe the truck

7    that initially was traveling westbound, approximately in

8    the Number 4 lane, turn to its right, which would be

9    going towards the Number 1 lane?  Is that generally

10   fair?                                                11:41:17

11   A.   Yes.

12   Q.   And when it made that maneuver going from the

13   Number 4 lane to the Number 1 lane, were you still

14   behind the guardrail, or had you at some point stepped

15   over the guardrail?                                  11:41:29

16   A.   At some point during that time frame, I stepped

17   over the guardrail.  I just don't recall which exact

18   moment.

19   Q.   Do you know if you stepped over the guardrail

20   before the vehicle turned to its right?              11:41:46

21   A.   It was at some point in which it was doing

22   that.  Again, I don't recall what -- what exact

23   instance.

24   Q.   And if I asked you whether you stepped over

25   before it got to the Number 1 lane, again, you're saying  11:42:07



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                    56

1    stop, end any potential threats, and take the driver

2    into custody.

3            And again, if anything there, up until the use

4    of deadly force, if it justified that for that situation,

5    but there was no set level that I had pre-determined at          11:47:01

6    any point.

7        Q.    Was there a reason why you had your rifle as

8    opposed to your handgun?

9        A.    Yes.  Just the caliber of the ammunition, if

10   deadly force was authorized and I did have to shoot my          11:47:22

11   weapon, then I know that the ballistics of a pistol

12   versus a rifle would be able to penetrate the vehicle or

13   be utilized in an efficient manner versus, you know, the

14   rifle has a much higher velocity and heavier weight in

15   which, if, for some reason I needed to shoot through the        11:47:48

16   windshield, that it would penetrate versus deflect in

17   any sort of angle that I didn't want that -- the bullet

18   to go.

19       Q.    Was there some type of center median dividing

20   the eastbound lanes from the westbound lanes?                   11:48:06

21       A.    Yes.

22       Q.    Did you have information as to whether vehicles

23   were traveling on the other side of the freeway when you

24   saw the truck?

25       A.    When I saw the truck, there was nobody               11:48:16



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                  57

1  coming -- driving on the westbound side of the freeway.

2  I noticed the traffic had stopped some ways back.

3      Q.   Did you give any commands to the driver of the

4  truck at any time?

5      A.   Yes, I did.                              11:48:38

6      Q.   And did you give them with some type of a PA

7  system, or just your -- just your voice?

8      A.   My voice.

9      Q.   Was the airship overhead at the time, if you

10  know?                                            11:48:56

11      A.   It was somewhere, yes.

12      Q.   Was it orbiting, to your knowledge?

13      A.   It was -- it was hovering somewhere in the

14  area.  I just don't recall its exact location in

15  reference to me or the truck.                    11:49:09

16      Q.   Were the overhead lights on on the patrol

17  vehicles?

18      A.   Yes, they were.

19      Q.   Do you recall if any of their sirens were on?

20      A.   No.  When the vehicle was in park, the sirens  11:49:21

21  automatically shut off.

22      Q.   And do you have any estimate as to the distance

23  you were from the truck when you gave these commands?

24      A.   I don't.  I don't recall.

25      Q.   Do you recall what commands you gave?          11:49:36



1       A.    Yeah, I repeatedly yelled, "Stop.  Stop.

2   Stop."

3       Q.    Anything else that you can recall saying, other

4   than, "Stop.  Stop.  Stop"?

5       A.    Prior to the shooting, there is nothing that I          11:49:52

6   can recall.

7       Q.    Do you recall where you were in relation to the

8   roadway when you gave the commands to, "Stop.  Stop.

9   Stop"?

10      A.    I was somewhere on the right half of the              11:50:09

11  roadway.  I just don't recall the exact positioning of

12  myself, but it was somewhere on the -- if you were to

13  split the freeway in half, somewhere along the southern

14  half of it.

15      Q.    So you had come over the guardrail at that           11:50:26

16  point?

17      A.    Yes, sir.

18      Q.    Do you recall if you were near any of the

19  patrol vehicles when you gave the commands to, "Stop.

20  Stop.  Stop"?                                                  11:50:37

21      A.    I was in front of him somewhere.  I just -- I

22  don't recall where exactly in relation to them.

23      Q.    Did you consider using any of the patrol

24  vehicles as cover at that point?

25      A.    Not at that point.                                   11:50:55



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                      61

1   actual physical stop.

2       Q.   And when you say you observed "it slowing,"

3   where was the truck in relation to the lanes when you

4   observed it slowing?

5       A.   Again, I don't recall the -- the exact          11:54:13

6   relation.  It was across multiple lanes at that point.

7   I just don't remember the specifics on its relation to

8   those lanes.

9       Q.   Are you saying you observed it slowing as it

10  was going from the Number 1 lane back towards the Number  11:54:27

11  4 lane?

12      A.   At some point, yes.

13      Q.   At some point, do you recall running into the

14  roadway?

15      A.   I recall being in the roadway and just turn --   11:55:03

16  maneuvering myself in a tactical advantage, but running

17  and -- no, I don't recall running at all.

18      Q.   Did you see yourself running at all in the

19  roadway when you watched the video?

20      A.   No.                                              11:55:23

21      Q.   At some point, did you see the truck, when you

22  watched the video, starting -- reversing or going

23  backwards?

24      A.   In watching the video --

25           MR. ROISTACHER:  From the point when he was      11:55:48



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                    62

1   watching the video or what he remembers at the time?

2           MR. GALIPO:  When he saw the video, was my

3   question.

4           THE WITNESS:  I remember seeing the truck

5   moving in -- in an opposite direction.                    11:56:00

6   BY MR. GALIPO:

7       Q.   When you watched the video?

8       A.   When watching the video, correct.

9       Q.   When you say "opposite direction," do you mean

10   going backwards?                                          11:56:15

11       A.   Backwards, in reference to its initial

12   movement.  So again, it's the opposite direction because

13   with the angles and stuff, in viewing the video, it did

14   appear to be, like, in a reverse direction.

15       Q.   Okay.  And could you tell from looking at the    11:56:34

16   video where you were positioned when the truck started

17   going in a reverse direction?

18       A.   I don't recall exactly because there was a lot

19   of me moving from different angles.  So before I started

20   wasn't where I ended.  So there was various movements      11:57:02

21   during that whole time frame.

22       Q.   When the truck began to reverse, was it going

23   in a northeasterly direction?

24       A.   Again, I don't recall the exact specifics on

25   its movements in relation to -- to those directions and    11:57:18



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                         63

1   stuff.

2       Q.   Well, prior to the truck going in reverse, when

3   you watched the video, which way was the front of the

4   truck facing, if you know?

5       A.   So it was in a southerly direction.  I just --        11:57:40

6   I don't recall, you know, how exact -- whether -- you

7   know, southwesterly or the exact angles at that point.

8   I -- I just -- I don't recall.

9       Q.   When you watched the video, did you notice that

10  the truck was reversing at the time you were firing your     11:58:06

11  shots?

12      A.   Again, in watching the video, it -- it appeared

13  that it was reversing, going in reverse at some point.

14      Q.   Right.  But what I'm wondering is, did it

15  appear when watching the video, that the truck was going     11:58:28

16  in reverse during the time you were firing your shots?

17      A.   Yes.

18      Q.   And did it appear from watching the video that

19  the truck was going in reverse during all of your shots?

20      A.   Again, I -- I couldn't give you specifics on         11:58:49

21  its movement during the entirety of that action

22  sequence.

23      Q.   Well, how could you tell from watching the

24  video that the truck was going in reverse at the time of

25  your shots?  What did you see?                                11:59:05



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                      64

1    A.   So, again, it's hard to differentiate the exact

2    specifics on the movement of the truck because I'm

3    trying view a video that is not the best of qualities.

4    So, again, the specifics on going in reverse, where it

5    was during the entirety of the shot placement or          11:59:33

6    anything like that, I just -- I don't recall the exact

7    details for that.

8    Q.   Okay.  Really I'm not asking exact details.

9    You just commented that in watching the video, you noted

10   that the truck appeared to be going in reverse during at   11:59:48

11   least some of your shots.  Do you recall that?

12   A.   Yes.

13   Q.   And what I'm just wondering is, when you

14   watched it, what did you see that made you come to that

15   impression?  Did you see the truck appear to be moving     12:00:06

16   backwards?  Did you see yourself appear to be firing

17   during that time?  What did you see?

18   A.   So, again, it was at some point during that,

19   while watching the video, the back of the truck was

20   headed back towards the area of the center median.  But    12:00:24

21   again, the -- from when the shots were going down

22   throughout the volley of shots, and then up -- at the

23   conclusion of that, I don't recall the exact movements

24   of it.

25   Q.   Okay.  Could you tell in watching the video      12:00:43



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                      72

1       MR. GALIPO:  You may answer.

2       THE WITNESS:  It just depends on what it was

3   reversing for.  Because again, if it was reversing slowly

4   and it completed a U-turn and started going away from us,

5   that would be one instance.  But if it was reversing to        12:10:27

6   reposition itself and continue proceeding westbound the

7   wrong way of the freeway, then that's a whole separate

8   circumstance.

9       So I couldn't speculate as to what I would do

10  as it's reversing.  It just depends on the totality of        12:10:41

11  circumstances after the fact and what that reversing

12  maneuver led to, ultimately.

13  BY MR. GALIPO:

14      Q.   But you would agree if it was reversing to

15  complete the U-turn or the three-point turn, as we            12:10:55

16  discussed previously, based on your training, it would

17  not be appropriate to shoot?  Would you at least agree

18  with that?

19      MR. ROISTACHER:  Assumes fact.

20      (Reporter clarification.)                                 12:11:05

21      MR. ROISTACHER:  Incomplete hypothetical.  It

22  calls for speculation.

23      THE WITNESS:  So it would depend on what

24  happened at the conclusion of that U-turn if -- again, if

25  he was going back the opposite direction there was no         12:11:36



1  imminent threat that I foresaw, then, yes, we would

2  reassess.  But again, what would happen at the conclusion

3  of that U-turn would depend on -- on what type of

4  reassessment would take place.

5  BY MR. GALIPO:                                      12:11:51

6      Q.    Right.  But you would at least agree that if he

7  was going backwards away from the officers, that based

8  on your training, you would not have an imminent threat

9  of death or serious bodily injury at that moment?

10          MR. ROISTACHER:  Incomplete hypothetical.         12:12:05

11  Calls for speculation.  Assumes facts.

12          THE WITNESS:  Again, at that particular moment,

13  I would have to wait to see what the reversing maneuver

14  led to.  I -- again, if -- if he's reversing and

15  repositioning and coming back towards us, that's a          12:12:21

16  completely different story than making a U-turn, going

17  back away from our positioning.

18          So I wouldn't want to speculate as to what I

19  would do during a reversing maneuver.  It's just

20  ultimately what that reverse led to.                        12:12:37

21  BY MR. GALIPO:

22      Q.    But if the reversing led to him turning away

23  from you to go the other way, then you're saying you

24  would not have shot; am I understanding you correctly?

25      A.    Again, yes, if there was no threat after that    12:12:49



DANIEL HOWARD                                           May 06, 2025
URQUIJO vs STATE OF CA                                         74

1    fact.

2       Q.   But the threat, again, would have to be the

3    immediate or imminent threat of death or serious bodily

4    injury based on your training?

5       A.   Correct.                                    12:13:02

12:13:25

12:13:38

12:13:55

12:14:12



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                    75

 4      Q.   Were you initially firing at the front
 5  windshield area?                                    12:14:22
 6      A.   Initially, yes.
 7      Q.   And it's my understanding you could not see
 8  into the cab at that point.  You were just trying to
 9  fire where you believed the driver would be?
10      A.   That's correct.                            12:14:34
11      Q.   And then at some point, as the vehicle was
12  changing position or moving backwards, I guess, you
13  would have been firing at the driver's side window area?
14      A.   Yeah.  At some point, I was moving from my left
15  to my right, and that angle maneuvered me from the      12:14:55
16  windshield to the driver's side door window that was on
17  the left side of the Peterbilt.
18      Q.   And when you were firing through the driver's
19  side window, again, could you see into the cab at that
20  point?                                              12:15:13
21      A.   No, I could not.
22      Q.   I take it you -- you had no idea of the age of
23  the people inside, their race, or even their sex; is
24  that true?
25      A.   That's correct.                            12:15:26



DANIEL HOWARD                                    May 06, 2025
URQUIJO vs STATE OF CA                                    80

1    on the 210 freeway and set up a roadblock and it turned

2    around, and just trying to figure out where it's going

3    from there.

4          But again, everything was speculative based

5    upon what the truck was doing at the time.  And yeah, we    12:22:18

6    just have to either continue pursuit or set up another

7    roadblock somewhere else.

8          Again, it's just determined -- depends on what

9    the truck's actions would have been at that moment.

10        Q.   Is it your experience that to do a three-point    12:22:34

11   turn, at some point a vehicle has to back up?

12        A.   During a three-point turn, yes.

13        Q.   Were you trying to keep, more or less, a

14   45-degree angle relative to the truck?

15        A.   Yes.    12:22:49

16        Q.   Was this your first critical incident as a

17   sergeant that you had to deal with like this?

18        A.   Yes, it was.

19        Q.   Initially, when the other officers wanted to

20   grab the rifles, you told them words to the effect, they    12:23:38

21   shouldn't; if anyone's going to shoot, it would be you?

22        A.   Yes.

23        Q.   But then later you agreed it was okay for them

24   to use the rifles if they felt they needed to?

25        A.   Yes.    12:23:52



DANIEL HOWARD                                              May 06, 2025
URQUIJO vs STATE OF CA                                              81

1        Q.   To your knowledge, did any of the other

2   officers on scene use deadly force, other than yourself?

3        A.   No.

4        Q.   Did you ever give -- oh, I'm sorry.

5        A.   Sorry.  I was just saying that no, no one else          12:24:05

6   used their weapons.

7        Q.   Did you give any verbal warning you were going

8   to use deadly force?

9        A.   There was nothing that was verbally stated,

10  other than yelling, "Stop.  Stop.  Stop," to the                  12:24:22

11  individual.

12       Q.   You were hoping, I take it, that the big rig

13  would turn around when it saw the vehicles?  Is that

14  what your hope was, initially?

15       A.   My hope initially was just that the big rig            12:25:03

16  would come to a stop and we would take him into custody.

17  That was -- that was my sole focus and hope at the time.

18       Q.   Do you recall in your statement indicating that

19  your -- you were hoping that the big rig was going to

20  see the patrol vehicles and turn around?                          12:25:27

21       A.   Yeah.  That was -- that was the hope, that at

22  least if he didn't come to a stop, that he would at

23  least right himself on the freeway.

24       Q.   Did you see the big rig slow partially at some

25  point?                                                            12:25:51



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                          82

1      A.   At some point, yes.

2      Q.   I'm going to read a section of your statement.

3           MR. GALIPO:  I don't know if we can put this

4  up, Renee, page 32, the middle paragraph.

5           MS. MASONGSONG:  Okay.  Let me find that.        12:26:30

6           You said "page 32"?

7           MR. GALIPO:  Yes, the middle paragraph.  If you

8  can possibly put that up.

9  BY MR. GALIPO:

10     Q.   Are you able to see that on your screen?        12:27:01

11     A.   Yes.

12     Q.   So starting on line 11, you say:  "And I

13  thought initially, also, okay, if he keep [sic] going

14  with that left curve, he could easily just make a

15  U-turn, just make it right into a U-turn, start heading  12:27:18

16  away from us.  Like, okay, and we can kind of pack up.

17  We can reevaluate the situation, and we can formulate a

18  new game plane, set up somewhere else, create another

19  roadblock somewhere else, and kind of keep playing this

20  until we figure out the best way to do it."             12:27:38

21          "I'm like, okay.  Well, at least, also, he

22  rights his path of travel now.  He's not going the wrong

23  way either."

24          Do you see that paragraph?

25     A.   Yes, sir.                                        12:27:53



DANIEL HOWARD                                May 06, 2025
URQUIJO vs STATE OF CA                            83

1      Q.    And this is kind of what we were talking about?
2    One of your hopes was that he would just turn around
3    when he saw the patrol car and go back the other way
4    like he had done previously?
5      A.    Yes, sir.                                    12:28:05
6      Q.    Okay.
7            MR. GALIPO:   Thank you, Renee.
8    BY MR. GALIPO:
9      Q.    Now, at some point, did you notice there was a
10   passenger in the vehicle, other than the driver?      12:28:20
11     A.    Later on, I did, after we opened up the
12   vehicle.
13     Q.    And do you know if the passenger was struck by
14   any of the gunfire?
15     A.    From what I was told after the fact, no, he was  12:28:37
16   not.
17     Q.    But I take it you didn't know if there was a
18   passenger or not when you fired?  Is that what you're
19   saying?
20     A.    That's correct.                               12:28:52
21     Q.    At some point, do you recall at the scene the
22   vehicle coasting backwards?
23     A.    Yes.
24     Q.    When do you recall the vehicle -- the truck
25   coasting backwards?                                   12:29:11



DANIEL HOWARD
URQUIJO vs STATE OF CA

May 06, 2025
84

1    A.    So at the conclusion of my shots, that's when I

2  noticed that the vehicle was no longer actively moving

3  and just appeared to kind of be coasting in a backwards

4  manner.

5    Q.    At some point, did you see something that led                    12:29:27

6  you to believe that the driver had been struck by

7  gunfire?

8    A.    Yes.

9    Q.    What did you see in that regard?

10    A.    So Officer Mark Garcia, who placed his patrol            12:29:37

11  vehicle behind the truck after it came to a stop and

12  came to rest against that patrol vehicle, Officer Garcia

13  came -- got out of that patrol car, came over to my

14  location, and opened the driver's side door to the

15  Peterbilt.  At which point, that's when I saw the driver      12:29:59

16  lying down on the seats, and blood was coming out of the

17  cab.

18    Q.    Did you notice at some point some what appeared

19  to be gunshots, either to the front windshield and/or

20  the driver's window?                                                      12:30:17

21    A.    Yeah.  At some point, I could tell that there

22  were rounds going through there.

23          MR. GALIPO:  Renee, can we put up these two

24  exhibits and then we'll take our break?  I don't know if

25  you have the -- we'll call it Exhibit 1 -- that shows the      12:30:34



```
 1   Number 4 lane at this point?
 2       A.   It's somewhere in the middle of the lanes.  I
 3   can't see exactly.
 4            MR. GALIPO:  Okay.  Let's continue, please.
 5            (Video being played.)                              01:03:41
 6            MR. GALIPO:  Stop right there.
 7   BY MR. GALIPO:
 8       Q.   Who said, "it looks like he's going to turn and
 9   do a U-turn"?
10       A.   That was San Bernardino County Sheriff's         01:03:53
11   helicopter.  I don't know if it was a pilot or flight
12   officer.
13       Q.   How are you able to hear those communications?
14       A.   So I have a -- I have a radio that's on my --
15   my duty belt, so I'm picking up the radio traffic          01:04:06
16   through there from a handheld radio.
17       Q.   Okay.  And them saying, "It looks like he's
18   going to do a U-turn," you were aware at that point that
19   he had done several U-turns previously?
20       A.   Yeah.  Leading up to this, I knew that there     01:04:24
21   were other U-turns prior to.
22            MR. GALIPO:  All right.  And we stopped it
23   again at 4:02, and 0000:16.
24            Please continue.
25            (Video being played.)                             01:04:41
```



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                        98

1      Q.   And you told me earlier in watching at least

2   the video recently, you noted that the truck was

3   reversing at some point during the shots; is that

4   correct?

5      A.   In reviewing the video, yes.                    01:06:19

6      Q.   Was there anyone directly behind the truck that

7   you saw?  Any vehicle or officer or person?

8      A.   Prior to the shooting, or --

9      Q.   Prior to the shooting.

10     A.   No, not that I was aware of.                     01:06:38

11     Q.   When the truck was going backwards, as you saw

12  it on the video, could you estimate its speed going

13  backwards?

14     A.   No, I couldn't.

15     Q.   When the truck was going backwards, when you     01:06:51

16  watched it on the video, did you see anything directly

17  behind the truck?

18     A.   Not that I was aware of, no.

19        MR. GALIPO:  Okay.  Please -- we stopped it,

20  for the record, at 4:13 and 0000:28.                     01:07:17

21        Please continue.

22        (Video being played.)

23        MR. GALIPO:  Okay.  We can stop it.  We can

24  take that down, please.

25  BY MR. GALIPO:                                           01:09:39



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                          99

```
 1        Q.   So when the passenger was taken out, where were
 2   you positioned relative to the truck?
 3        A.   I don't recall where I was moving around.
 4   Initially, when they were trying to access the
 5   passenger-side door, I was holding cover on the driver's     01:09:55
 6   side with my pistol.  And after that, I was maneuvering
 7   around trying to get the -- our medical bag.
 8        Q.   And did you see the driver after he was taken
 9   out at some point?
10        A.   I saw him, but briefly, and from a distance.       01:10:21
11        Q.   So basically, you would at least agree that
12   based on your training, in order to use deadly force,
13   there would have to be an immediate or imminent threat
14   of death or serious bodily injury?
15        A.   Yes.                                                01:10:42
16        Q.   And would you at least agree if you had
17   realized that the truck was backing up slowly, you
18   wouldn't have fired?
19        A.   Not necessarily.  I can't speculate on what its
20   reverse actions were going to be.                            01:11:06
21        Q.   When the truck was backing up slowly, from
22   watching the video, did you see anyone about to be
23   struck by the truck?
24        A.   Again, from my -- my perception on the scene, I
25   didn't even see the vehicle backing until the shooting      01:11:24
```



DANIEL HOWARD                                      May 06, 2025
URQUIJO vs STATE OF CA                                      100

1   was -- had taken place and was over with.

2       Q.   Right.  But when you saw it on the video

3   backing up slowly during the shots, did you see anybody

4   about to be struck on the video?

5       A.   On the video, no.                          01:11:37

6       Q.   And you, being the closest person to the truck

7   when you were firing, you're not sure of that estimate

8   still, even from watching the video?

9       A.   "Estimate" of what?

10      Q.   The distance between yourself and the truck?   01:11:50

11      A.   No.

12      Q.   Do you know if it was more or less than 50

13  feet?

14      A.   Again, I would have to speculate.  I don't want

15  to give estimates for distances.                      01:12:04

16      Q.   Okay.  That's okay.

17           MR. GALIPO:  Okay.  That's all I have.  I'll

18  see if the other counsel have any questions today.

19           MR. LI:  I'll just be very short.

20                    EXAMINATION                         01:12:16

21  BY MR. LI:

22      Q.   First of all, Sergeant Howard, do you need a

23  break?

24      A.   I'm okay.

25      Q.   Okay.  Great.                                01:12:23



DANIEL HOWARD                                          May 06, 2025
URQUIJO vs STATE OF CA                                          111

```
 1        A.   No.   Again --
 2             (Simultaneous speakers.)
 3   BY MR. LI:
 4        Q.   -- before the shooting?
 5        A.   All I recalled was me yelling "Stop."  And if    01:29:14
 6   any other conversations were being had, I don't recall
 7   anything -- hearing anything.
 8             MR. LI:  Okay.  I have no further questions.
 9             MR. GALIPO:  Lee, do you have anything today?
10             MR. ROISTACHER:  No, thank you.                  01:29:33
11                  CONTINUED EXAMINATION
12   BY MR. GALIPO:
13        Q.   Just real quick, do you even know if the driver
14   of the truck heard you say "Stop" from that distance,
15   with the noise going on?                                   01:29:41
16        A.   I have no idea.
17        Q.   And when the vehicle was backing up, as we see
18   on the video, would it have been moving towards you or
19   away from you?
20        A.   From reviewing the video, it was going away      01:29:53
21   from me.
22             MR. GALIPO:  Okay.  That's all that I have.
23             And then I have some information off the record
24   about that document I can share with both of you.
25             MR. LI:  Okay.  Let's go off the record.         01:30:16
```



1 | STATE OF CALIFORNIA)
                      ) ss:
2 | COUNTY OF BUTTE    )

3

            I, KIMBERLY E. D'URSO, do hereby certify:
4

5            That the witness named in the foregoing

6 | deposition was present remotely and duly sworn to testify

7 | to the truth in the within-entitled action on the day and

8 | date and at the time and place therein specified;

9            That the testimony of said witness was reported

10 | by me in shorthand and was thereafter transcribed through

11 | computer-aided transcription;

12            That the foregoing constitutes a full, true and

13 | correct transcript of said deposition and of the

14 | proceedings which took place;

15            Further, that if the foregoing pertains to the

16 | original transcript of a deposition in a federal case,

17 | before completion of the proceedings, review of the

18 | transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20 | a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22 | my hand this 20th day of May, 2025.

23 | _____
                        *Kimberly D'urso*

24 | KIMBERLY D'URSO, CSR NO. 11372, RPR

25

